**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-99-CV-320-KC** |
| | § | |
| **YSLETA DEL SUR PUEBLO, et al.,** | § | |
| | § | |
| **Defendants**. | § | |

## Table of Contents

I.   BACKGROUND ................................................................................................ 1
  A.   Procedural History ...................................................................................... 1
  B.   The Show Cause Hearing ........................................................................... 9
    1.   Texas's witness testimony ...................................................................... 9
    2.   The Tribe's witness testimony .............................................................. 13
  C.   The Tribe's Sweepstakes .......................................................................... 20
    1.   The Kiosks ............................................................................................ 21
    2.   The Server ............................................................................................ 22
    3.   The POS ................................................................................................ 24
    4.   Means of entry ...................................................................................... 24
II.  CONTEMPT .................................................................................................. 25
  A.   Standard .................................................................................................... 25
  B.   Pueblo Defendants are in Contempt for Operating Unapproved Tribal Sweepstakes ...... 26
    1.   The Modified Injunction is not ambiguous .......................................... 27
    2.   The Tribe's sweepstakes are not National Third-Party Vendor Sweepstakes ............. 31
III. THE TRIBE'S SWEEPSTAKES MAY NOT CONSTITUTE LOTTERY ........................ 35
  A.   Texas Lottery Law .................................................................................... 37
    1.   Promotional sweepstakes and the element of consideration .......................... 39
      a.   Case law .......................................................................................... 40
        i.   Persuasive value of *Knebel* .................................................... 43
      b.   Texas Attorney General opinions ................................................... 45
  B.   Promotional Sweepstakes Are Not Per Se Illegal in Texas ............................ 52
    1.   The Tribe's product ............................................................................. 53
      a.   Casino-like atmosphere .................................................................. 57
    2.   Finite pool of predetermined results .................................................... 59
    3.   The Tribe's alternative means of free entry ......................................... 60
IV.  THE TRIBE'S KIOSKS AS GAMBLING DEVICES ............................................. 63
V.   THE PUEBLO DEFENDANTS' PROPOSAL AND TEXAS'S RIGHT TO RESPOND... 67
VI.  TEXAS'S CLAIM FOR COSTS ...................................................................... 70
VII. CONCLUSION .............................................................................................. 75

## ORDER

On this day, the Court considered Plaintiff State of Texas's ("Texas") Fifth Amended Motion for Contempt ("Motion for Contempt"), ECF No. 423, in the above-captioned case (the "Case"). For the reasons set forth below, Texas's Motion for Contempt is **GRANTED**. Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, Tribal Council, and Tribal Governor Francisco Paiz or his successor (the "Pueblo Defendants") are operating a tribal sweepstakes without judicial approval in contempt of the Court's September 27, 2001, injunction as modified by the Court's May 17, 2002, order.

Within sixty days of this Order, the Pueblo Defendants shall cease all gaming operations, including all sweepstakes promotions, being offered on the reservation of the Ysleta del Sur Pueblo. The Pueblo Defendants may, however, receive a temporary stay from the Court's order to cease gaming operations by submitting, within sixty days of this Order, a firm and detailed sweepstakes proposal for the Court's consideration. That stay shall remain in effect while the Court considers the legality of the proposal. Failure to either cease all gaming operations or submit the proposal within sixty days of this Order shall result in a civil contempt penalty of $100,000.00, jointly and severally, for each day the Pueblo Defendants remain in violation of this Order.

Furthermore, the Pueblo Defendants shall pay Texas's costs of investigation as well as attorney's fees, as described in more detail below.

## I.      BACKGROUND

### A.      Procedural History

The Motion for Contempt is only the most recent tangle in a protracted saga between Texas and the Ysleta del Sur Pueblo of the Tigua Indian tribe (the "Tribe"). For nearly fifteen years the Tribe has sought to institute various forms of gaming on its reservation, while Texas

has sought to enjoin those operations as violations of Texas gaming laws. To state in full the story of this litigation is beyond the scope of this opinion. The Court lays out below only the facts and orders relevant to the instant Motion for Contempt.

In 1987, Congress passed the Restoration Act, 25 U.S.C. § 1300g *et seq.*, granting the Tribe full federal trust status. Under the provisions of the Restoration Act, the Tribe is restricted from conducting certain gaming operations on its lands. *See id.* § 1300g-6. Pertinent to the Court's decision in the present Order is § 1300g-6(a), which provides that:

> All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the [T]ribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas.

*Id.* § 1300g-6(a).

Though the Restoration Act does not grant Texas civil or criminal regulatory jurisdiction over the Tribe's gaming activities, *see id.* § 1300g-6(b), Texas is not precluded "from bringing an action in the courts of the United States to enjoin violations of [§ 1300g-6(a)]." *Id.* § 1300g-6(c). Exclusive jurisdiction for such actions lies in the federal courts of the United States. *Id.*

In 1993, the Tribe opened the Speaking Rock Casino and Entertainment Center ("Speaking Rock")[1] on its reservation in El Paso, Texas. *See* Oct. 20, 2003, Order, ECF No. 179, at 1. Though Speaking Rock began as a bingo hall, it quickly expanded to a full-service casino offering a wide variety of gambling activities played with cards, dice, and balls. *See id.* at

---

[1] The Court notes that the Tribe ceased operation of Speaking Rock Casino and Entertainment Center on February 12, 2002. *See Texas v. Ysleta del Sur Pueblo*, 220 F. Supp. 2d 668, 711 (W.D. Tex. 2001). Nonetheless, the Tribe had subsequently reopened the facility as "Speaking Rock Entertainment Center" by 2007 at the latest. *See* Oct. 7, 2014, Tr. of Oral Arg., ECF No. 508, at 195. There is no evidence before the Court indicating that the physical facility which makes up the Speaking Rock Entertainment Center is different from the original Speaking Rock Casino and Entertainment Center. Accordingly, the Court refers to this facility simply as "Speaking Rock." In doing so, the Court makes no determination whether Speaking Rock Entertainment Center, as currently operated, is a "casino" or is otherwise operating illegally.

1-2; Sept. 27, 2001, Order Granting Summ. J. and Inj. (the "Original Injunction"), ECF No. 115, at 3-5.

On September 27, 1999, Texas filed its Original Complaint for Injunctive Relief ("Complaint") seeking to enjoin various agents and agencies of the Tribe from continuing to operate the gambling activities at Speaking Rock in violation of the Texas Penal Code and the Restoration Act.  *See* Compl., ECF No. 1, at 1, 11; *Texas v. Ysleta del Sur Pueblo*, 220 F. Supp. 2d 668, 709 (W.D. Tex. 2001) ("*Ysleta I*").  After the parties filed cross-motions for summary judgment, the Court issued its Original Injunction on September 27, 2001.  By the Original Injunction, the Court found the Tribe was conducting illegal gambling operations in violation of the Texas Penal Code and the Restoration Act.  Original Inj. 1-2.  The Court accordingly enjoined the Ysleta del Sur Pueblo, Tigua Gaming Agency, Tribal Council of the Ysleta del Sur Pueblo, tribal Governor Albert Alvidrez, tribal Lieutenant Governor Filbert Candelaria, Gaming Commissioner Francisco Hernandez, and the "officers, agents, servants, employees, and attorneys of the foregoing persons and parties" from operating a number of gaming activities played with cards, dice, balls, or any other gambling device. *Id.* at 3-5.  The Original Injunction had the "practical and legal effect of prohibiting illegal as well as legal gaming activities by the [Tribe]."  *Ysleta I*, 220 F. Supp. 2d at 699.

On October 12, 2001, Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, the Tribal Council, Tribal Governor Albert Alvidrez, Tribal Lieutenant Governor Filbert Candelaria, and Gaming Commissioner Francisco Hernandez (the "Pueblo Representatives") filed their Motion for New Trial and Motion to Amend Judgment ("Motion to Amend the Injunction"),[2]

---

[2] Throughout the fifteen years of this protracted litigation, the parties named in the numerous motions submitted to the Court have been inconsistent at best.  The Court therefore refers to the parties who filed the Motion to Amend the Injunction in 2001 as the "Pueblo Representatives," while the Court refers to the parties whom Texas seeks to hold in contempt by the instant Motion for Contempt as the "Pueblo Defendants."

ECF No. 118, asserting that the Original Injunction was overly broad for "enjoin[ing] all gaming activities regardless of their legality under Chapter 47 [of the Texas Penal Code.]"  *Id.* at 9.  On November 2, 2001, the Court denied the Motion to Amend the Injunction, concluding that "[a]fter the illegal operations cease and the nuisance is fully abated, the defendants are, of course, free to petition the Court for a modification of any of the terms of the [Original Injunction] that they believe might limit their ability to participate in any legal gaming activity for which they have qualified under Texas law."  Nov. 2, 2001, Order, ECF No. 126, at 3-4. After an unsuccessful appeal of the Court's refusal to modify the Original Injunction, the Tribe ceased operation of the prohibited gambling activities at Speaking Rock on February 12, 2002. *Ysleta I*, 220 F. Supp. 2d at 711.

Less than a month after ceasing operations at Speaking Rock, the Pueblo Representatives submitted their Emergency Motion for Clarification of Order Granting Summary Judgment and Injunction ("First Clarification Request"), ECF No. 160, on March 1, 2002.[3]  By the First Clarification Request, the Pueblo Representatives "request[ed] a clarifying declaration that" the use of certain electronic gaming devices and third-party sweepstakes would not violate the Original Injunction.  *Id.* at 3-5.  Specifically, the Pueblo Representatives sought a declaration that third-party sweepstakes conducted at the Tribe's stores by vendors such as Mobil 1, Nestlé Crunch, M&Ms, Corn Nuts, 7UP, Pepsi, Doritos, Cheerios, and Coca-Cola would not violate the Original Injunction.  *Id.* at 4-5.  Further, the Pueblo Representatives proposed that the Tribe itself be permitted to conduct sweepstakes "in compliance with the provisions of Chapter 43, of the Texas Business and Commerce Code."  *Id.* at 5.

---

[3] By the time of the March 1, 2002, filing, current Defendant Carlos Hisa had replaced Mr. Filbert Candelaria as the listed Tribal Lieutenant Governor.  *See* First Clarification Req. 1.

4

On May 17, 2002, the Court issued its Order Modifying September 27, 2001, Injunction ("May 17, 2002, Order"), ECF No. 165.  In relation to the third-party contests offered at the Tribe's stores, the Court noted that, though the Pueblo Representatives had not included specific information about the third-party contests, the Court "presume[d] that they [were] of a type that are common at fuel stations and grocery stores across the country." *Id.* at 13.  "For [that] reason," the Court modified the Original Injunction "to permit these and other like-national third party vendor contests" ("National Third-Party Vendor Sweepstakes"), "provided that no specific contest violates Texas gaming law." *Id.*  The Court refers to the Original Injunction, as modified by the May 17, 2002, Order, as the "Modified Injunction."[4]

Nonetheless, the Court rejected the Pueblo Representatives' request for the Tribe to be permitted to conduct its own sweepstakes ("Tribal Sweepstakes") because the Pueblo Representatives provided "no description of the proposed Tribal [S]weepstakes, nor any rules or regulations for such a proposal." *Id.*  The Court therefore declined to "modify the [Original Injunction] to permit the Tribe to conduct a [Tribal Sweepstakes] absent a firm and detailed proposal showing that said sweepstakes would be in compliance with Texas law." *Id.* at 14.

On September 9, 2003, Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, and the Tribal Council submitted their Second Emergency Motion for Clarification of Order Granting Summary Judgment and Injunction ("First Proposal"), ECF No. 177, seeking approval for a Tribal Sweepstakes promotion "in compliance with the provisions of Chapter 43 of the Texas Business and Commerce Code." *Id.* at 3.  Specifically, the First Proposal sought permission to conduct a "Running Bear Prepaid Phone Card Sweepstakes," which centered around sweepstakes entries granted in connection with the purchase of prepaid phone cards, as well as the related use of those cards in "sweepstakes validation terminal[s]." *See id.* at 3-4.

---

[4] The Court notes that the full text of the Modified Injunction can be found at *Ysleta I*, 220 F. Supp. 2d 668.

On October 20, 2003, the Court rejected the First Proposal on the grounds that the phone cards were "geared towards inducing purchasers to participate in the sweepstakes contest so that the Tribe will receive financial gain." Oct. 20, 2003, Order 12.

Undaunted by the Court's rejection, the Tribe began operating electronic gaming devices at Speaking Rock as early as 2008. *See* Aug. 3, 2009, Mem. Op. and Order Granting Mot. for Contempt ("Second Contempt Order"), ECF No. 281, at 4. The electronic devices resembled traditional eight-liner gambling devices and were operated by a card purchased with cash. *Id.* The Tribe issued any prizes won in the form of Visa debit cards. *Id.* at 5. In response, on March 14, 2008, Texas filed its Motion for Contempt for Violation of the September 27, 2001 Injunction, ECF No. 204.

On August 3, 2009, the Court issued its Second Contempt Order. After finding that a Visa debit card was the "equivalent of money" under the Texas Penal Code, the Court found Ysleta del Sur Pueblo, Tigua Gaming Agency, the Tribal Council, Tribal Governor Francisco Paiz, and Lieutenant Governor Carlos Hisa in contempt for operation of illegal "gambling devices" in violation of the Modified Injunction. Second Contempt Order 5, 7-8.

Simultaneous to the 2008 contempt proceedings, on May 30, 2008, Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, and the Tribal Council filed their Third Emergency Motion for Clarification of Order Granting Injunction ("Second Proposal"), ECF No. 241. The Second Proposal sought a declaration that the Tribe's "Texas Reel Skill" sweepstakes would not violate the Modified Injunction. *Id.* at 2-3. The Texas Reel Skill sweepstakes offered participants the ability to purchase a card containing Internet access minutes. *Id.* at 3. With that purchase, participants additionally obtained entries to a sweepstakes that could be played on electronic gambling simulators. *Id.* Sweepstakes entries were also available without purchase. *Id.*

Prior to the Court's ruling on the Second Proposal, the Tribe informed the Court that "representations of value" redeemable for "non purchasable products" at the Tribe's stores had replaced the Visa debit cards as prizes in the Tribe's sweepstakes.  *See* Aug. 4, 2009, Order Regarding Defs.' Third Mot. for Clarification ("Aug. 4, 2009, Order"), ECF No. 282, at 2.

On August 4, 2009, the Court rejected the Second Proposal.  *See id.*  The Court first found that the Tribe's "representations of value" were "indistinguishable" from the Visa debit cards, and therefore did not purge the illegality of the Tribe's gaming devices.  *Id.*  The Court next found that the Texas Reel Skills sweepstakes was distinguished from the First Proposal primarily "by the substitution of prepaid internet access cards for prepaid phone cards."  *Id.* at 4.  This substitution was a "distinction without a legal difference" and the Court accordingly refused the Tribe permission to carry out the sweepstakes.  *Id.* at 4-5.

Less than a week later, on August 10, 2009, Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, the Tribal Council, and Carlos Hisa filed their Notice of Filing Defendants' Proposal as Requested in this Court's Order Granting Motion for Contempt ("Third Proposal"), ECF No. 284.  The Third Proposal sought approval for the Tribe to conduct a sweepstakes in which participants obtained entries through "various free methods or through a donation to the Tribe."  Third Proposal Attach. 1, ECF No. 284-1, at 2.  Sweepstakes entries could be "revealed through the use of various game terminals," though "customers" could also "redeem their winning entries without engaging in a game should they so desire."  *Id.*  "The sweepstakes [would] be administered by a third party vendor through a central database server which [would] hold the [predetermined] sweepstakes prizes."  *Id.*  This "third party vendor" would "initiate a sweepstakes 'series' by generating a [predetermined] number of entries and corresponding prizes in the aforementioned database."  *Id.*

On October 18, 2010, the Court issued its Order Regarding Defendants' Motion to Approve Sweepstakes Proposal ("October 18, 2010, Order"), ECF No. 337, refusing permission to conduct the sweepstakes described in the Third Proposal. Though the Court rejected Texas's argument that the Third Proposal would necessarily violate the Texas Penal Code, the Court nonetheless refused permission to conduct the proposed sweepstakes because the Third Proposal lacked sufficiently detailed information regarding the proposed use of electronic gaming devices. *Id.* at 4-5.

Nonetheless, and in spite of the October 18, 2010, Order, the Tribe did not cease sweepstakes operations at Speaking Rock, and at some time between 2010 and 2012,[5] the Tribe opened a second sweepstakes operation at the Socorro Entertainment Center ("Socorro"). *See* Oct. 6, 2014, Tr. of Oral Arg. ("Oct. 6, 2014, Transcript"), ECF No. 507, at 95 (Lt. Loper indicating that Texas first learned Socorro was operating in 2012), 209 (Pueblo Defendants' attorney indicating that Socorro did not exist in 2010).

Nearly three years later, on September 24, 2013, Texas filed its Second Motion for Contempt for Violation of the September 27, 2001 Injunction, ECF No. 356; and, after a protracted series of three amendments spanning a period of six months, Texas filed the instant Motion for Contempt on March 17, 2014. Through a disjointed array of bullet points, the Motion for Contempt asserts that the Pueblo Defendants are in violation of the Modified Injunction in three respects: (1) for operating an unauthorized Tribal Sweepstakes; (2) for operating illegal lotteries under Texas law; and (3) for operating illegal gambling devices under Texas law. Mot. for Contempt 9, 11-13.

---

[5] The Court notes that neither party presented evidence at the Hearing indicating the exact date Socorro began operations.

On March 10, 2014, the Court held a hearing in an attempt to resolve the contempt issue; however, neither party was prepared to present evidence at that time.  Instead, the Court used that hearing as a status conference to schedule the future contempt hearing.

On September 24, 2014, the Court issued its Order to Show Cause, ECF No. 483.  By the Order to Show Cause, the Court ordered the Pueblo Defendants to appear and show cause that they are not in contempt of the Modified Injunction.  *Id.* at 35-36.

### B.    The Show Cause Hearing

On October 6 and 7, 2014, the Court held the Show Cause Hearing (the "Hearing").  At the Hearing, the Court admitted into evidence sixty-one separate exhibits totaling over a million and a half pages.  *See* Pl.'s Exs., ECF No. 503; Defs.' Exs., ECF No. 504.  In addition to the parties' exhibits, the Court heard testimony from a total of fifteen witnesses.  *See* Am. List of Witnesses, ECF No. 505.  The Court discusses the relevant testimony and evidence below.

### 1.    Texas's witness testimony[6]

Texas's first witness, Lieutenant James Ferguson ("Lt. Ferguson") of the Texas Attorney General's office, testified regarding inspections conducted at Speaking Rock and Socorro (collectively the "Entertainment Centers") in 2013 and 2014.  *See* Oct. 6, 2014, Tr. 19-20.  According to Lt. Ferguson, Speaking Rock was "probably as big as a Wal-Mart," and contained "rows and rows" of electronic gaming kiosks.  *Id.* at 21-22, 43.  Socorro, likewise, contained "an outer room [with] a few dozen machines" and "an interior room maybe the size of a basketball gymnasium that appeared to have hundreds of machines."  *Id.* at 40.  Speaking Rock contained

---

[6] In addition to the witnesses discussed below, Texas called Mr. Christopher Dobbs and Officer James Greg Dewees.  At the hearing, the Court sustained objections to Mr. Dobbs's testimony on relevance grounds, thus rendering it largely inadmissible.  *See* Oct. 6, 2014, Tr. 187.  Officer Dewees, on the other hand, testified to his observations during a 2010 inspection of Speaking Rock.  *Id.* at 209.  However, Officer Dewees later conceded on cross-examination that he has no personal knowledge of the Tribe's gaming operations since 2010.  *Id.*  Thus, although Officer Dewees's testimony was received without objection, the Court finds the testimony of Lt. Loper and Lt. Ferguson, who testified to similar facts based on personal knowledge from 2012-2014, more relevant.  Accordingly, the Court does not discuss Mr. Dobbs's or Officer Dewees's testimony here.

"very little light," *id.* at 26, while Socorro was well lit, but lacked windows. *Id.* at 50. The atmosphere in both Socorro and Speaking Rock was "very much . . . like casinos." *Id.* at 58.

Every gaming kiosk Lt. Ferguson witnessed contained a prominently displayed placard stating "No Donation Required." *Id.* at 43; Pl.'s Ex. 1.22. Nonetheless, Lt. Ferguson was unable to solicit a response from the kiosks without inserting cash. Oct. 6, 2014, Tr. 22. Upon insertion of cash, a message displayed informing Lt. Ferguson of the charitable nature and use of the donations. *Id.* The kiosk then asked Lt. Ferguson if he agreed to make a donation. *Id.* If Lt. Ferguson declined to donate, the kiosk printed a cash-out ticket returning the money inserted. *Id.*

When Lt. Ferguson agreed to donate, the kiosks displayed a series of buttons allowing him to either "max," "donate," or "play." *Id.* at 40. The exact language on the buttons differed by kiosk. *Id.* at 40, 61-62. "[W]henever the button was pushed to place a bet or to play, . . . a recording started playing much like a cartoon-type sound[]." *Id.* at 59. At other times, the kiosks produced the sounds of bells and whistles. *Id.* These sounds would "conclude when the roulette stopped turning or the cards stopped turning over." *Id.* at 59-60. Distinctive bells and whistles sounded when the kiosks produced a winning result. *Id.* at 60. Lt. Ferguson won cash prizes during his engagement with the kiosks. *Id.* at 23-24; *see also* Pl.'s Exs. 1.3, 1.5, 1.6.

Prior to conducting the inspection, Lt. Ferguson did not review any of the Case's materials or the Court's prior orders. Oct. 6, 2014, Tr. 53. Nor did Lt. Ferguson consult any authorities regarding what constituted a legal sweepstakes in Texas. *Id.* Lt. Ferguson did not, and does not, know what makes a sweepstakes legal under Texas law. *Id.* at 53-54.

During his visits to the Entertainment Centers, neither Lt. Ferguson, nor anyone from his team, inspected either the computer servers or the software running the gaming kiosks. *Id.* at 47-48. Furthermore, despite signs stating that no donation was necessary to play, Lt. Ferguson

made no effort to obtain free entries at either Socorro or Speaking Rock.  *Id.* at 57-58.  Lt. Ferguson additionally "did not read the [sweepstakes] rules," *id.* at 49, and does not know what was in the Tribe's records because he only looked at them briefly.  *Id.* at 57.

Texas next called Tom Loper, a lieutenant with the Criminal Investigation Division of the Texas Attorney General's Office ("Lt. Loper").  Lt. Loper's testimony regarded a 2012 inspection of the Entertainment Centers and was largely consistent with Lt. Ferguson's testimony.  Specifically, Lt. Loper estimated that he observed nearly one thousand gaming kiosks at Speaking Rock and close to four hundred kiosks at Socorro.  *Id.* at 85.  Lt. Loper further testified that the Entertainment Centers promoted a similar "environment" to legal casinos, including low lighting, participants rubbing the gaming kiosks in superstitious ways, and the distinctive sounds of bells, whistles, and coins falling into trays.  *Id.* at 83-84, 102.

Like Lt. Ferguson's subsequent inspection, Lt. Loper was "not tasked with the job of determining whether or not [he] could play [the] machines without paying." *Id.* at 94.  Rather, the sole purpose of Lt. Loper's inspection was to determine if he could insert money into the gaming kiosks and win cash prizes.  *Id.* at 89.  In doing so, Lt. Loper never saw or received free entry options during his inspection.  *Id.* at 84.  Accordingly, neither Lt. Loper nor his officers attempted to obtain free play vouchers.  *Id.* at 90.  Nor did Lt. Loper enter the inspection with a definition of a legal "sweepstakes" under Texas law.  *Id.* at 99.  Furthermore, neither Lt. Loper nor his team investigated the software underlying the sweepstakes.  *Id.* at 98.  Lt. Loper did, however, successfully insert money into the gaming kiosks and win cash prizes.  *Id.* at 82-83.

Texas next offered the testimony of Captain Daniel Guajardo ("Cpt. Guajardo") of the Law Enforcement Division of the Texas Attorney General's Office.  Cpt. Guajardo testified that Texas incurred a total cost of $71,937.27 conducting inspections of the Tribe's gaming

11

operations during 2012-2014.  *Id.* at 107; Pl.'s Ex. 38.  These expenses, Cpt. Guajardo testified, include the costs of travel, contracts, direct expenses, meals, hourly wages, and cash used to play the kiosks.  Oct. 6, 2014, Tr. 108.  According to Cpt. Guajardo, officers based in the Attorney General's offices in Austin and San Antonio carried out the inspections because the Attorney General's El Paso-based agents lacked the requisite "experience or knowledge" to carry out the inspection.  *Id.* at 111, 116.  Nonetheless, Cpt. Guajardo conceded that Texas would have incurred the costs of the Austin and San Antonio-based officers' salaries regardless of whether those officers were assigned to inspect the Entertainment Centers in El Paso, or to another inspection elsewhere.  *Id.* at 115.

Texas then called Karl Maahs ("Mr. Maahs"), General Manager at the Ysleta del Sur Pueblo.  Mr. Maahs testified that the Tribe contracts out the current sweepstakes operation to four third-party vendors.  *Id.* at 120.  These vendors are Blue Stone Entertainment, LLC ("Blue Stone"), Accelerated Marketing Solutions, LLC ("AMS"), XCite Amusement, Inc. ("XCite"), and Winter Sky, LLC ("Winter Sky").  *Id.*  Mr. Maahs stated that under the terms of the contracts, the third-party vendors provide the sweepstakes equipment and draft the sweepstakes' rules.  *Id.* at 121, 128.  In return, the Tribe remits to the vendors 30% of the total sweepstakes proceeds, net of the prize money paid out, with the Tribe retaining the remaining 70%.  *Id.* at 120.  According to Mr. Maahs, in 2012 and 2013, the Tribe "netted approximately" $30,000,000.00 each year in income from the sweepstakes, and remitted $15,000,000.00 to its vendors.  *Id.* at 121.  Mr. Maahs stated that this revenue sharing scheme is not advertised to sweepstakes participants.  *Id.* at 122.

Mr. Maahs further testified that participants may request free entries to the sweepstakes once per day at each of the Entertainment Centers.  *Id.* at 145.  A request grants free entry to

each of the four vendors' sweepstakes. *Id.* at 145-46. Mr. Maahs stated that the number of free entry credits provided with each request varies by promotion from 100 to 5,000, with an average of 800 credits per request. *Id.* at 146, 148. Additionally, Mr. Maahs testified that four to five hundred participants request free entries each day. *Id.* at 146. Mr. Maahs stated that in total, between February 2012 and October 2014, the Tribe received over a million and a half free entry applications. *Id.* at 147, 156; *see also* Defs.' Ex. H. According to Mr. Maahs, each of these free entry applications represents a single requesting participant, with an average of 800 free entry credits granted. Oct. 6, 2014, Tr. 147-48. In total, this equates to roughly $12,000,000.00 in free entry credits. *Id.* at 148.

Mr. Maahs also testified that the Entertainment Centers earn profit from the sale of food, beverages, merchandise, tobacco, and ticketed events, *id.* at 128, and in fact, nearly 35-40% of the Entertainment Centers' earnings come from food and beverage sales. *Id.* at 132. Mr. Maahs stated that cigarette sales produce an additional $3,500,000.00 in income. *Id.*

## 2.    The Tribe's witness testimony[7]

Linda Austin ("Ms. Austin"), Director of Operations at the Ysleta del Sur Pueblo, testified regarding the Tribe's annual budget. According to Ms. Austin, the Tribe uses its annual budget to provide direct services to the Tribe's members. *See* Oct. 7, 2014, Tr. of Oral Arg. ("October 7, 2014, Transcript"), ECF No. 508, at 157. These services include fire safety, border patrol, law enforcement, elderly care, vaccines, and educational scholarships. *Id.* at 164-65. Ms. Austin testified that because state and federal grants do not pay for the full costs of these programs, the Tribe pays the balance using its "general fund." *Id.* at 160. In 2013, the Tribe transferred $12,754,431.00 from the general fund to cover the costs of direct services. *Id.* at 163;

---

[7] In addition to the witnesses discussed below, the Tribe called Mr. Lou Bright, former General Counsel at the Texas Alcoholic Beverage Commission. Because Mr. Bright's testimony is not relevant to the instant order, the Court does not discuss his testimony below.

Defs.' Ex. AS, at 18.  Ms. Austin stated that the largest source of transfers to the general fund is donations from Speaking Rock and Socorro, which "impact every one of the programs offered by the Pueblo."  Oct. 7, 2014, Tr. 163.

The Pueblo Defendants also called the Tribe's Lieutenant Governor, Carlos Hisa ("Lt. Gov. Hisa"), to testify regarding the Tribe's governmental expenditures of the donations earned at the Entertainment Centers.  Specifically, Lt. Gov. Hisa testified that final decision-making authority on how the donations are spent lies with the Tribal Council.  *Id.* at 193-94.  According to Lt. Gov. Hisa, in deciding how to spend the donations, the Tribal Council prioritizes education, health care, public safety, and housing.  *Id.* at 194.  However, Lt. Gov. Hisa stated that although the Tribal Council prioritizes certain services over others, there are no formal restrictions regarding how the donations are spent.  *Id.* at 212.  Examples of programs recently funded by donations, according to Lt. Gov. Hisa, include services for the elderly, educational scholarships, border patrol services, the Tribe's police department, mental health care services for tribal veterans, day care programs, environmental initiatives, and efforts to revitalize the Tigua language.  *Id.* at 198-204.

The Pueblo Defendants further presented the testimony of Scott Brown ("Mr. Brown"), Production Manager at Speaking Rock and Socorro.  Mr. Brown testified that the Tribe offers non-gaming events such as live music, sports viewing, and wrestling matches at Speaking Rock and Socorro.  *Id.* at 90.  Special events at the Entertainment Centers can attract crowds as large as 20,000 people, excluding customers playing the gaming kiosks.  *Id*. at 95, 108.  Mr. Brown stated that the Tribe advertises these non-sweepstakes events through television, radio, and social media.  *Id*. at 95-97.  According to Mr. Brown, the advertisements make no mention of the

sweepstakes, *id.* at 97-99, and customers wishing to attend non-sweepstakes events are not required to enter or pass by the rooms containing the gaming kiosks. *Id.* at 106.

The Pueblo Defendants also presented two expert witnesses. First, the Pueblo Defendants questioned Russell Autry ("Mr. Autry"), an expert on public opinion research. Mr. Autry testified regarding the findings of a market research survey he conducted at Speaking Rock on March 10-12, 2014. *Id.* at 71, 73; Market Research Survey ("Autry Report"), Defs.' Ex. C. The Autry Report is the result of 763 questionnaires distributed to a random selection of customers at Speaking Rock. Autry Report 1. According to Mr. Autry, the survey found that 69% of respondents had received free sweepstakes entries at Speaking Rock.[8] Oct. 7, 2014, Tr. 75. Furthermore, 89% of respondents knew that "all of the proceeds of [Speaking Rock] are contributions that go to benefit the members of the Ysleta del Sur Pueblo." *Id.*; Autry Report 4. Mr. Autry testified that these numbers were "statistically significant." Oct. 7, 2014, Tr. 75-76. During a subsequent survey conducted on September 28, 2014, Mr. Autry found that 81% of respondents had attended a concert or other special event hosted by the Tribe. *Id.* at 76, 78. Mr. Autry testified, however, that neither of the surveys determined the "causation" for the respondents' presence at Speaking Rock. *Id.* at 82. Therefore, Mr. Autry explained that neither survey establishes whether respondents patronized Speaking Rock for the specific purpose of donating to the Tribe. *Id.* The Pueblo Defendants further presented the expert testimony of Robert Robicheaux ("Dr. Robicheaux"), a professor of marketing at the University of Alabama-Birmingham. *See* Oct. 6, 2014, Tr. 263. Dr. Robicheaux has forty years of experience "studying sweepstakes and other forms of sales promotion." *Id.* at 265. According to Dr. Robicheaux, all sweepstakes have three characteristics: (1) a finite set of predetermined prizes, (2) no means for a participant or operator to influence the chance of winning, and (3) an alternative means of free

---

[8] The survey contained a margin of error of +/- 3.6%. Oct. 7, 2014, Tr. 73.

entry.  *Id.* at 268-69.  Furthermore, Dr. Robicheaux testified that the product promoted by a sweepstakes need not be tangible.  *Id.* at 276, 286.  Nor, he explained, is there any requirement that a promotional sweepstakes last for either a limited or extended period of time.  *Id.* at 302.

According to Dr. Robicheaux, for a sweepstakes to have an alternative means of free entry, the sweepstakes sponsor "cannot require that any person who wants to participate in the sweepstakes has to buy anything."  *Id.* at 269.  However, Dr. Robicheaux testified that there is no required minimum percentage of participants that must enter through the free play alternative.  *Id.* at 270.  Indeed, Dr. Robicheaux explained that it is standard practice for sponsors to grant only a limited number of free entries to each participant per day.  *Id.* at 284.  While visiting Socorro, Dr. Robicheaux witnessed hundreds of people waiting in line to receive free entries.  *Id.* at 280.

After reviewing the Tribe's current gaming operation, Dr. Robicheaux testified that in his expert opinion "the sweepstakes promotions offered at the entertainment centers have all the . . . characteristics" of a sweepstakes.  *Id.* at 278.

The Pueblo Defendants additionally offered the testimony of three witnesses describing the technical mechanics of the sweepstakes offered at Speaking Rock and Socorro.  First, Randee Ralph Kerns ("Mr. Kerns"), Director of Business Development and Compliance at Diamond Game Enterprises ("Diamond Game"), testified regarding the sweepstakes operated by Diamond Game and Blue Stone.[9]  Oct. 7, 2014, Tr. 7.  According to Mr. Kerns, Blue Stone controls the implementation of its sweepstakes at the Entertainment Centers, including control over the rules by which the sweepstakes operate.  *Id.* at 8.  Mr. Kerns testified that the Tribe is not authorized to make any alterations to Blue Stone's gaming hardware or software.  *Id.* at 11.  Nonetheless, he

---

[9] Diamond Game leases its equipment to Blue Stone which, in turn, provides the gaming equipment to the Entertainment Centers.  *See* Decl. of Randee Kerns, Defs.' Ex. O, at 1.  Mr. Kerns therefore has personal knowledge of the technical aspects of Blue Stone's sweepstakes.

explained, the sweepstakes are run for the benefit of the Tribe, *id.* at 44, and neither Blue Stone nor Diamond Game sells a product in connection with a sweepstakes at Speaking Rock or Socorro.  *Id.*

Mr. Kerns also testified that Blue Stone's sweepstakes contain "a finite pool of [predetermined] prizes available for each donation level."  *Id.* at 13.  These prizes are "fixed[,] . . . locked down in a set, and . . . issued out in order to the kiosks one by one as the kiosks request a result."  *Id.*  Moreover, according to Mr. Kerns, Blue Stone provides participants the option of obtaining free entry credits at the Entertainment Centers, by mail, or over the Internet. *Id.* at 14.  However, he explained, playing by free entry does not alter the odds of winning a prize.  *Id.* at 15.  Between September 30, 2013, and September 28, 2014, Blue Stone issued 598,359 free entry credits.  *Id.* at 26.

Mr. Kerns testified that Blue Stone's gaming kiosks do not contain any electronic or mechanical means of creating a randomized result.  *Id.* at 20.  Therefore, according to Mr. Kerns, the kiosks' graphical displays do not change the odds, result, or amount of any prize awarded. *Id.* at 16-17.  Further, Mr. Kerns stated that all of Blue Stone's kiosks are attached to a server, *id.* at 18, and if a kiosk is not connected to a server the kiosk cannot be used.  *Id.* at 42. Accordingly, Mr. Kerns testified that the server, the wiring, and the kiosks are all "essential parts" of the sweepstakes' administration.  *Id.*

Mr. Kerns further states that prior to the start of the sweepstakes, the computer server takes a finite pool of preprogrammed results and shuffles them once.  *Id.* at 20.  He then explained that each sweepstakes pool has an expiration date upon which the pool will terminate if all the predetermined entries have not been used.  *Id.* at 46.  Mr. Kerns stated that the information remaining upon termination is archived and a new sweepstakes is created.  *Id.*  The

servers are designed, however, to create a new pool of entries if the current pool is exhausted

prior to the sweepstakes' expiration date. *Id.* at 37-38. Mr. Kerns testified that upon creation of

a new pool, a random number generator is used to shuffle the pool's predetermined results. *Id.* at

35.

Jack Saltiel ("Mr. Saltiel"), President of Eclipse Gaming Systems, provided similar

testimony indicating that AMS's sweepstakes operate substantially similarly to Blue Stone's.[10]

According to Mr. Saltiel, AMS currently has approximately three-hundred kiosks at the

Entertainment Centers. *Id.* at 130. He described AMS's kiosks as "upright cabinets with two

video displays, a bill acceptor[,] . . . a printer, and some buttons on them in order to interact with

the users." *Id.* at 115. Mr. Saltiel testified that the kiosks' simulated gaming displays are

"designed to create the look and the feel of casino-like games." *Id.* at 133. However, Mr. Saltiel

explained that the kiosks merely "present the result of a previously determined outcome," and,

"[w]ithin the kiosk itself, there is no game that is actually played." *Id.* at 115. Therefore,

according to Mr. Saltiel, participants cannot alter the predetermined result through interaction

with the kiosk. *Id.* at 116.

Mr. Saltiel additionally testified that AMS provides participants with an alternative

means of free entry. *Id.* at 122. He further stated that no advantage is gained by entering the

sweepstakes through donation, as all entries are drawn from the same finite pool and the odds of

winning do not change based on the means of entry. *Id.* at 122, 127. Furthermore, Mr. Saltiel

testified that AMS's sweepstakes contain a predetermined number of winning entries that "are

generated when the sweepstakes [are] started." *Id.* at 121-22, 125. According to Mr. Saltiel, all

---

[10] Eclipse Gaming Systems produces the software run by AMS. Oct. 7, 2014, Tr. 110. Accordingly, Mr. Saltiel has personal knowledge regarding the operation of AMS's sweepstakes. *Id.* at 114.

entries are drawn from the same finite pool and distributed in a previously shuffled order maintained on a server.  *Id.* at 122.

Mr. Saltiel testified that AMS's kiosks cannot reveal the predetermined results without being connected to a server, *id.* at 126, and the server, likewise, cannot operate without being attached to the kiosks.  *Id.* at 137.  Therefore, Mr. Saltiel stated that the server and the kiosks are both "component[s] of the overall system."  *Id.*[11]

Finally, the Pueblo Defendants presented the testimony of Richard Henry Williamson ("Mr. Williamson"), a former employee of BMM Test Labs.  Oct. 6, 2014, Tr. 221.  Mr. Williamson testified that BMM Test Labs ("BMM") is an internationally recognized company specializing in the certification of gaming software.  *Id.* at 222-23.  According to Mr. Williamson, BMM conducted lab testing on all four of the Tribe's third-party vendors' sweepstakes systems.  *Id.* at 225, 241.  Based on this testing, BMM produced a report certifying that all four vendors' software met a series of specifications provided by the Pueblo Defendants' attorney.  *Id.* at 241, 250; BMM Certification Test Report ("BMM Report"), Defs.' Ex. A.[12]  Mr. Williamson further testified that BMM subsequently conducted two on-site inspections at Socorro and Speaking Rock in 2013 and 2014 to ensure that the software operated in practice as it did during lab testing.  Oct. 7, 2014, Tr. 225; BMM Field Inspection Report, Defs.' Ex. B. Through this testing, he explained, BMM verified that the sweepstakes software at Socorro and

---

[11] The parties did not present witness testimony discussing the sweepstakes operated by XCite or Winter Sky.  There is no indication, however, that the parties dispute that these sweepstakes operate similarly to the sweepstakes offered by AMS and Blue Stone.  Furthermore, non-testimony evidence in the record tends to establish that the sweepstakes of all four vendors operate in a substantially similar manner.  *See* BMM Certification Test Report ("BMM Report"), Defs.' Ex. A.

[12] The top of the columns in the BMM Report are redacted for unknown reasons.  However, testimony at the Hearing established that the left column heading states the "criteria" used to test the software, while the right column heading states the "test results."  *See* Oct. 6, 2014, Tr. 230.

Speaking Rock operated as indicated in the BMM Report as recently as August 2013.  Oct. 7, 2014, Tr. 244.

> ### C.    The Tribe's Sweepstakes

Based upon the undisputed evidence presented at the hearing and information otherwise available in the record, the Court understands the following regarding the sweepstakes currently offered by the Tribe at its Entertainment Centers.

Both Speaking Rock and Socorro offer sweepstakes operated by the four third-party vendors - Blue Stone, Winter Sky, AMS, and XCite.  *See* Oct. 6, 2014, Tr. 120; *see also* Accelerated Marketing Solutions, LLC Compliance Statement ("AMS Compliance Statement"), Pl.'s Ex. 35, at 2; Letter from Brian Bonnette to Randolph Barnhouse (Nov. 27, 2012) ("Winter Sky Letter"), Pl.'s Ex. 36, at 1.  The sweepstakes are run to solicit donations for the Tribe.  Oct. 7, 2014, Tr. 44.  Indeed, the third-party vendors do not sell a product in connection with the sweepstakes.  *See* Oct. 7, 2014, Tr. 44 (Blue Stone); *see also* Winter Sky LLC's Stipulation of Facts ("Winter Sky Stipulation"), Pl.'s Ex. 13, at 1; XCite Amusement, Inc.'s Stipulation of Facts ("XCite Stipulation"), Pl.'s Ex. 14, at 1; Accelerated Marketing Solutions, LLC's Stipulation of Facts ("AMS Stipulation"), Pl.'s Ex. 15, at 1.

Participants play the sweepstakes through hundreds of electronic gaming systems offered at Speaking Rock and Socorro.  *See* Oct. 6, 2014, Tr. 40, 85; Oct. 7, 2014, Tr. 130.  The electronic sweepstakes systems consist of three components: (1) video sweepstakes terminals ("Kiosks"), (2) a central server ("Server"), and (3) a point of sale system ("POS").  *See* BMM Report 9 (Blue Stone), 27 (AMS), 44 (Winter Sky), 57 (XCite).  Before proceeding with its analysis, the Court briefly discusses each of these components, as well as the Tribe's free-entry alternative, in more detail below.

1.      **The Kiosks**

The Kiosks are responsible for providing an entertaining display for the redemption of sweepstakes tickets, BMM Report 9 (Blue Stone), 27 (AMS), 44 (Winter Sky), 57 (XCite), and are "upright cabinets with two video displays, a bill acceptor and a printer." Oct. 7, 2014, Tr. 115; *see also* May 6, 2014, Incident Supplement Page ("May 6, 2014, Report"), Pl.'s Ex. 1, at 9. Participants begin an interaction with a Kiosk by inserting either cash or pre-obtained free entry vouchers into the Kiosk's bill reader. Oct. 6, 2014, Tr. 22; Oct. 7, 2014, Tr. 9.

When a participant enters cash into a Kiosk's reader, a message appears on the Kiosk's screen stating that all "donations" go toward helping fund the Tribe's services in health care, education, public safety, elder care, veterans' services, and after school and day care programs. May 6, 2014, Report 3; Oct. 6, 2014, Tr. 22; Oct. 7, 2014, Tr. 28, 49. This message further informs participants more specifically which "entities" are assisted by their donations. *See* May 6, 2014, Report 5. After the message is displayed, a screen prompts the participant to either agree or disagree to make a donation. *Id*. at 3; Oct. 6, 2014, Tr. 22. Each Kiosk, however, has a sign informing the participant that no donation is necessary. Oct. 6, 2014, Tr. 43; May 6, 2014, Report 3, 5. If a participant does not agree to donate, the Kiosk prints a "cash-out ticket" in the amount inserted into the Kiosk. Oct. 6, 2014, Tr. 22; *see also* May 6, 2014, Report 3. If a participant agrees to make a donation, however, the Kiosk displays a series of touch screen buttons that allow the participant to either "max," "donate," or "play." Oct. 6, 2014, Tr. 40, 61-62; *see also* May 6, 2014, Report 11. The exact language displayed on the Kiosks' buttons differs by Kiosk. Oct. 6, 2014, Tr. 40.

After a participant touches the "max," "donate," or "play" button, the Kiosk uses "[v]isual entertainment" to indicate whether the sweepstakes entries represent a winning or

losing result.  *See* BMM Report 34 (AMS), 49 (Winter Sky), 60 (XCite), 116 (Blue Stone).  This visual entertainment is "designed to create the look and the feel of casino-like games."  Oct. 7, 2014, Tr. 133.

The Kiosks themselves contain no random number generators or any other capacity to create a random result.  *Id.* at 20.  Nor do the Kiosks' visual entertainment displays alter or determine the sweepstakes result.  *See* BMM Report 34 (AMS) (Kiosk cannot independently alter or set the value of a result), 60 (XCite) (same), 84 (Winter Sky) (same), 94 (Blue Stone) (same).  The Kiosks can only read the value of a result sent by the Server.  *See id.* at 34 (AMS), 60 (XCite), 84 (Winter Sky), 94 (Blue Stone).  Accordingly, "[t]he entertaining display is solely determined by the outcome delivered to the [Kiosk] by the [Server]."  *Id.* at 27 (AMS), 44 (Winter Sky), 57 (XCite), 91 (Blue Stone).  Indeed, in order to obtain a sweepstakes result, the Kiosk must be connected to a Server.  Oct. 7, 2014, Tr. 42, 126.

### 2.  The Server

The Server is the "core component" of the sweepstakes systems.  BMM Report 9 (Blue Stone), 27 (AMS), 44 (Winter Sky), 57 (XCite).  Software hosted on the Server creates sweepstakes by generating randomized pools of sweepstakes entry results.  *See id.* at 14 (Blue Stone), 33 (AMS), 48 (Winter Sky), 60 (XCite).  Each sweepstakes consists of multiple "donation levels."  Oct. 7, 2014, Tr. 35-36.  The "donation level" refers to the number of sweepstakes credits needed to obtain a single entry result from the pool.  *Id.*  There is one pool of results created for each donation level, *id.* at 35, with multiple Kiosks potentially connected to a single pool.  *Id.* at 42.

Within each pool the Server creates a finite number of entries, *see* BMM Report 33 (AMS), 48 (Winter Sky), 60 (XCite), 115 (Blue Stone), and assigns each entry a fixed value

upon creation. *See id.* at 33 (AMS), 48 (Winter Sky), 60 (XCite); Oct. 7, 2014, Tr. 13 (Blue Stone). Therefore, the Server creates a finite number of predetermined winning entries when each pool is assembled. *See* BMM Report 33 (AMS), 48 (Winter Sky), 60 (XCite), 115 (Blue Stone); Oct. 7, 2014, Tr. 13 (Blue Stone).

Once the pool of fixed results is created, a random number generator shuffles the results in the pool. *See* BMM Report 13 (Blue Stone), 59 (XCite). Neither the participant nor the sweepstakes "operator" is able to alter the order of the sweepstakes results once they are shuffled. *See id.* at 34 (AMS), 47 (Winter Sky), 58 (XCite), 92 (Blue Stone).

The Server, upon request, sends a sweepstakes result from a pool to a Kiosk, which in turn displays the result in an entertaining fashion. *See id.* at 34 (AMS), 60 (XCite), 74 (Winter Sky), 94 (Blue Stone). The means of choosing which sweepstakes result is sent to the Kiosk differs between the four vendors. Some vendors select entries sequentially from the randomized pool. *See id.* at 32 (AMS), 59 (XCite), 93 (Blue Stone). Other vendors employ a random number generator to pick a random result located in the pool. *Id.* at 48 (Winter Sky). Regardless of the means of selecting the particular entry result, "[o]nce [an] outcome has been dispensed and displayed, it is marked as burned in the database" and cannot be used again. *Id.* at 33 (AMS), 48 (Winter Sky), 59 (XCite); *accord id.* at 93 (Blue Stone).

"[A]ll sweepstakes entries, made with or without purchase or donation, are drawn from the same sweepstakes pool." *See id.* at 35 (AMS), 50 (Winter Sky), 61 (XCite); *accord id.* at 15 (Blue Stone). Accordingly, a participant's chance of winning a sweepstakes is not increased by purchasing a product, making a donation, or providing personal information. Oct. 6, 2014, Tr. 238; Oct. 7, 2014, Tr. 127.

Each sweepstakes pool continues until it expires or all entries have been dispensed.  *See* BMM Report 16 (Blue Stone), 35 (AMS), 61 (XCite), 74 (Winter Sky).  However, if the sweepstakes pool empties before the expiration date, the system is designed to create an identical pool that is again randomly shuffled.  *See id.* at 32 (AMS), 72 (Winter Sky), 92 (Blue Stone).  Therefore, though each created pool contains a finite number of entries and a finite time period, there is, theoretically, an infinite series of identical pools generated as needed until the sweepstake's deadline ends.  *See id.* at 32 (AMS), 72 (Winter Sky), 92 (Blue Stone); *see also* Oct. 6, 2014, Tr. 255-56.

### 3.      The POS

The POS is a computer terminal the Entertainment Centers' cashiers use to accept donations and distribute sweepstakes entries.  Oct. 7, 2014, Tr. 19.  It offers participants the opportunity to make donations and reveal sweepstakes results without engaging a Kiosk.  *Id.* at 18-19, 57.  However, the POS can also print bar coded sweepstakes tickets for use at the Kiosks.  BMM Report 9 (Blue Stone), 27 (AMS), 44 (Winter Sky), 57 (XCite).  Entries obtained through the POS are drawn from the same pool as entries revealed through the Kiosks.  Oct. 7, 2014, Tr. 19.

### 4.      Means of entry

Participants may receive sweepstakes entries either in connection with a donation to the Tribe or through a request for free entry without donation.  *See* BMM Report 15 (Blue Stone), 33 (AMS), 48 (Winter Sky), 59 (XCite).  Participants receive approximately one sweepstakes entry credit per one cent donated.  Oct. 6, 2014, Tr. 212.  The amount of sweepstakes entry credits provided with an in-person request for a free voucher varies from 1 to 5,000.  *Id.* at 145-46.  The average number of free entries received per request for entry without donation is 800.  *Id.* at 148.

Signage informing participants that no donation is necessary to play is posted on Kiosks and walls throughout both Entertainment Centers. *Id.* at 43; May 6, 2014, Report 49. This "signage is clear throughout the facilit[ies]." Oct. 6, 2014, Tr. 281; *see also id.* at 43.

Around four to five hundred people a day request free entries at the Entertainment Centers. *Id.* at 146. In total, the Tribe received over a million and a half free entry forms between 2012-2014. *See id.* at 147; Defs.' Free Entry Appls., Defs.' Ex. H; *see also* No Donation Necessary Forms from Entertainment Centers from March 13 through 19, 2012, Defs.' Ex. D; No Donation Necessary Forms from Entertainment Centers from May 7 through 9, 2012, Defs.' Ex. E; No Donation Necessary Forms from Entertainment Centers from July 9, 2013, Defs.' Ex. F; No Donation Necessary Forms from Entertainment Centers from May 16, 2014, Defs.' Ex. G. Though each free entry application represents a single participant, more than a single sweepstakes entry credit is granted per voucher. Oct. 6, 2014, Tr. 147-48.

## II.   CONTEMPT

### A.   Standard

"'A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order.'" *Seven Arts Pictures, Inc. v. Jonesfilm*, 512 F. App'x 419, 422 (5th Cir. 2013) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). "[E]vidence is clear and convincing only if it 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established' [which] 'enable[s] the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.'" *Oaks of Mid City*

*Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013) (quoting *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995)).

### B.     Pueblo Defendants are in Contempt for Operating Unapproved Tribal Sweepstakes

Texas argues that the Pueblo Defendants are in contempt of the Modified Injunction for operating a Tribal Sweepstakes without first obtaining the Court's approval. *See* Mot. for Contempt 9.

The Pueblo Defendants respond that they cannot be held in contempt because the Modified Injunction is ambiguous and open to more than one interpretation. *See* Oct. 6, 2014, Tr. 11-12, 215-16; Oct. 7, 2014, Tr. 231. While the Pueblo Defendants do not clearly articulate the basis for this contention, the Court understands the Pueblo Defendants to assert that the Court's September 27, 2001, Order is ambiguous as to what it permits and prohibits, and therefore one possible interpretation of the Modified Injunction would allow the Tribe to conduct the sweepstakes currently offered at Speaking Rock and Socorro. Specifically, according to the Pueblo Defendants, the sweepstakes currently offered at Speaking Rock and Socorro are permitted National Third-Party Vendor Sweepstakes for which the Pueblo Defendants did not need prior judicial approval. Oct. 6, 2014, Tr. 12; Oct. 7, 2014, Tr. 231-34.

"The judicial contempt power is a potent weapon which should not be used if the court's order upon which the contempt was founded is vague or ambiguous." *In re Baum*, 606 F.2d 592, 593 (5th Cir. 1979) (citing *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)); *accord Martin*, 959 F.2d at 47. "Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 (5th Cir. 1975) (citing *Int'l Longshoremen's Ass'n*,

389 U.S. at 76); *accord Salazar ex rel. Salazar v. Dist. of Columbia*, 602 F.3d 431, 442 (D.C. Cir. 2010); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006); *Islander E. Rental Program v. Barfield*, No. 96-41275, 145 F.3d 359, at *3-4 (5th Cir. Mar. 24, 1998).   Accordingly, Federal Rule of Civil Procedure 65(d) requires that any injunction must "state its terms specifically" and "describe in *reasonable detail . . . that act or acts restrained or required.*"  Fed. R. Civ. P. 65(d) (emphasis added); *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013).  Nonetheless, "[w]hile injunctions should be specific, the command for specificity is not absolute; it merely requires injunctions to be 'framed so that those enjoined will know what conduct the court has prohibited.'"  *Martin's Herend Imps., Inc. v. Diamond & Gem Trading United States of America Co.*, 195 F.3d 765, 771 (5th Cir. 1999) (quoting *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981)).  "[A] district court is entitled to a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order."  *Hornbeck*, 713 F.3d at 792.

## 1.     The Modified Injunction is not ambiguous

As stated above, the Original Injunction has the "practical and legal effect of prohibiting illegal as well as legal gaming activities by the [Pueblo Defendants]."  *Ysleta I*, 220 F. Supp. 2d at 699.  The Pueblo Defendants are well aware of the Original Injunction's broad prohibition against both legal and illegal gaming; indeed, several of the Pueblo Defendants have directly attacked the Original Injunction as overbroad on this very basis.  *See* Mot. to Am. the Inj. 9 (Pueblo Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, and Tribal Council recognizing that the Original Injunction "enjoin[s] all gaming activities regardless of their legality under Chapter 47 [of the Texas Penal Code].");  *Ysleta I*, 220 F. Supp. 2d at 701-02.  In

response, the Court made clear that in order to offer any gaming on its lands, the Tribe must first "petition the Court for a modification of any of the terms of the [Original] [I]njunction that they believe might limit their ability to participate in any legal gaming activity for which they have qualified under Texas law."  Nov. 2, 2001, Order 3-4.

On March 1, 2002, the Pueblo Representatives submitted such a petition by their First Clarification Request, seeking "a clarifying declaration" that certain contests offered by third-party vendors at the Tribe's Big Bear Lube Express and Running Bear stores did not violate the Original Injunction.  First Clarification Req. 3-5.  The Pueblo Representatives specifically enumerated a number of national vendors offering sweepstakes at the Tribe's stores, including Mobil 1, Nestlé Crunch, M&Ms, Corn Nuts, 7UP, Pepsi, Doritos, Cheerios, and Coca-Cola.  *Id.* at 4-5.

On May 17, 2002, in response to the First Clarification Request, the Court modified the Original Injunction to permit certain third-party vendor contests "conducted at [the Tribe's] Big Bear Lube Express [and] . . . Running Bear [s]tores."  *See* May 17, 2002, Order 12-13.  In doing so, the Court explicitly referred to the same vendors listed in the First Clarification Request – namely, Mobil 1, Nestlé Crunch, M&Ms, Corn Nuts, 7UP, Pepsi, Doritos, Cheerios, and Coca-Cola.  *See id.*  The Court then explained,

> Though the record does not include specific information about each of these contests or giveaways, the Court will presume that they are of a type that are common at fuel stations and grocery stores across the country.  *For this reason*, the injunction will be modified to permit these and other like-national third party vendor contests, provided that no specific contest violates Texas gaming law.

*Id.* at 13 (emphasis added).

While the Pueblo Defendants spend considerable resources attempting to take this passage out of context, it means exactly what it says and no more: that the Original Injunction

was modified to permit only the enumerated contests offered at the Tribe's stores and "other *like*-national third party vendor contests" that are "*of a type* . . . common at fuel stations and grocery stores across the country." *Id*. (emphasis added). This language is clear on its face.

Still, the Court further delineated the boundaries of the permissible contests by listing specific vendors' contests as examples of the sort permitted, and explaining that the permitted sweepstakes were of a type found at particular businesses – grocery stores and gas stations. *Id.* at 12-13. The Court's plain language, as well as the specific examples which further delineate the boundaries of the permitted contests, are sufficiently clear to give the Pueblo Defendants adequate notice of what conduct remained prohibited. *See Lady Primrose's, Inc. v. After Hours Bath Prods., Inc.*, No. 99-40753, 211 F.3d 125, at *5, *5 n.8 (5th Cir. Mar. 6, 2000) (holding that injunction which prohibited "offering for sale the After Hours French Lace Dusting Powder *or any similar product*" was sufficiently clear) (emphasis added); *Medtronic, Inc. v. Benda*, 689 F.2d 645, 649 (7th Cir. 1982) (holding injunction sufficiently specific where court "elaborate[d] on the prohibition by identifying several specific acts which [were] covered . . . [thus] help[ing] to clarify the boundaries of the injunction"). Though the Modified Injunction encompasses a range of potential contests by permitting "other like-national third party vendor contests," *see Ysleta I*, 220 F. Supp. 2d at 705, given the large variety of products presumably sold at the Tribe's stores, the Court finds "the [Modified Injunction's] degree of specificity here is appropriate in light of the commercial environment in which [it] applies." *See Lady Primrose's*, 211 F.3d 125 at *5 n.8 (citing *United States v. Central Adjustment Bureau, Inc.*, 823 F.2d 880, 881 (5th Cir. 1987)).

Moreover, the Court modified the Original Injunction in response to the Pueblo Representatives' request for "nothing more than a clarification that the [Tribe] may" permit

certain third-party contests at the Tribe's stores. *See* First Clarification Request 1, 4. In permitting the contests at the Tribe's stores, the Court set out its modification in nearly identical language to that contained in the Pueblo Representatives' request, including a full listing, virtually verbatim, of the contests for which the Pueblo Representatives sought clarification. *Compare* First Clarification Request 4-5, *with* May 17, 2002, Order 12-13, *and Ysleta I*, 220 F. Supp. 2d at 705. The Court will not permit the Pueblo Defendants to now cast a shadow of ambiguity onto a Court order that so closely tracks the language of several of the Pueblo Defendants' own request.[13] *See ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 348 (5th Cir. 2008) ("Appellant's argument that the injunction's language is not sufficiently specific also fails because the language of the injunction closely tracks the bargained-for contractual language of the confidentiality provision."). For the Pueblo Defendants to attempt so here approaches bad faith.

Furthermore, it appears that the Pueblo Defendants themselves are well aware that the current sweepstakes operations are not National Third-Party Vendor Sweepstakes. On August 10, 2009, the Pueblo Defendants submitted their Third Proposal for the Court's approval. *See* Third Proposal. The gaming operations contemplated in the Third Proposal appear to be substantially similar to the sweepstakes currently offered at the Entertainment Centers. Indeed, both operations (1) center on the Tribe providing sweepstakes entries to patrons who make a donation to the Tribe, *compare* Third Proposal Ex. 1, at 2, *with* Oct. 7, 2014, Tr. 236, (2) involve the use of electronic gaming kiosks, *compare* Third Proposal Ex. 1, at 2, *with* Oct. 6, 2014, Tr. 40, 85, *and* Oct. 7, 2014, Tr. 130, and (3) are administered by a third-party vendor through a central database. *Compare* Third Proposal Ex. 1, at 2, *with* Ysleta del Sur's Answers and Objs.

---

[13] Pueblo Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, and Tribal Council were among the Tribal Representatives that submitted the First Clarification Request, and are, therefore, well aware of the language and purpose of the submitted request. *See* First Clarification Req. 1.

to Pl.'s First Set of Interrs., Pl.'s Ex. 10, at 2, *and* Ysleta del Sur Tribal Council's Answers and

Objs. to Pl.'s First Set of Interrs., Pl.'s Ex. 11, at 2, *and* BMM Report 9 (Blue Stone), 27 (AMS),

44 (Winter Sky), 57 (XCite).

At the Hearing, the Pueblo Defendants themselves characterized the Third Proposal as a

request for a Tribal Sweepstakes.  *See* Oct. 6, 2014, Tr. 138 ("Docket 284, filed August the 10th

of 2009, was the Proposal for Tribal Sweepstakes.").  In light of this admission, and given the

similarity between the Third Proposal and the current sweepstakes, the Pueblo Defendants

cannot argue in good faith that the Modified Injunction was too ambiguous to give the Pueblo

Defendants reasonable notice of the prohibited activity.  *See Hornbeck*, 713 F.3d at 792 ("[A]

district court is entitled to a degree of flexibility in vindicating its authority against actions that,

while not expressly prohibited, nonetheless violate the reasonably understood terms of the

order.").  Accordingly, the Pueblo Defendants' claim of ambiguity is specious at best.

For the above mentioned reasons, the Court finds that the meaning of the Modified

Injunction was sufficiently specific and detailed for the Pueblo Defendants to "know what

conduct the court has prohibited."  *See Martin's Herend Imps., Inc.*, 195 F.3d at 771.

## 2.      The Tribe's sweepstakes are not National Third-Party Vendor Sweepstakes

Having determined that the Modified Injunction is not unclear or ambiguous, the Court

now turns to the Pueblo Defendants' argument that the Tribe's current sweepstakes are National

Third-Party Vendor Sweepstakes, which the Modified Injunction would permit.  Though the

Pueblo Defendants try hard to make much of this issue, the truth of the matter is simple: The

Tribe's current sweepstakes are not a permitted National Third-Party Vendor Sweepstakes.

As an initial matter, the contests allowed by the Modified Injunction are contests

promoting third-party products sold at the Tribe's stores.  *See* May 17, 2002, Order 12-13;

*Ysleta I*, 220 F. Supp. 2d at 705. All fourteen contests enumerated in the Modified Injunction are sweepstakes offered by third-party vendors to promote those third-party vendors' consumer products commonly found at grocery stores and fuel stations. Here, there is no contention whatsoever, let alone any evidence, that the sweepstakes offered at Speaking Rock and Socorro are attached to any third-party product. Indeed, the evidence demonstrates that, to the contrary, the sweepstakes are run purely for the benefit of the Tribe. Oct. 7, 2014, Tr. 44. And, though operated by third-parties, none of the Tribe's current sweepstakes sell or promote a third-party product of any sort in connection with the sweepstakes, and certainly not any products comparable to the oil promoted by Mobil 1, or the candy promoted by M&Ms, or any of the other products offered at the Tribe's stores, as set out in the Modified Injunction. *See* Winter Sky Stipulation 1; XCite Stipulation 1; AMS Stipulation 1; *see also* Oct. 7, 2014, Tr. 44; Oct. 6, 2014, Tr. 25. In a fashion utterly incomparable to the contests enumerated in the Modified Injunction, here, the *Tribe* promotes donations to the *Tribe* through devices provided by third-party vendors of gaming systems.

Furthermore, the Tribe's sweepstakes are not "of a type that are common at fuel stations and grocery stores across the country." *See* May 17, 2002, Order 13; *Ysleta I*, 220 F. Supp. 2d at 705. Indeed, the sweepstakes more closely resemble contests of a type that are common at *casinos* across the country. The Tribe's own witness – Mr. Saltiel – testified as much. *See* Oct. 7, 2014, Tr. 133 (stating that the sweepstakes "are designed to create the look and the feel of casino-like games"). Unlike any sweepstakes found at fuel stations and grocery stores, the Tribe's current sweepstakes are played on hundreds of electronic Kiosks that reveal results through an "entertaining display" accompanied by distinctive casino-like sounds. *See* Oct. 6, 2014, Tr. 21-22, 84, 236; Oct. 7, 2014, Tr. 133; *see also* May 6, 2014, Report 9, 23, 45. Such

sweepstakes do not resemble the contests offered by the likes of Doritos and Coca-Cola "at fuel stations and grocery stores across the country."  *See* May 17, 2002, Order 13; *Ysleta I*, 220 F. Supp. 2d at 705.  The undisputed evidence presented at the Hearing shows as much.

Accordingly, neither the product, nor the vendors, nor the sweepstakes themselves are even remotely comparable to the contests specifically enumerated by the Court in the Modified Injunction.  For the Pueblo Defendants to now come before the Court and claim otherwise is, frankly, absurd.

Moreover, even after the Court made it abundantly clear that sweepstakes substantially similar to those currently offered at the Entertainment Centers constituted prohibited Tribal Sweepstakes, the Pueblo Defendants proceeded to not only operate such sweepstakes, but to even expand those operations by opening a *second* entertainment center at Socorro.  *Compare* Oct. 18, 2010, Order 5 ("It is therefore ORDERED that the Defendants' latest proposal to conduct a sweepstakes [ECF No. 284] be, and it is hereby, DENIED WITHOUT PREJUDICE.") (emphasis in the original) (issued October 18, 2010), *with* Oct. 6, 2014, Tr. 95 (Lt. Loper indicating that Texas first determined Socorro was operating in 2012), 209 (Pueblo Defendants' attorney stating that Socorro did not exist in 2010).

In response to this brazen posture, the Court warns the Pueblo Defendants that the Court will not grant the Pueblo Defendants "immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined."  *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).  As the United States Supreme Court declared over sixty years ago,

> [s]uch a rule would give tremendous impetus to the program of experimentation with disobedience of the law[.] . . . The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy.  Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined.  Hence a new decree is entered enjoining that

> particular plan.  Thereafter the defendants work out a plan that was
> not specifically enjoined.  Immunity is once more obtained because
> the new plan was not specifically enjoined.  And so a whole series
> of wrongs is perpetrated and a decree of enforcement goes for
> naught.

*Id.* at 192-93.

Pursuant to Supreme Court authority, the Court will not permit the Pueblo Defendants to conduct a series of "experimentation[s] with disobedience" by making slight variations to the Tribe's gaming operations in attempts to avoid the reach of the Modified Injunction.  *See id.* at 192.  Under the terms of the Modified Injunction, the Tribe is currently prohibited from conducting "illegal as well as legal gaming activities."  *Ysleta I*, 220 F. Supp. 2d at 699.  The only exception to this rule is the Tribe's right to permit the contests enumerated in the Modified Injunction, and "other *like*-national third party vendor contests" that are "*of a type* . . . common at fuel stations and grocery stores across the country."  *Id.* at 705 (emphasis added).  For any other contests the Tribe is "free to petition the Court for a modification of any of the terms of the [Modified Injunction] that they believe might limit their ability to participate in any legal gaming activity for which they have qualified under Texas law."  *Id.* at 711; Nov. 2, 2001, Order 3-4.  However, should the Tribe choose not to petition the Court and instead "make their own determination of what the [Modified Injunction] mean[s] . . . they act[] at their peril."  *See McComb*, 336 U.S. at 192.

Accordingly, the Court finds that Texas has established by clear and convincing evidence that the Tribe's sweepstakes are not National Third-Party Vendor Sweepstakes as contemplated by the Modified Injunction.  The Pueblo Defendants' contention to the contrary is less than meritless.  The current sweepstakes are, and have been, prohibited conduct.  Nonetheless, the Pueblo Defendants continue to operate those sweepstakes in the face of the Modified Injunction.

The Court finds that the Pueblo Defendants are, therefore, in contempt of the Modified Injunction.

### III.   THE TRIBE'S SWEEPSTAKES MAY NOT CONSTITUTE LOTTERY

Because the Court has found the Pueblo Defendants in contempt for operating a Tribal Sweepstakes without approval, the Court does not reach the issue of whether the Tribe's current sweepstakes are prohibited lotteries under Texas law.  Nonetheless, because the Court provides the Pueblo Defendants with the opportunity to submit to the Court a detailed sweepstakes proposal, as explained in more detail below, the Court offers the following discussion as a guide to the parties.

Texas alleges that the Tribe's current sweepstakes are prohibited lotteries as defined by Texas Penal Code § 47.01(7).  Mot. for Contempt 13-15.  In support of this argument, Texas relies on numerous Texas Attorney General opinions.  *See* Section C Pl.'s Hr'g Preparation Order Compliance ("Plaintiff's Hearing Compliance"), ECF No. 486, at 26, 30.  The Pueblo Defendants respond that the sweepstakes are not lotteries because "consideration is not required to enter."  Pueblo Defs.' Resp. and Mem. in Opp'n to Pl.'s Fifth Am. Mot. for Contempt ("Pueblo Defendants' Response"), ECF No. 431, at 6.  The Pueblo Defendants further argue that because the current sweepstakes conform to the criteria approved by a Texas trial court in *American Legion, Knebel Post 82 v. TABC*, Cause No. D-1-GN-10-003084 (Dist. Ct. Travis Cnty. Oct. 14, 2011),[14] there is no violation of Texas law in the present case.  Oct. 7, 2014, Tr. 244.  Texas responds that the *Knebel* opinion is of little precedential value and inconsistent with the opinions of higher Texas courts.  Oct. 7, 2014, Tr. 248-49.

---

[14] Because the *Knebel* decision is not readily available in electronic databases, the Court notes that a copy of the case can be found in the record at ECF No. 358-2.

As an initial matter, the Court has found only one definition of a "sweepstakes" under Texas statutory law.  Section 622.001 of the Texas Sweepstakes Act, Tex. Bus. & Comm. Code § 622.001 *et seq.*, defines a "sweepstakes" as "a contest that awards one or more prizes based on chance or the random selection of prizes."  *Id.* § 622.001(4).  The Sweepstakes Act, however, "does not apply to a sweepstakes for which the only use of the mail is for a consumer to return an entry form to the sweepstakes sponsor," *id.* § 622.051(b), nor "to a sweepstakes in which the value of the most valuable prize is less than $50,000."  *Id.* § 622.052(a).  Neither party has argued that the Sweepstakes Act applies to the Tribe's current sweepstakes.  In fact, Texas appears to assert that the Tribe's sweepstakes do not fit either the mailing or minimum prize thresholds set out in the Sweepstakes Act.  *See* Pl.'s Hr'g Compliance 13.

Upon a review of the evidence, however, the Court notes that the Tribe's current sweepstakes may potentially fall within the provisions of the Sweepstakes Act.  First, testimony at the Hearing indicated that participants can both request entry to the sweepstakes *and* receive results through the mail.  Oct. 7, 2014, Tr. 56 (Mr. Kerns testifying that upon receiving a mail-in request form, "there is a process . . . where two people access the [S]erver at Speaking Rock, remove the next result from the pool," and mail the result to the participant).  Accordingly, it does not appear that the "only use of the mail is for a consumer to return an entry form to the sweepstakes sponsor."  *See* Tex. Bus. & Comm. Code § 622.052(b).  Further, at least two of the Tribe's sweepstakes vendors appear to offer maximum prizes of $50,000.00 or higher.  *See* XCite Sweepstakes Rules ("XCite Rules"), Defs.' Ex. L, at 3 (indicating maximum prize of "50000" without reference to the units this number represents); AMS Official Sweepstakes Rules ("AMS Rules"), Defs.' Ex. M, at 4-11 (listing prizes of "372464," "208080," "400000," and "409776" without reference to the units these numbers represent).

36

The Pueblo Defendants shall, therefore, in any proposal submitted to the Court, address whether the provisions of the Texas Sweepstakes Act apply to the gaming operations submitted in the proposal.  In particular, the Pueblo Defendants shall provide detailed information indicating the maximum prizes, in dollars, awarded by each sweepstakes, and explicitly discuss the extent to which the sweepstakes employ the use of the mail.

However, because the parties have focused their arguments on the issue of whether or not the Tribe's sweepstakes constitute illegal lotteries under Texas law, the Court does not address the implications of the Texas Sweepstakes Act further at this time.  Instead, the Court turns to an analysis of the legality of promotional sweepstakes in the context of Texas lottery law.

## A.    Texas Lottery Law

Under the Restoration Act, the Tribe may only engage in gaming that is not "prohibited by the laws of the State of Texas."  25 U.S.C. § 1300g-6(a).  Prior to 1991, section 47, article 3 of the Texas Constitution provided that "[t]he Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises *or other evasions involving the lottery principle*, established or existing in other States."  Tex. Const. sec. 47, art. 3 (amended 1980) (emphasis added); *Verney v. Abbot*, No. 03-05-00064-CV, 2006 WL 2082085, at *1 (Tex. App. July 28, 2006).  In 1991, however, section 47 of article 3 was amended to provide that "[t]he Legislature shall pass laws prohibiting lotteries and gift enterprises in this State other than those authorized by Subsections (b), (d), and (e) of this section."[15]  *See* Tex. Const. sec. 47, art. 3 (as amended 1991); *Verney*, 2006 WL 2082085, at *1.  "Significantly, the portion denouncing the *sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle* . . . did not survive the amendment

---

[15] Subsections (b), (d), and (e) permit charitable bingo, raffles, and a state lottery.  *See* Tex. Const. sec. 47, art. 3 (amended 1991).  As no party argues that the Tribe's current gaming operations fall within these provisions, the Court does not address them.

process." *Owens v. State*, 19 S.W.3d 480, 484 (Tex. App. 2000). Accordingly, "[t]he current version of Article III, section 47(a) is substantially the same [as the pre-amended provision], except that as amended, it permits certain lotteries." *Id.* The "multifarious issues of what is and is not permitted by the 1991 amendment to section 47 of article III have yet to be resolved." *Verney*, 2006 WL 2082085, at *2. "Rather, they remain the subject of legislative debate and Attorney General opinions." *Id.*

"In its present form, the [Texas] Constitution does not define 'lottery.'" *Owens*, 19 S.W.3d at 484. "Where, as here, a constitutional provision is not self-executing, it is incumbent on the [Texas] Legislature to enact legislation to implement public policy." *Id.* (citing *City of Corpus Christi v. City of Pleasanton*, 276 S.W.2d 798, 803 (Tex. 1955)).

Pursuant to this constitutional mandate, the Texas Legislature passed Texas Penal Code § 47.03, making it an offense to set up or promote any "lottery." *See* Tex. Penal Code Ann. § 47.03(a)(5). A "lottery" under Texas law is "any scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win anything of value, whether such scheme or procedure is called a pool, lottery, raffle, gift, gift enterprise, sale, policy game, or some other name." *Id.* § 47.01(7). Thus, to fall under the prohibition of the Texas Penal Code, a lottery must contain the elements of chance, prize, and consideration. *See id.*; *Jester v. State*, 64 S.W.3d 553, 557 (Tex. 2001).

The parties do not dispute that the prize and chance elements are present in the Tribe's sweepstakes. *See* Pueblo Defs.' Mot. for Summ. J., ECF No. 468, at 15 ("[T]here is no dispute that the sweepstakes offer prizes and employ games of chance."); Oct. 6, 2014, Tr. 23-24, 83-84; *see also* May 6, 2014, Report 15, 19, 21. The parties dispute, however, whether the Tribe's sweepstakes contain the element of consideration. *See* Oct. 7, 2014, Tr. 230, 239. Furthermore,

the Court finds certain evidence regarding the creation of the sweepstakes' pools to be of concern in relation to the element of chance.  Accordingly, the Court addresses the elements of consideration and chance below.

### 1.    Promotional sweepstakes and the element of consideration

"Even before the definition of *lottery* was written into the statutes, Texas courts, resorting to the popular meaning of the term, identified three elements in a *lottery*: prizes, chance, and direct or indirect consideration."  *Jester*, 64 S.W.3d at 557 (citing *Cole v. State*, 112 S.W.2d 725 (Tex. Crim. App. 1937)).  "The current Penal Code . . . does not substantively vary from that definition, and the ways in which the gambling statutes have changed does not affect the requirement of consideration."  *Id.*

Long standing judicial precedent clearly establishes two principles regarding the element of consideration in relation to sweepstakes.  First, consideration is absent from a sweepstakes where no participant provides any form of payment to enter the sweepstakes.  *See Griffith Amusement Co. v. Morgan*, 98 S.W.2d 844, 844-45, 847 (Tex. Civ. App. 1936); *Brice v. State*, 242 S.W.2d 433, 435 (Tex. Crim. App. 1951).  Second, "consideration [is present] if sweepstakes participants *must* pay money for the privilege of playing or if participants who pay have better chances of winning than non-paying participants."  *United States v. Davis*, 690 F.3d 330, 337 (5th Cir. 2012) (emphasis added) (citing *Cole*, 112 S.W.2d at 727; *Brice*, 242 S.W.2d at 434).

The instant Case presents facts which fall somewhere between this guidance.  On the one hand, participants in the Tribe's sweepstakes are not *required* to make a donation in order to play.  Certified software reports from BMM Test Labs confirm that participants can play the sweepstakes with free entry vouchers.  *See BMM Report 35 (AMS), 48 (Winter Sky), 59*

(XCite), 114 (Blue Stone); *see also* Oct. 6, 2014, Tr. 260.  Further, it is clear that participants

have, in fact, obtained free entry vouchers from the Tribe over a million and a half times since

2012.  *See* Defs.' Free Entry Appls., Defs.' Ex. H; *see also* No Donation Necessary Forms from

Entertainment Centers from March 13 through 19, 2012, Defs.' Ex. D; No Donation Necessary

Forms from Entertainment Centers from May 7 through 9, 2012, Defs.' Ex. E; No Donation

Necessary Forms from Entertainment Centers from July 9, 2013, Defs.' Ex. F; No Donation

Necessary Forms from Entertainment Centers from May 16, 2014, Defs.' Ex. G; Oct. 6, 2014,

Tr. 146 (400 to 500 participants a day request free entries).

It is, however, likewise beyond dispute that at least some of the Tribe's sweepstakes

participants *do* make a payment in the form of a donation to the Tribe in connection with the

sweepstakes.  *See* Oct. 6, 2014, Tr. 120-21 (Tribe received approximately $30,000,000.00 in

donations from the sweepstakes in 2012 and 2013); Oct. 7, 2014, Tr. 54 ("[T]otal daily average

value of the donations [made through the sweepstakes] is $552,614.24."), 156 (majority of

$7,600,000.00 net increase in Tribe's governmental assets due to donations received through

sweepstakes).

Accordingly, in order for the Court to be able to determine whether any sweepstakes

proposal is permitted under Texas law, the Pueblo Defendants' proposal, and any response from

Texas, must address the legal issues set out in the following, and any other, pertinent law.

### a.    Case law

After an extensive review of case law discussing lotteries and other games of chance in

Texas, the Court has identified the following precedent as controlling on the issue of the legality

of promotional sweepstakes.

In *State v. Socony Mobil Oil Co., Inc.*, 386 S.W.2d 169 (Tex. App. 1964), the Texas Court of Appeals reviewed a "cooperative advertising" scheme between Socony Mobil Oil Co., Inc. ("Mobil") and Idea Research and Development Corporation ("Idea"). *Id.* at 170-71. Under the terms of the cooperative advertising agreement, dealer-agents of Mobil were instructed to "give [bingo] cards to anyone that asked for them." *Id.* at 171. Though participants "[were] not required to buy anything at the filling station [in order to receive a card,] . . . the cards [could] be given to customers who [did] make a purchase." *Id.* at 172. The evidence did not show what proportion of the bingo cards were given to customers and what proportion were given to non-customers. *Id.* Nonetheless, the court expressly recognized that the cards "[were] intended to increase the sale of Mobil products . . . [and] had that effect." *Id.* Despite this evidence indicating that the bingo cards tempted at least some participants to patronize the dealer-agents' premises, the Court of Appeals held that where "a person can receive a [bingo] card and win a prize . . . without paying one cent for the privilege of participating," the promotion as conducted was not a lottery. *Id.* at 173.

More recently, in *Jester v. State*, 64 S.W.3d 553 (Tex. 2001), the Supreme Court of Texas considered the sufficiency of the evidence to convict a café owner who offered a sweepstakes played on electronic devices at his store. Like the bingo scheme in *Socony Mobil*, the sweepstakes in *Jester* offered participants the opportunity to receive plays without any purchase necessary. *Id.* at 555. Participants, however, also received entries in connection with the purchase of prepaid telephone cards. *Id.* at 554-55. Specifically, "[participants] insert[ed] a minimum of one dollar into [a] machine," and "[f]or each dollar inserted, the machine dispense[d] one prepaid telephone card." *Id.* at 554. "In addition to receiving the telephone card, the machine [also gave] the player 100 credits [to play the sweepstakes] for each dollar

inserted." *Id*. at 555.  In analyzing whether consideration was present in this sweepstakes, the Supreme Court of Texas held that "the decision turn[ed] on whether the sweepstakes was intended to promote the sale of telephone cards or whether the telephone cards were there as an attempt to legitimize an illegal gambling device." *Id*. at 558.

In *United States v. Davis*, 690 F.3d 330 (5th Cir. 2012), the Fifth Circuit likewise implicitly recognized that receipt of sweepstakes entries in connection with the purchase of a product would not necessarily result in the presence of consideration.  In *Davis*, participants could enter a sweepstakes either by (1) purchasing Internet time at one of the defendants' cafés, (2) requesting free entries in person, or (3) requesting free entries through the mail.  *Id.* at 333. Though the *Davis* court noted that "the consideration element in the Texas gambling statutes can be fulfilled without an explicit exchange of money for the opportunity to participate in a sweepstakes," *id.* at 339, the court, citing *Jester*, again focused its analysis on "whether the sweepstakes was intended to promote the sale of [Internet time] or whether the [Internet time] [was] there as an attempt to legitimize an illegal gambling device."  *Id*. at 338 (citing *Jester*, 64 S.W.3d at 558).

Thus, in both *Jester* and *Davis*, the courts examined sweepstakes schemes in which "free" entries were provided in connection with the purchase of a product.  *See Jester*, 64 S.W.3d at 554-55; *Davis*, 690 F.3d at 333.  The Court finds it significant that neither the *Jester* nor the *Davis* courts held that consideration was *necessarily* present where participants received entries to the sweepstakes in connection with the purchase of a product.  Instead, both courts focused their analysis on whether the sweepstakes was intended to promote the sale of a legitimate product or whether the presence of the product was mere subterfuge to promote play in the sweepstakes.  *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-39.  The inference drawn

from these cases, therefore, is that at least in certain circumstances, a promotion may provide entries to a sweepstakes in connection with the purchase of a product without supplying the necessary consideration to bring that sweepstakes within the meaning of an illegal lottery under the Texas gaming statutes.

In 2011, a Texas state district court held that a charitable sweepstakes offered by Post 83[16] of the American Legion was not illegal gambling under Texas law. In *Knebel*, plaintiffs provided entry to a charitable sweepstakes to participants who (1) purchased an alcoholic beverage, (2) made a donation, or (3) requested entries without making a donation or purchase. *See Knebel*, Cause No. D-1-GN-10-003084 at 2. The *Knebel* court held that such a sweepstakes could be permissible under Texas law if it retained a number of characteristics, specifically: (a) a finite number of predetermined entry results; (b) results drawn from the same fixed pool of finite entries; (c) an alternative means of free entry; (d) equal treatment of free entrants; (e) electronic game graphics that could not change the content of the results; (f) opening of more than one entry could not increase or decrease or otherwise change the prize associated with an entry; and (g) the software had to contain security to prevent tampering. *Id.* at 2-3.

### i.      Persuasive value of *Knebel*

The Pueblo Defendants rely heavily on the *Knebel* decision, arguing that there is no violation of Texas law in the present Case if the Tribe's sweepstakes conform to the criteria approved in *Knebel*. Oct. 7, 2014, Tr. 244. Texas responds that the *Knebel* requirements cannot purge the illegality of the Tribe's sweepstakes because the opinion is of little precedential value and is inconsistent with the opinions of higher Texas courts. *Id.* at 248-49.

---

[16] Although listed as Post 82 in *Knebel's* case heading, plaintiff in the case was in fact Post 83. *See Knebel*, Cause No. D-1-GN-10-003084 at 1.

State trial court decisions are treated with less deference than state appellate courts.  *See Hampton Co. Nat. Sur., LLC v. Tunica Cnty., Miss.*, 543 F.3d 221, 226 (5th Cir. 2008) (citing 19 C. Wright & A. Miller, Federal Practice and Procedure § 4507 (2008)).  Nonetheless, trial court decisions "may be 'attributed some weight' on interpreting state law," *id.* (citing *Comm'r of Internal Revenue v. Bosch's Estate*, 387 U.S. 456, 465 (1967)), and are "entitled to consideration as an indication of what the state law is, but in and of themselves . . . are not controlling on the federal courts if they are not regarded as precedents within the state itself."  *Id.*

The Court recognizes that the decision in *Knebel* lacks citation to legal authority in support of its conclusions of law.  Nor has *Knebel* been relied on by subsequent Texas courts as binding precedent within Texas.  Indeed, the opinion has been partially overturned to the extent that the Texas Court of Appeals reversed the trial court's grant of summary judgment in favor of the plaintiff.  *See TABC v. Am. Legion Knebel Post 82*, No. 03-11-00703-CV, 2014 WL 2094195, at *7 (Tex. App. May 16, 2014) (finding material issue of fact existed as to whether participants were required to pay to enter the sweepstakes).  Accordingly, *Knebel* is not controlling, *see Hampton*, 543 F.3d at 226, and, to the extent the Pueblo Defendants assert that conformance with the *Knebel* factors necessitates finding no violation of Texas law, the Court rejects the Pueblo Defendants' argument.

Nonetheless, no Texas authority, other than *Knebel*, has definitively ruled on the possible legality of charitable sweepstakes as presented in this case.  Further, the "multifarious issues of what is and is not permitted by the 1991 amendment" to the Texas constitution's gaming prohibitions have not been resolved.  *Verney*, 2006 WL 2082085, at *2; *see also G2, Inc. v. Midwest Gaming, Inc.*, 485 F. Supp. 2d 757, 766 (W.D. Tex. 2007) (recognizing issues surrounding charitable sweepstakes as "unsettled" under Texas law).  Therefore, in light of the

44

absence of any superior authority on the issue of charitable sweepstakes in Texas, the Court finds

the *Knebel* decision to carry at least "some weight" to the extent it is not inconsistent with higher

judicial authority.  *See Hampton*, 543 F.3d at 226.

### b.    Texas Attorney General opinions

Texas has relied on numerous Texas Attorney General opinions to support its argument

that the Tribe's current sweepstakes constitute illegal lotteries under the Texas Penal Code.  For

the following reasons, the Court finds Texas's reliance on the cited Attorney General opinions

unpersuasive.

Attorney General opinions are "not binding on the judiciary."  *Coates v. Brazoria Cnty.*

*Tex.*, 919 F. Supp. 2d 863, 870 (S.D. Tex. 2013) (quoting *Jones v. Williams*, 45 S.W.2d 130, 131

(Tex. 1931)).  Nonetheless, "[o]pinions of the Attorney General are 'entitled to careful

consideration by courts, and [are] quite generally regarded as highly persuasive.'"  *Harris Cnty.*

*Comm'rs Court et al. v. Moore*, 420 U.S. 77, 87 n.10 (1975) (citing *Jones*, 45 S.W.2d at 131;

*see also Swearingen v. Owens-Corning Fiberglas Corp.*, 968 F.2d 559, 564 (5th Cir. 1992).  An

opinion of the Attorney General, however, "may be given close scrutiny" if "it appears to be in

direct conflict with several earlier opinions of the Attorney General."  *Harris Cnty.*, 420 U.S. at

87 n.10.

As early as 1967, the Texas Attorney General recognized that companies could conduct

promotional sweepstakes connected to the sale of a product without running afoul of the Texas

Penal Code.  In Opinion M-67, the Attorney General reviewed a promotional sweepstakes

offered by a soft drink bottling company.  *See* Tex. Att'y Gen. Op. No. M-67 at 1-2 (1967).

Under the promotion, certain bottle caps were printed with pictures of prizes.  *Id*. at 1.

Customers who found these pictures under their drinks' caps could turn the cap in for the

specified prize.  *Id.*  In conjunction with this paid means of entry, the sweepstakes'

advertisements clearly stated that customers could receive free bottle crowns from a variety of

sources.  *Id.*  According to the Attorney General, "it seem[ed] clear that any such program

providing that anyone may participate without the necessity of a purchase, and given reasonable

opportunity to register or otherwise become eligible at each of the participating stores, [did] not

constitute a lottery."  *Id.* at 2.

      In 1997, the Attorney General again confirmed that a promotional sweepstakes that

provides customers with sweepstakes entries upon the purchase of a legitimate product is not

necessarily prohibited under Texas gaming laws.  *See* Tex. Att'y Gen. Op. No. LO-97-008, 1997

WL 113966 (1997).  The sweepstakes scheme at issue involved the sale of "Lucky Shamrock"

phone cards.  *See id.* at *1.  "In addition to receiving the long distance credit, and for no

additional charge, the purchaser of the phone card [received an entry] to participate in the [Lucky

Shamrock] sweepstakes promotion."  *Id.*

      After finding both prize and chance present in the sweepstakes, *id.* at *2, the Attorney

General opined that whether the sweepstakes constituted an illegal lottery "center[ed] on whether

a purchaser of the [product] furnishe[d] any amount of the . . . consideration for the privilege of

participating in the sweepstakes."  *Id.*  If a purchase "is the sole means of entering the

sweepstakes . . . a court will attribute a portion of the [amount paid] to consideration for

participation in the sweepstakes."  *Id.*  However, the Attorney General concluded, a sweepstakes

may "circumvent this result" if it "provide[s] an 'alternative' means of entering the contest that

does *not* require the payment of consideration, *and* it [treats] 'customers' and 'non-customers'

alike."  *Id.* (citing *Socony Mobil*, 386 S.W.2d at 172-73).

Despite the above cited opinions, Texas argues that the Tribe's sweepstakes are illegal lotteries because four Texas Attorney General opinions, GA-0527 from 2007, JM-482 from 2002, JM-513 from 1986, and H-820 from 1976, stand for the proposition that the "elimination of consideration from some players who play for free does not remove the element of consideration from all others who pay to play." *See* Pl.'s Hr'g Compliance 26, 30.

As an initial matter, the Court notes that Attorney General Opinion GA-0527 addressed the issue of whether "[a] stored-value card enabling the purchase of merchandise is a medium of exchange within the definition of cash" under Texas Penal Code § 47.01(4)(B). *See* Tex. Att'y Gen. Op. No. GA-0527, 2007 WL 709285 at *3 (2007). At no point in the Opinion did the Attorney General consider free or paid entries to a sweepstakes or their effect on the element of consideration. The Court therefore finds Opinion GA-0527 irrelevant to the legality of the Tribe's gaming operations.

Texas's reliance on Opinion H-820 is similarly misplaced. In Opinion H-820, the Attorney General was asked to determine if six separate gaming proposals would constitute illegal lotteries. *See* Tex. Att'y Gen. Op. No. H-820 (1976). In the first proposal, the sweepstakes sponsor would sell tickets to a drawing for certain prizes. *Id.* at 3. The second involved the sponsor giving tickets to a drawing to persons who made a donation to a charity. *Id.* In the third, the sponsor would grant customers who bought admission tickets an automatic entry to a drawing. *Id.* The fourth proposal involved selling tickets to game booths at a carnival, with each ticket granting the purchaser a chance to win a door prize. *Id* at 4. The fifth entitled each person who purchased a commodity a chance to win a door prize. *Id.* Finally, the sixth proposal revolved around selling memberships to a club, with members being eligible for a free prize drawing. *Id.* Importantly, however, none of the schemes considered in Opinion H-820 offered a

free means of entry, as is the case with the sweepstakes at issue here.  Accordingly, the Court finds Opinion H-820 factually distinguishable and therefore unpersuasive in the context of the Tribe's gaming operations.

In Opinion JM-513, the Attorney General concluded that a charitable sweepstakes would constitute an illegal lottery "if a nonprofit organization gives away artistic paintings to holders of numbered tickets, where the winners are chosen at random, and where each person receiving a numbered ticket is asked to make a donation for the purchase of art collections."  *See* Tex. Att'y Gen. Op. JM-513, 1986 WL 219359, at *1 (1986).  Texas is correct that in Opinion JM-513, the Attorney General declared that such an arrangement would constitute an illegal lottery because, among other reasons, "the fact that one person receives a chance to win for free while another person 'pays' for the chance does not negate the fact that someone in the contest has paid consideration for the chance to win."  *Id.* at *2.

The Attorney General's conclusion in Opinion JM-513 may well be persuasive in the proper context.  That is, where it is established that at least one person has paid *for the chance* to win a prize.  This Court, however, is faced with a different issue, that is, whether the Tribe's participants are in fact paying for the chance to win a prize, as opposed to paying for a Tribal product.  Where, as here, the determination turns on whether a product is legitimate such that any consideration paid is for the product and not for the sweepstakes, Opinion JM-513 offers little guidance.  Accordingly, the Court finds Opinion JM-513 unpersuasive in the present context.

Furthermore, even assuming that Opinion JM-513 was relevant, the Attorney General gives no explanation why the sweepstakes in Opinion JM-513, issued in 1986, was less legitimate than the sweepstakes considered legal in Opinion M-67, issued in 1967.  *Id.* at *1-2. Nor does the Attorney General's subsequent Opinion LO-97-008, issued in 1997, explain why

that sweepstakes could be legal, as opposed to the sweepstakes presented in Opinion JM-513, which the Attorney General declared illegal without similar analysis in 1986. *See* Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2-5. Upon review of the three opinions, it appears that the only way to reconcile the differing conclusions is in the Attorney General's treatment of a payment made in connection with a charitable sweepstakes as opposed to a payment made in connection with a for-profit sweepstakes. In Opinion JM-513, the sweepstakes sought to promote donations to a charitable organization. *See* Tex. Att'y Gen. Op. JM-513, 1986 WL 219359, at *1. In both Opinion M-67 and Opinion LO-97-008, on the other hand, for-profit companies employed a sweepstakes to promote the sale of their products. *See* Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *1 (sweepstakes promoting sale of phone cards); Tex. Att'y Gen. Op. No. M-67 at 1 (sweepstakes promoting sale of soft drinks). It appears that, where the sweepstakes promoted a payment in connection with a charitable sweepstakes, the Attorney General equated any payments in the form of donations to a direct cash payment made to play the sweepstakes. *See* Tex. Att'y Gen. Op. JM-513, 1986 WL 219359, at *2 ("[Charitable sweepstakes] would constitute a 'lottery' unless no one actually made a donation."). On the other hand, where the sweepstakes promoted a payment to a for-profit company, the Attorney General accepted that participants' payments could be made to obtain the promoted product and not to play the sweepstakes. *See* Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2 (payment not necessarily consideration where sweepstakes promoted the sale of phone cards); Tex. Att'y Gen. Op. No. M-67 at 2 (payment not necessarily consideration where sweepstakes promoted the sale of soft drinks). In no opinion does the Attorney General explain why this is so.

As both the *Jester* and *Davis* courts make clear, if entries to a sweepstakes are granted in connection with the purchase of a product, the product must be the "primary subject of the transaction," otherwise the payment is made to purchase an entry to win a prize, and the so-called sweepstakes is, in actuality, an illegal lottery. *See Jester*, 64 S.W.3d at 559; *Davis*, 690 F.3d at 339-40; *see also* Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2 (presence of consideration "centers on whether a purchaser of the [product] furnishes any amount of the . . . consideration for the privilege of participating in the sweepstakes"). Thus, while it is no violation of law to issue sweepstakes entries to customers purchasing a product, Opinion JM-513 is consistent with case law that a customer cannot "pay to play" the sweepstakes without violating Texas law. *See Jester*, 64 S.W.3d at 559; *Davis*, 690 F.3d at 339-40; Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2; Tex. Att'y Gen. Op. JM-513, 1986 WL 219359, at *2. Put another way, for a sweepstakes to be legal in the presence of an exchange of payment, it appears that the payment must be made for a non-gaming product; the product cannot be a sham existing to disguise what is actually a payment to play the game. *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-39.

The Court has found no other legal basis, however, supporting the Attorney General's assumption in Opinion JM-513 that a participant making a donation to a charitable organization is necessarily paying to play the sweepstakes. Nor does Opinion JM-513 cite to any legal authority, or give any explanation, for treating the analysis different when a sweepstakes seeks to promote a charitable product. Accordingly, because the Court has found no basis for Opinion JM-513's conclusion, and because it conflicts, without explanation, with both prior and subsequent Attorney General opinions on the issue of consideration in promotional sweepstakes,

the Court rejects the Attorney General's unsupported assumption in JM-513 as unpersuasive. *See Harris Cnty.*, 420 U.S. at 87 n.10.

For substantially the same reasons, Opinion JC-482 is likewise unpersuasive. In Opinion JC-482, a non-profit organization inquired whether it would constitute an illegal lottery if participants could, without making any donation, enter a weekly sweepstakes drawing by filling out a numbered ticket made available at a particular sweepstakes location. *See* Tex. Att'y Gen. Op. No. JC-482, 2002 WL 463420, at *1 (2002). Although not required in order to obtain a ticket, a participant could donate money to the sweepstakes and become a member of the corporation. *Id.* In Opinion JC-482, the Attorney General again stated that such a sweepstakes would constitute an illegal lottery because "the fact that one person receives a chance to win for free while another person 'pays' for the chance does not negate the fact that someone in the contest has paid consideration for the chance to win." *Id.* at *3. As discussed above, this proposition in of itself is sensible, and finds support in the case law. *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-39. Nonetheless, once again, it offers little guidance to the Court here because it assumes that a participant has paid *for the chance to win* and makes no analysis of the legitimacy of any product. Accordingly, Opinion JC-482 is, like JM-513, wholly unpersuasive in the present context because it assumes, without any explanation, that a payment made in the form of a donation is the functional equivalent of consideration paid to play the sweepstakes.

Finally, it is not clear that the Tribe's status as a federally-recognized Native American tribe is even comparable to the charitable organizations or other non-profit entities at issue in these Attorney General opinions. Consequently, Opinions JC-482 and JM-513 may be inapposite for this additional reason.

**B.      Promotional Sweepstakes Are Not Per Se Illegal in Texas**

Accordingly, opinions from the Texas courts, Fifth Circuit and Texas Attorney General support the proposition that a sweepstakes will not necessarily constitute an illegal lottery when a means of entry is connected to the purchase of a legitimate product.  *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40; *Socony Mobil*, 386 S.W.2d at 173-74; Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2-3; Tex. Att'y Gen. Op. No. M-67 at 2.  However, a promotional sweepstakes must also offer an alternative means of free entry and the primary subject of the transaction must be the promoted product and not the sweepstakes game itself.  *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40; *Socony Mobil*, 386 S.W.2d at 173-74; Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2-3; Tex. Att'y Gen. Op. No. M-67 at 2.

Therefore, any determination of the presence of consideration in the Pueblo Defendants' sweepstakes proposal should turn on whether the sweepstakes is intended to promote a Tribal product, or whether the product is mere subterfuge to legitimize consideration paid to participate in the Tribe's sweepstakes.  *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40; Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2-3.  To be legal, the product promoted by the Tribe's sweepstakes must be the "primary subject of the transaction."  *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40; *see also* Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2 (presence of consideration "centers on whether a purchaser of the [product] furnishes any amount of the . . . consideration for the privilege of participating in the sweepstakes").

Furthermore, the Tribe "must provide an 'alternative' means of entering the contest that does *not* require the payment of consideration, *and* it must treat 'customers' and 'non-customers'

alike." *See* Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2 (citing *Socony Mobil*,

386 S.W.3d at 172-73); *accord Davis*, 690 F.3d at 337 ("[C]onsideration [is present] if . . .

participants who pay have better chances of winning than non-paying participants." (citing *Cole*,

112 S.W.2d at 727, 730; *Brice*, 242 S.W.2d at 434)); Oct. 6, 2014, Tr. 268-69 (Dr. Robicheaux

testifying that "companies and non-profits cannot require that any person who wants to

participate in the sweepstakes has to buy anything"). "[T]he mere pretense of free prizes,

designed to evade the law, [will] not negate the element of consideration." *Jester*, 64 S.W.3d at

558 (citing *Brice*, 242 S.W.2d at 434).

Because the Court allows the Pueblo Defendants the opportunity to submit a sweepstakes

proposal within sixty days of this Order, the Court raises the following issues of concern

regarding the Tribe's current sweepstakes in light of the above cited law.

## 1.   The Tribe's product

"In order to avoid characterization as a 'lottery,' a promotional scheme must . . . involve

the legitimate sale of a product." Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *4;

*see also Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40. "If a product of little or no

value is being sold in conjunction with a sweepstakes ticket, the consideration may be deemed to

have been paid for the privilege of entering the sweepstakes." Tex. Att'y Gen. Op. No. LO-97-

008, 1997 WL 113966, at *4; *see also Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40.

The Court notes that the Pueblo Defendants have not clearly articulated what product they

believe the Tribe's sweepstakes promote.

The Pueblo Defendants appear to argue that a charitable sweepstakes need not promote a

product. Oct. 7, 2014, Tr. 238-39 ("[T]he issue of product and what people receive from that is

really separate from the issue of whether people can donate."); Defs.' Hr'g Compliance 3. The

reasoning behind the Pueblo Defendants' argument is most clearly articulated in the Pueblo

Defendants' pre-hearing briefing:

> A private party cannot accept donations.  So a private party must
> sell a product to offer a sweepstakes.  Because the private party
> cannot accept donations, there must be something more than a
> "sham" product.  But only if for private gain.  *Knebel* imposes no
> such restriction on nonprofit donations which by definition are of
> value and which by definition are legitimate if the nonprofit is
> legitimate.

Defs.' Hr'g Compliance 3.

Contrary to the Pueblo Defendants' assertion, *Knebel* does not stand for the proposition

that a charitable sweepstakes need not promote a product.  While it is true the *Knebel* court held

that a charitable sweepstakes was not "per se gambling," *Knebel*, Cause No. D-1-GN-10-003084

at 3, at no point in the opinion does the court hold that no product is required in a charitable

sweepstakes.  Indeed, as discussed above, *Knebel* is short and devoid of substantive analysis.

Among the issues that the *Knebel* court fails to discuss is the product promoted by the

sweepstakes and whether that product is the primary subject of the transaction.  *See id.* at 1-3.

The *Knebel* opinion is silent on the issue of the sweepstake's product, and therefore does not

stand, either one way or the other, as persuasive authority that no product is needed in connection

with a charitable sweepstakes.  Nor do the Pueblo Defendants cite to any other authority for their

assertion that a product need not be attached to a charitable sweepstakes.  As a result, the Court

rejects the Pueblo Defendants' position on this point.

The Court further notes that the Pueblo Defendants have presented argument that the

donation itself is the product that the sweepstakes are designed to promote.  For instance, the

Pueblo Defendants have stated that participants receive "complimentary sweepstakes entries as a

courtesy for making a charitable donation to the [Tribe]."  Pueblo Defs.' Mot. for Summ. J. 11;

*see also* Oct. 7, 2014, Tr. 44 (Mr. Kerns affirming that the sweepstakes "are run to solicit

donations" for the Tribe); Oct. 7, 2014, Tr. 236 (Tribe stating that it tells participants, "If you give us a donation, you can participate in our sweepstakes"). This characterization of the donations, however, conflates the *payment* to the Tribe with the *product* the sweepstakes are designed to promote. After an exhaustive search, the Court has found no authority equating a donation to a product in such a manner. Indeed, Texas law appears to make no distinction between charitable payments made to play a sweepstakes and payments made to a for-profit entity for the same purpose. *See State v. Amvets Post No. 80 et al.*, 541 S.W.2d 481, 483 (Tex. Civ. App. 1976) ("A gain is no less a gain if it is contributed to charity. Consequently, a lottery is no less a lottery if the proceeds are used for charitable purposes."). The "primary subject of the transaction," therefore, cannot be the payment made to enter the sweepstakes, whether charitable or not. *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 339-40; *Amvets*, 541 S.W.2d at 483. Accordingly, in submitting any proposal to this Court, the Pueblo Defendants must show that the Tribe's sweepstakes promote a product separate from the donations made by participants.[17]

The Pueblo Defendants have additionally presented evidence regarding the services supported by the donations made to the Tribe. *See* Oct. 7, 2014, Tr. 164-66, 181-82, 199-205. It is unclear to the Court whether the Pueblo Defendants contend that these services are a legitimate product promoted by the sweepstakes. Therefore, to the extent that the Pueblo Defendants believe that the services themselves either are the promoted product, or substantially

---

[17] The Court notes that the Pueblo Defendants' expert witness, Dr. Robicheaux, suggested that the Tribe's product is entertainment. *See* Oct. 6, 2014, Tr. 282. The Court does not believe that the entertainment of playing the sweepstakes can serve as the "primary subject of the transaction" because the product must be sufficiently distinct from the sweepstakes for the Court to find that the payment was not given for the purpose of securing entry into the sweepstakes. *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 339-40; Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2.

legitimize some product, the Pueblo Defendants shall brief that assertion in any proposal submitted to the Court.

Furthermore, in any proposal, the Pueblo Defendants must do more than merely identify a bona fide product.  For the Tribe's sweepstakes to be considered legal under Texas law, the Pueblo Defendants must also establish that the Tribe's product is valued as the "primary subject of the transaction," and not "mere subterfuge" to promote an illegal lottery.  *See Jester*, 64 S.W.3d at 559; *Davis*, 690 F.3d at 338-40.  In making this evaluation, decisions from the Supreme Court of Texas and the Fifth Circuit have measured the product's value from two perspectives: that of the sweepstakes participants, and the sweepstakes sponsor.  *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 335, 339.

In *Jester*, the court held a sweepstakes could be found to constitute an illegal lottery where there was substantial evidence showing that neither the participants, nor the vendors, valued the product connected with the participants' payment.  *See Jester*, 64 S.W.3d at 558-59. With respect to the sweepstakes participants, the court's conclusion was based on the fact that (1) participants purchased the product despite the cost exceeding market value, (2) the product often was not functional, and (3) some participants did not even know what product they were purchasing.  *Id.* at 558.  Further, as to the sweepstakes sponsors, the court noted that (1) employees were aware customers did not value the product, (2) there were no signs on the outside of the building advertising the product, and (3) no employee made a sales pitch promoting the purchase of the product.  *Id.*

Similarly, in *Davis*, the Fifth Circuit found sufficient evidence to conclude that the product associated with the sweepstakes was not the primary subject of the transaction where there was strong evidence that neither the participants nor the sweepstakes sponsors valued the

product connected to the sweepstakes. *Davis*, 690 F.3d at 335, 339. For instance, customers' receipts revealed that over 300,000 minutes of Internet time remained after sweepstakes gaming, thus indicating that customers did not use the Internet time they purchased. *Id.* at 399. Indeed, "customers actually used 'a little less' than $100 worth of Internet time each week." *Id.* at 335. "That amount was dwarfed by the $27,770 in Internet time sales during a representative week." *Id.* This evidence was further bolstered by testimony that all of the customers in the Internet café were playing the sweepstakes, and none were actually using the Internet. *Id.* at 339. There was also evidence casting doubt upon the sweepstakes sponsor's legitimate interest in the product sold. For example, the manager of the café stated he was "not worried about" the income from non-sweepstakes services. *Id.*

Thus, in any sweepstakes proposal, the Pueblo Defendants should explain in detail what product the Tribe's sweepstakes are designed to promote, and should show, through citation to evidence and law, that the product promoted is the "primary subject of the transaction" for both the Tribe and its sweepstakes participants. *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40.

### a.      Casino-like atmosphere

The Fifth Circuit has indicated that a casino-like atmosphere can represent "[f]urther evidence that [a] defendant['s] true purpose" is to promote the playing of a sweepstakes and not the sale of a product. *Davis*, 690 F.3d at 339. The Texas Attorney General, likewise, has indicated that the "nature of the appeal which the business makes to secure the patronage of its customers" is of relevance in determining whether a promotional scheme constitutes a lottery. Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *4 (citing *G.A. Carney, Ltd. v. Brzeczek*, 453 N.E.2d 756, 760 (Ill. App. 1983)).

In light of the above, the Court finds troubling the Tribe's clear intent to create a casino-like business model. The undisputed evidence at the Hearing established that the Entertainment Centers are lined with "rows and rows" of sweepstakes Kiosks that look similar to slot machines. Oct. 6, 2014, Tr. 21-22, 84; May 6, 2014, Report 9 (photo of row of Kiosks), 37 (same), 45 (same). Specifically, Speaking Rock contains close to 1,000 such machines, while Socorro contains "close to 400." Oct. 6, 2014, Tr. 85. Further, the Entertainment Centers are filled with the sounds of bells and whistles emitted from these Kiosks. *Id.* at 59-60. There is also at least some evidence that the Entertainment Centers contain low lighting and offer free food and drinks to participants engaged with the Kiosks. *Id.* at 26, 50, 286-87.

It is additionally indisputable that the Kiosks are designed to look and function similar to slot machines. The Kiosks are "upright cabinets with two video displays, a bill acceptor and a printer." Oct. 7, 2014, Tr. 115. When a participant makes a donation, the Kiosk allows the participant to choose a game theme resembling roulette, black jack, poker, or other common casino games. Oct. 6, 2014, Tr. 59-60, 258. The Kiosks further make distinctive sounds, mimicking bells, whistles, and coins falling into a tray whenever a participant pushes the Kiosks' buttons. *Id.* at 59-60, 84. Indeed, the Kiosks' simulated gaming displays are "designed to create the look and the feel of casino-like games." Oct. 7, 2014, Tr. 133; *see also* May 6, 2014, Report 5 (indicating officers played Kiosks named "Busting Vegas" and "Lucky Penguins"). Accordingly, it is beyond dispute that the Entertainment Centers are designed to look and feel like casinos.

The Court accordingly is highly concerned that the casino-like business model indicates that the "true purpose" of the Entertainment Centers is to "create a place where people [are] comfortable staying for a long time . . . and playing the sweepstakes," and not to promote a tribal

product. *See Davis*, 690 F.3d at 339. Likewise, the Court is concerned that the "true purpose"
for participants in patronizing the Entertainment Centers is the chance to win an uncertain prize,
not to support the Tribe's product. *See id.* The Pueblo Defendants shall, therefore, address these
concerns in any sweepstakes proposal submitted to the Court.

### 2.      Finite pool of predetermined results

At the Hearing, the Pueblo Defendants presented substantial evidence regarding the
Tribe's sweepstakes' conformance to the *Knebel* court's requirement that a sweepstakes have a
finite number of predetermined entries. *See* Oct. 6, 2014, Tr. 227-36; Oct. 7, 2014, Tr. 13-16,
19-20, 121-23, 126-27; *see also* BMM Report 33 (AMS), 48 (Winter Sky), 60 (XCite), 115 (Blue
Stone). Neither the *Knebel* court, nor the parties, however, cite to any other Texas legal
authority that sets out this requirement.

Upon review of Texas and federal law, it appears that statutory requirements regarding
finite and predetermined entries in sweepstakes have been enacted for the purpose of consumer
protection. The Texas Sweepstakes Act, for instance, prohibits the publication of sweepstakes
rules that "do not uniquely identify the prizes" to be awarded. *See* Tex. Bus. & Comm. Code §
622.106. The Deceptive Mail Prevention and Enforcement Act likewise requires disclosure of
"the quantity, estimated retail value, and nature of each prize" associated with a sweepstakes
conducted through the mail. *See* 39 U.S.C. § 3001(k)(3)(A)(V)(bb). *Knebel* as well, provides
"some weight" that Texas law would not necessarily prohibit a charitable sweepstakes that
contained, among other factors, a finite set of predetermined entries. *See Hampton*, 543 F.3d at
226; *Knebel*, Cause No. D-1-GN-10-003084, at 2. Expert testimony at the Hearing further
indicated that promotional sweepstakes across the country generally contain predetermined

prizes and entries.  *See* Oct. 6, 2014, Tr. 269; *see also, e.g.*, Md. Code Ann., Comm. Law § 13-305(g); Colo. Rev. Stat. Ann. § 6-1-803(6)(c).

The Court is concerned that the Tribe's sweepstakes, as operated, may not in practice consist of a finite pool of predetermined prizes.  It is true that the BMM Report certified that the Tribe's sweepstakes pools contain finite sets of predetermined results.  *See* BMM Report 33 (AMS), 48 (Winter Sky), 60 (XCite); Oct. 7, 2014, Tr. 13 (Blue Stone).  It is also true that the sweepstakes pools expire upon a certain date.  *See* BMM Report 16 (Blue Stone), 35 (AMS), 61 (XCite), 74 (Winter Sky).  Nonetheless, if the entries in a pool are exhausted prior to the termination date, the Server automatically creates a new, identical pool of entries.  *See id.* at 32 (AMS), 72 (Winter Sky), 92 (Blue Stone).  The Pueblo Defendants presented no evidence establishing how frequently new pools are generated.  As a practical matter, the rate at which the sweepstakes pools regenerate may render the prize pool virtually infinite.

Accordingly, in any proposal, the Pueblo Defendants shall explain the relevance of the finite pool of predetermined results to the legality of their sweepstakes.  Further, to the extent the Pueblo Defendants argue that this is a legal requirement, they shall detail how any proposed sweepstakes will incorporate a finite pool of predetermined results, including information regarding the rate of renewal of those sweepstakes pools.

### 3.    The Tribe's alternative means of free entry

Texas also argues that the Tribe's alternative means of free entry is insufficient because only a small percentage of the participants enter for free.  Oct. 7, 2014, Tr. 247; Pl.'s Hr'g Compliance 10 ("alleged free entries are insignificant").  This shows, according to Texas, that "the [Tribe's] business model is to entice the players to exchange money for chances to play." Oct. 7, 2014, Tr. 247.

The Pueblo Defendants respond that the evidence presented establishes that the "[E]ntertainment [C]enters [do] everything they can to make [free entry] as easy as possible" and in fact the sweepstakes participants have taken advantage of free entries in large numbers. *Id.* at 240-41.

In order to avoid the Texas Penal Code's prohibitions against lotteries, a valid promotional sweepstakes must negate the element of consideration by offering an alternative means of free entry. *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-39; *Socony Mobil*, 386 S.W.2d at 172-73; Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *3; Tex. Att'y Gen. Op. No. M-67 at 2. "[T]he mere pretense of free prizes, designed to evade the law, [will] not negate the element of consideration." *Jester*, 64 S.W.3d at 558 (citing *Brice*, 242 S.W.2d at 434). Thus, the Tribe "must provide an 'alternative' means of entering the contest that does *not* require the payment of consideration, *and* it must treat 'customers' and 'non-customers' alike." *See* Tex. Att'y Gen. Op. No. LO-97-008, 1997 WL 113966, at *2 (citing *Socony Mobil*, 386 S.W.3d at 172-73). Furthermore, these free entries cannot be "nominal." *See Jester*, 64 S.W.3d at 558.

The Pueblo Defendants have presented substantial evidence that a free entry alternative is, in fact, available to participants. *See* BMM Report 15 (Blue Stone) (certifying sweepstakes accepts "no purchase necessary" entries), 33 (AMS) (certifying that "patron[s] may request an entry without purchase or donation"), 48 (Winter Sky) (same), 59 (XCite) (same); *see also* Oct. 6, 2014, Tr. 43 (every Kiosk has a prominently displayed placard stating "No Donation Required"); May 6, 2014, Report 49 (photo of "No Donation Necessary" sign).

Further, the Pueblo Defendants have submitted evidence indicating that the Tribe has received over a million and a half free entry applications since 2012. *See* Defs.' Free Entry

61

Appls., Defs.' Ex. H; No Donation Necessary Forms from Entertainment Centers from March 13 through 19, 2012, Defs.' Ex. D; No Donation Necessary Forms from Entertainment Centers from May 7 through 9, 2012, Defs.' Ex. E; No Donation Necessary Forms from Entertainment Centers from July 9, 2013, Defs.' Ex. F; No Donation Necessary Forms from Entertainment Centers from May 16, 2014, Defs.' Ex. G; *see also* Oct. 6, 2014, Tr. 146 (400 to 500 participants a day request free entries), 280 (indicating that customers queue for free entries).

The Pueblo Defendants have also shown that donation-based entrants receive no advantage over participants who enter for free. *See* Oct. 7, 2014, Tr. 122, 127; *see also* BMM Report 15 (Blue Stone) (free entries drawn from same pool as donation based entries), 35 (AMS) (same), 50 (Winter Sky) (same), 61 (XCite) (same).

Though the Texas officers who testified at the October 6, 2014, hearing stated that they did not see or receive free entry options during their investigation, *see* Oct. 6, 2014, Tr. 60, 84, the same officers testified that they did not attempt to look for free entry. *Id.* at 44-45, 90. The Court therefore finds the officers' testimony on the issue of free entry availability unpersuasive. Further, Texas's own evidence indicates that "No Donation Necessary" signs are posted on Kiosks throughout both Entertainment Centers. *See* May 6, 2014, Report 3 (Speaking Rock), 5 (Socorro), 49 (photo showing "No Donation Necessary" sign). Indeed, Lt. Ferguson testified that each Kiosk contains a sign stating that no donation is necessary. Oct. 6, 2014, Tr. 43. Texas has offered no evidence to undermine the Pueblo Defendants' assertions that an alternative means of free entry is available at the Entertainment Centers.

Nonetheless, despite the Pueblo Defendants' substantial evidence regarding the availability of a free play alternative, Texas argues that the Court should find the Tribe's alternative means of free entry to be merely "nominal" because the evidence indicates that the

vast majority of participants pay to play the sweepstakes.  *See* Oct. 7, 2014, Tr. 247.  Texas, however, has presented no evidence or law establishing that a minimum amount of participants must use an alternative means of entry in order for a sweepstakes operation to avoid being labeled an illegal lottery.  To the contrary, expert testimony indicates that there are no guidelines in any state requiring a certain proportion of sweepstakes entrants to be through a free means of entry.  *See* Oct. 6, 2014, Tr. 270.

Accordingly, Texas is advised that its response to any Pueblo Defendants' proposal urging the Court to find the Tribe's alternative means of free entry to be merely nominal must be supported by citations to law and evidence in the record.

## IV.   THE TRIBE'S KIOSKS AS GAMBLING DEVICES

Texas alleges that the Tribe's Kiosks are illegal "gambling devices" as defined under the Texas Penal Code.  Mot. for Contempt 11-12; Oct. 7, 2014, Tr. 250.  The Pueblo Defendants respond that the Kiosks are not prohibited gambling devices because the elements of chance, prize, and consideration are all absent.  *See* Oct. 6, 2014, Tr. 260; Oct. 7, 2014, Tr. 235; Defs.' Mot. for Summ. J. 21; Defs.' Hr'g Compliance 7-8.

Under Texas law it is illegal to possess "any gambling device," "subassembly," or "essential part of a gambling device."  Tex. Penal Code Ann. § 47.06(a).  The Texas Penal Code defines a "gambling device" as "any electronic, electromechanical, or mechanical contrivance . . . that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance."  *Id.* § 47.01(4).[18]  Like

---

[18] The Texas Penal Code excludes from the definition of gambling device:

> "any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a

the definition of lottery, a gaming device becomes an illegal "gambling device" where the three elements of chance, prize, and consideration are present. *See id.* §§ 47.01(4), 47.06; *see also Davis*, 690 F.3d at 333 (definition of gambling device requires the "existence of some consideration exchanged for the privilege of playing the sweepstakes"). The element of consideration in the definition of a gambling device "should be treated in the same manner" as consideration in the definition of lotteries. *See Jester*, 64 S.W.3d at 557. The Pueblo Defendants have, as discussed below, disputed all three elements in relation to the Kiosks at various times during the course of the present Motion for Contempt.

The Pueblo Defendants assert that the element of chance is absent because "[a] random number generator is not used to create the sweepstakes prizes or entries." Defs.' Hr'g Compliance 8; *see also* Defs.' Mot. for Summ. J. 10; Oct. 7, 2014, Tr. 20, 235. The evidence, however, appears to establish the contrary. Though the Kiosks contain no random number generator, Oct. 7, 2014, Tr. 20, a random number generator is employed by the Server at various points in the pool creation process. *See* BMM Report 13 (Blue Stone), 32 (AMS), 48 (Winter Sky), 59 (XCite). Furthermore, at least in connection with the Winter Sky sweepstakes, the Server employs a random number generator to choose and issue a participant's result. *See id.* at 48 (Winter Sky). Thus, it is clear that a random number generator is employed at least at the Server level.

---

representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less."
Tex. Penal Code Ann. § 47.01(4)(B).

Because it is indisputable that the Tribe's devices offer cash prizes, the Court finds the exclusion provided in § 47.01(4)(B) inapplicable in the present case and does not address it further. *See* Official Rules for the Blue Stone Entertainment Donation Sweepstakes Promotion, Defs.' Ex. K, at 2; XCite Sweepstakes Rules, Defs.' Ex. L, at 3; Winter Sky Electronic Sweepstakes Rules, Defs.' Ex. N, at 4, 6; AMS Official Sweepstakes Rules, Defs.' Ex. M, at 4-11; *see also* Oct. 6, 2014, Tr. 25; May 6, 2014, Report 15 (photo of cash prize), 19 (photo of cashier window), 21 (same).

Though the Kiosk itself does not apply the random number generator, the Kiosk is nonetheless connected to the Server that does so.  *See* Oct. 6, 2014, Tr. 124 (Mr. Maahs testifying that all vendors' Kiosks are connected to "at least one" Server).  Indeed, the Pueblo Defendants' own witness, Mr. Kerns, admits that both the Kiosk and the Server are "essential parts" of the same overall gaming device.  *See* Oct. 7, 2014, Tr. 42.  Accordingly, despite the Pueblo Defendants' attempt to separate the element of chance from the Kiosks, it would nonetheless be illegal to possess such an "essential part" of a gambling device, if the Court finds that the gaming system as a whole contains the element of chance.  *See* Tex. Penal Code Ann. § 47.06(a).  The Pueblo Defendants' attempt to negate the element of chance in relation to the Kiosks, therefore, appears unavailing.

The Pueblo Defendants further argue that the Kiosks do "not award participants any type of prize, cash or non-cash, nor afford the participant an opportunity to obtain such a prize." Pueblo Defs.' Resp. 7.  For the same reason that the Pueblo Defendants' attempt to negate the element of chance in relation to the Kiosks is unavailing, the Pueblo Defendants' attempt to remove the element of prize also fails.  It is indisputable that the sweepstakes system, as a whole, offers participants the possibility of winning cash prizes.  *See* Official Rules for the Blue Stone Entertainment Donation Sweepstakes Promotion, Defs.' Ex. K, at 2; XCite Rules 3; Winter Sky Electronic Sweepstakes Rules, Defs.' Ex. N, at 4, 6; AMS Rules 4-11; *see also* Oct. 6, 2014, Tr. 25; May 6, 2014, Report 15 (photo of cash prize), 19 (photo of cashier window), 21 (same).  It is further indisputable that the Kiosks print the prize vouchers awarded to participants.  *See* BMM Report 27 (AMS) ("[Kiosks are] [r]esponsible for the . . . printing and redemption of sweepstakes tickets."), 57 (XCite) (same), 71 (Winter Sky) (same), 91 (Blue Stone) (same).

Furthermore, though it is the Server that creates, defines, and chooses the winning sweepstakes entries that result in cash prizes, *see id.* at 32-33 (AMS), 48 (Winter Sky), 60 (XCite), 114-16 (Blue Stone), the Server nonetheless ultimately sends these results to a Kiosk to display the result in an entertaining fashion. *See id.* at 34 (AMS), 60 (XCite), 74 (Winter Sky), 94 (Blue Stone). Accordingly, because the Kiosks are an "essential part" of the sweepstakes system, Oct. 7, 2014, Tr. 42, the Kiosks would be no less prohibited if the sweepstakes system as a whole contains the element of prize. *See* Tex. Penal Code Ann. § 47.06(a).

The Pueblo Defendants further assert that the element of consideration is lacking from the Kiosks because participants need not pay to play. Oct. 6, 2014, Tr. 260; Defs.' Mot. for Summ. J. 21; Defs.' Hr'g Compliance 7-8. As noted above, the element of consideration in relation to the definition of gambling devices should be treated in the same manner as the element of consideration in the definition of lotteries. *Jester*, 64 S.W.3d at 557. Accordingly, whether consideration is present in relation to the Kiosks turns, in part, on whether the sweepstakes are intended to promote the Tribe's product or whether the Tribe's product is a mere subterfuge to legitimize consideration paid to play the sweepstakes. *See id.* at 558-59; *Davis*, 690 F.3d at 338-40. If a participants' primary subject of the transaction is playing the sweepstakes, and not to promote or secure the Tribe's product, the cash inserted into the Kiosk is consideration paid for the sweepstakes. *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40.

Consequently, whether the Tribe's sweepstakes participants donate to the Tribe primarily for the purpose of supporting or securing a tribal product is highly relevant to the Court's determination of whether the Kiosks are illegal gambling devices. In this regard, evidence presented at the Hearing has given the Court cause for concern. The Tribe's own survey

indicates that 94% of patrons at Speaking Rock use the Kiosks during their visit, while 96% state that they use the Kiosks "primarily for fun and entertainment." *See* Autry Report 3-4. Mr. Autry's market research appears to support the finding that the patrons' main purpose is to have fun playing the Kiosks, and not to purchase or support any tribal product. *See id.*

Thus, in any future sweepstakes proposal, the Pueblo Defendants shall include a detailed explanation regarding the extent to which participants value the Tribe's product and whether the primary subject of the transaction is the product or engaging with the Kiosks. *See Jester*, 64 S.W.3d at 558. The Pueblo Defendants must further cite to legal authority to support their conclusions under applicable Texas and federal law.

## V.   THE PUEBLO DEFENDANTS' PROPOSAL AND TEXAS'S RIGHT TO RESPOND

Because the Court recognizes the economic benefits at stake for the Tribe with regard to this Order, *see* Oct. 7, 2014, Tr. 166 (Ms. Austin testifying that loss of the donations would result in loss of jobs and the Tribe going "back ten steps instead of [the] progressive move that [it is] on"); Ysleta del Sur Pueblo Financial Statements Years Ended Dec. 31, 2012 and 2011, Pueblo Defs.' Ex. AR, at 42 (indicating $172,556,506.00 in "sales" at Speaking Rock in 2011); 44 (indicating $222,716,350.00 in "[c]ash received from customers" at Speaking Rock in 2012), the Court will allow the Pueblo Defendants the opportunity to submit a proposal outlining a legal tribal sweepstakes to be conducted on the Tribe's territory. If the Pueblo Defendants do not submit such a proposal, they shall cease all gaming operations, including all Tribal Sweepstakes promotions, on the territory of the Ysleta del Sur Pueblo. Failure to cease all gaming operations shall result in a civil penalty in the amount of $100,000.00 per day that the Pueblo Defendants fail to cease operating.

In that proposal, the Pueblo Defendants shall address, at a minimum, the areas of concern identified by the Court above.  Specifically, the Pueblo Defendants must explain what product the Tribe's sweepstakes promote.  The Pueblo Defendants shall further ensure that any explanation of the Tribe's product fully briefs, with support found in both the evidence and the law, that the product promoted is the "primary subject of the transaction" for both the Tribe and its sweepstakes participants.  *See Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40.  Further, the Pueblo Defendants shall address the casino-like atmosphere at the Entertainment Centers and explain how that atmosphere does not indicate that the "true purpose" of the Entertainment Centers is the promotion of the sweepstakes and not the Tribe's product.  *See Davis*, 690 F.3d at 339.

The Pueblo Defendants shall also address whether the provisions of the Texas Sweepstakes Act apply to the gaming operations submitted in the proposal.  In particular, the Pueblo Defendants shall provide detailed information indicating the maximum prizes, in dollars, awarded by each sweepstakes, and explicitly discuss the extent to which the sweepstakes employ the use of the mail.

Additionally, the Pueblo Defendants shall detail whether the proposed sweepstakes will incorporate a finite pool of predetermined results, and provide specific information regarding the rate of renewal of those pools if they will continue to automatically replenish upon exhaustion of the predetermined entries.

The Pueblo Defendants shall further address any other concerns or argument they wish to bring to the Court's attention.  As noted above, in briefing any issues in the proposal, it would be unwise for the Pueblo Defendants to rely too heavily on the state trial court's opinion in *Knebel* to support the legality of their proposed gaming operations.

Furthermore, as a party to the action, Texas shall have a right to respond to the Pueblo Defendants' Proposal.  Specifically, Texas shall have thirty days from submission of the proposal in which to submit a response indicating Texas's position on the legality of the proposed sweepstakes under Texas law.  The Court advises Texas, however, that a "looks like a duck, quacks like a duck" analysis may not suffice to establish the illegality of the proposal.  *See* Oct. 6, 2014, Tr. 104.

Moreover, though the Court must interpret Texas law to determine the legality of the Tribe's gaming operations, Texas law is "operat[ing] as surrogate federal law on the Tribe's reservation."  *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1334 (5th Cir. 1994).  When interpreting federal laws enacted for the benefit of Native American tribes, ambiguities must "be liberally construed, doubtful expressions being resolved in favor of the [tribe]."  *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 795 (1991) (internal citations omitted); *see also Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310, 316 (5th Cir. 1981) (interpreting ambiguous Florida gambling statute in favor of Indian tribe).

The ambiguity surrounding the "multifarious issues of what is and is not permitted by the 1991 amendment" to the Texas constitution is well-recognized.  *See Verney*, 2006 WL 2082085, at *2; *see also G2, Inc.*, 485 F. Supp. 2d at 766.  Thus, "in construing [these] admittedly ambiguous statute[s], [the Court] must be guided by that eminently sound and vital canon, that statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians."  *Blatchford*, 501 U.S. at 795 (internal citations omitted).  Texas is advised to take account that this is not a Texas state court and the Pueblo Defendants are not the usual Texas citizens, rather they are a sovereign nation.

There are complex issues of federal law overlapping the interpretation of these Texas state gaming statutes that Texas has failed to acknowledge.

Accordingly, any response from Texas should specifically address the law which separates a legal promotional sweepstakes from a prohibited lottery under Texas law, and how any proposal by the Pueblo Defendants does or does not comply with that Texas law. What Texas has done to date has fallen well short of this standard.

## VI.   TEXAS'S CLAIM FOR COSTS

Texas requests an award of costs incurred in conducting the undercover inspections at the Entertainment Centers, as well as its legal expenses in bringing the Motion for Contempt to final hearing. Mot. for Contempt 20.

The Pueblo Defendants, though not directly articulating so, appear to respond that Texas should not recover the costs of its officers' salaries because Texas would have incurred those expenses even if the officers had not inspected the Entertainment Centers. *See* Oct. 6, 2014, Tr. 115. Further, the Pueblo Defendants appear to argue that the additional expense Texas incurred by assigning officers from Austin and San Antonio to inspect the El Paso-based Entertainment Centers was unnecessary because the Attorney General could have used local officers to conduct the inspections. *Id.* at 111-13. Texas replies that it was necessary to assign officers from Austin and San Antonio because its El Paso-based officers lacked the necessary "gambling inspection investigation experience." *Id.* at 116.

"[T]he proper aim of judicial sanctions for civil contempt is 'full remedial relief.'" *Fla. Steel Corp. v. N.L.R.B.*, 648 F.2d 233, 239 (5th Cir. 1981) (citing *McComb*, 336 U.S. at 193); *accord N.L.R.B. v. Concordia Elec. Co-Op, Inc.*, No. 95-60404, 1999 WL 1411474, at *9 (5th Cir. Nov. 9, 1999). Accordingly, "[c]ompensatory civil contempt reimburses the injured party

70

for the . . . losses flowing from noncompliance and expenses reasonably and necessarily incurred in the attempt to enforce compliance." *Rousseau v. 3 Eagles Aviation, Inc.*, 130 F. App'x 687, 690 (5th Cir. 2005) (citing *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976)).  In compensating the moving party, "a court has discretion to award reasonable attorney's fees and other expenses necessary to make [the] innocent party whole." *See Dow Chem. Co. v. Chem. Cleaning, Inc.*, 434 F.2d 1212, 1215 (5th Cir. 1970); *Concordia Elec.*, 1999 WL 1411474, at *9 n.94.  "[S]uch sanctions should be 'adapted to the particular circumstances of each case' and . . . the only limitation upon the sanctions imposed is that they be remedial or coercive but not penal.'" *Fla. Steel*, 648 F.2d at 239 (internal citations omitted); *accord Concordia Elec.*, 1999 WL 1411474, at *9.

Texas seeks reimbursement for "the legal costs of bringing [the Motion for Contempt] to final hearing."  Mot. for Contempt 20.  Because the Court has found the Pueblo Defendants in contempt of the Modified Injunction, and in light of the legal expense that Texas incurred to bring that contempt to the Court's attention, the Court finds that Texas is entitled to reimbursement for its attorney's fees.  *See Towne v. Gee Const., LLC*, Civ. No. 11-1884, 2014 WL 4981442, at *2 (E.D. La. Oct. 6, 2014); *TiVo Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661, 664, 666 (E.D. Tex. 2009); *see also In re Katrina Canal Breaches Litig.*, No. 08-30362, 2008 WL 5069808, at *1 (5th Cir. Dec. 2, 2008) ("[A] court may sanction a party by awarding attorneys' fees to a government entity."); *Dow Chem.*, 434 F.2d at 1215 ("[A] court has discretion to award reasonable attorney's fees and other expenses necessary to make [the] innocent party whole.").

The Court notes, however, that Texas has not submitted any indication of the total amount of attorney's fees incurred to bring the Motion for Contempt.  Texas has only submitted

71

a legal billing invoice listing the costs of its inspecting officers' expenses, *see* Pl.'s Ex. 38, which

the Court understands to be evidence supporting Texas's separate request for the costs of the

undercover inspections at the Entertainment Centers.  *See* Mot. for Contempt 20.[19]  This is

insufficient.  Accordingly, if Texas is seeking attorney's fees, Texas shall make its application

for attorney's fees within 14 days of this Order.[20]  The parties shall follow the procedure set out

in Local Rule CV-7(j) with regard to the award of attorney's fees, and are encouraged to resolve

any disputes prior to Texas's making its application.  *See* Local Rule CV-7(j).

Texas further requests reimbursement for the costs of inspecting the Entertainment

Centers in 2012, 2013, and 2014.  *See* Mot. for Contempt 20; Pl's Ex. 38, at 1-2, 4, 6-7.  In total,

Texas seeks $71,937.27 for "travel costs, contract costs, direct expenses, meals, [and] the hourly

cost for the investigators and the analysts involved."  Oct. 6, 2014, Tr. 108; *see also* Pl.'s Ex. 38,

at 9.  In response, the Pueblo Defendants appear to challenge Texas's requested recovery on two

grounds.  First, they contend that Texas should not recover the costs of its officers' salaries

because Texas would have incurred that expense "regardless of whether [the officers] were out

. . . in El Paso or [elsewhere]."  *See* Oct. 6, 2014, Tr. 115.  Second, the Pueblo Defendants

contend that portions of Texas's investigation costs were unnecessary as "it certainly would have

been more cost efficient . . . to have used local [officers] instead of having to incur the expenses

of hotel, travel, [and] meals . . . during a 10-day investigation."  *See id.* at 112-13.

As an initial matter, the Court has found no support for the Pueblo Defendants' argument

that Texas may not recover the costs of its officers' salaries.  Indeed, courts have "'broad

---

[19] The Court's understanding is based on the fact that the personnel listed in the legal billing invoice appear to be the names of Texas's inspecting officers, while there is no indication that the submitted billing records apply to any of Texas's attorneys.  *See* Pl.'s Ex. 38.

[20] In the Fifth Circuit, courts employ the "lodestar" method to calculate attorney's fees.  *See Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012).  The lodestar method determines attorney's fees by "multiplying the number of hours reasonably expended by an appropriate hourly rate in the community for the work at issue."  *Id.*

discretion in assessing sanctions to protect the sanctity of its decrees and the legal process.'"
*Hornbeck Offshore Servs., L.L.C. v. Salazar*, 730 F.3d 402, 403 (5th Cir. 2013) (citing *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 581-82 (5th Cir. 2005)).  This includes the power to order a contemnor to pay "*all costs* and expenses . . . incurred by the [prevailing party] in the investigation, preparation, presentation, and final disposition" of the contempt proceedings.  *See N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1024 (5th Cir. 1984) (emphasis added).  Accordingly, a court may issue an award of the salaries of employees involved in the investigation of a contemnor's actions.  *See In re Establishment Inspection of Microcosm*, 951 F.2d 121, 126 (7th Cir. 1991) (holding award of fixed benefits and overhead expenses "clearly valid" as costs for preparing and prosecuting a contempt petition); *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 748 (7th Cir. 1976) ("[S]alaries of [prevailing party's] personnel in preparing and prosecuting a contempt petition, may be awarded as compensation."), *overruled on other grounds by Kinney v. Pioneer Press*, 881 F.2d 485, 493 (7th Cir. 1993); *Dow Chem.*, 434 F.2d at 1215 (holding district court did not err in awarding "salary costs for several . . . employees involved in the investigation" of a contempt proceeding).  Having found no support for the Pueblo Defendants' argument that Texas should not recover the costs of its officers' salaries, the Court rejects it.  Texas is entitled to the recovery of some of the costs of its investigations.

Nonetheless, the Court finds merit in the Pueblo Defendants' argument that Texas should not recover the unnecessary costs of assigning officers from Austin and San Antonio to inspect the Entertainment Centers.  Compensatory civil contempt reimburses a party for expenses "reasonably and necessarily incurred in the attempt to enforce compliance."  *Rousseau*, 130 F. App'x at 690.  Texas argues it was necessary to assign officers from Austin and San Antonio

because its El Paso-based officers lacked the "experience or knowledge" to conduct the inspections.  Oct. 6, 2014, Tr. 116.  Testimony at the Hearing, however, fails to show what specialized knowledge the officers assigned to conduct the inspections possessed.  For instance, prior to conducting the inspection, Lt. Ferguson did not review any of the Case's materials, the Court's prior orders, or any authorities regarding the difference between a legal sweepstakes and an illegal lottery under Texas law.  *Id.* at 53.  Indeed, Lt. Ferguson testified that he did not know at the time of the inspection what made a sweepstakes legal.  *Id.* at 53-54.  Lt. Loper, likewise, did not review the Court's injunction prior to his inspection, and did not have any knowledge regarding the definition of a legal sweepstakes.  *Id.* at 91, 99.  Nor did Lt. Loper have any experience investigating sweepstakes in Texas.  *Id.* at 97.

Furthermore, there is no evidence establishing that any specialized skills were even needed to conduct the inspections.  Both Lt. Loper and Lt. Ferguson testified that they visited the Entertainment Centers only to determine whether it was possible to put money in the Kiosks, push buttons, and receive a prize.  *Id.* at 46, 89.  This is hardly a specialized skill.  Nor did any of the officers use specialized computer skills to inspect the gaming Kiosks or Servers.  *Id.* at 47-48, 98.

Moreover, the Court finds the length of the inspections to be both unnecessary and unreasonable.  In particular, Lt. Loper spent *ten days* at the Entertainment Centers in 2012, apparently including four days of surveillance before the officers even began the undercover inspection inside the Entertainment Centers.  *Id.* at 88, 94.  Texas requests a total of $57,602.98 in compensation for this undercover operation alone.  *See* Pl.'s Ex. 38, at 1-3.  The Court finds, however, that Texas has not established how this ten day inspection was either reasonable or

necessary in order to determine if it was possible to insert money into the Kiosks, push the buttons, and receive a prize.

Accordingly, the Court declines to award the full amount of costs requested. *See Rousseau*, 130 F. App'x at 690 (parties only entitled to costs "reasonably and necessarily incurred in the attempt to enforce compliance"). Instead, the Court finds that reasonable and necessary costs amount to the cost for three El Paso-based officers to inspect the Entertainment Centers for two days in each of 2012, 2013, and 2014, along with the administrative overhead. Based upon the information provided by Texas for the Austin and San Antonio-based officers' salaries, and subtracting the costs of travel, the Court calculates this amount at $16,928.64.[21]

## VII.     CONCLUSION

For the foregoing reasons, Texas's Motion for Contempt, ECF No. 423, is **GRANTED**.

**IT IS THEREFORE ORDERED** that, within sixty (60) days of entry of this Order, the Pueblo Defendants shall cease all gaming operations at Speaking Rock and Socorro Entertainment Centers, as well as anywhere else on their lands, with the exception of Third Party-Vendor Sweepstakes as defined by this Order and the Modified Injunction. Failure to cease gaming operations shall result in a civil penalty of $100,000.00 per day, jointly and severally among each of the Pueblo Defendants, for each day the gaming operations continue in violation of this Order.

---

[21] In reaching this total, the Court calculates the average hourly salary of Texas's officers from 2012-2014, as evidenced by Plaintiff's Ex. 38 (indicating average officer salary of $27.87/hour), and awards a cost equal to three officers' salaries for two eight-hour inspections in each of 2012, 2013, and 2014 (totaling $4,013.28). In addition, the Court calculates the average hourly overhead for Texas's officers, as evidenced by Plaintiff's Ex. 38 (indicating average overhead costs of $30.91/hour, per officer), and awards a cost equal to the overhead for three officers over two eight-hour days in each of 2012, 2013, and 2014 (totaling $4,451.04). The Court then adds these amounts, resulting in a total of $8,464.32. The Court then doubles that amount to provide for reasonable costs incurred by a single day in preparation for each inspection and a single day of debriefing after each inspection. The Court calculates this total sum to amount to $16,928.64.

**IT IS FURTHER ORDERED** that the Pueblo Defendants may submit a firm and detailed proposal setting out a sweepstakes promotion that operates in accordance with federal and Texas law.  Any proposal shall address the issues of concern to the Court as set out above with citation to legal authority and evidence.  The Pueblo Defendants shall submit any proposal within sixty (60) days of the entry of this Order.  Submission shall result in a stay of the order to cease gaming operations on tribal lands.  Any stay shall remain in effect during the Court's consideration of the proposal.

**IT IS FURTHER ORDERED** that Texas shall have thirty (30) days from the submission of any Pueblo Defendants' sweepstakes proposal to submit a response, supported by citation to the legal authority.

**IT IS FURTHER ORDERED** that Texas shall submit, no later than fourteen (14) days from entry of this Order, a memorandum, supported by the affidavit of counsel, establishing the amount of reasonable attorney's fees incurred as a direct result of the Pueblo Defendants' contempt.  Such submission shall follow the procedures set out in Local Rule CV-7(j).

**IT IS FURTHER ORDERED** that the Pueblo Defendants shall pay $16,928.64 to the State of Texas for the reasonable costs associated with the 2012, 2013, and 2014 inspections.

**SO ORDERED**.

SIGNED this 6th day of March, 2015.

_Kathleen Cardone_
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE