IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-99-CV-320-KC** |
| | § | |
| **YSLETA DEL SUR PUEBLO, et al.,** | § | |
| | § | |
| **Defendants**. | § | |

## <u>ORDER</u>

On this day, the Court considered Defendants Ysleta del Sur Pueblo, Tigua Gaming Agency, The Tribal Council, and Tribal Governor Carlos Hisa or his successor's (the "Pueblo Defendants") Motions to Vacate Injunction and Dismiss Case for Failure to Name Indispensable Parties and Lack of Subject Matter Jurisdiction, or in the Alternative, to Modify Injunction to Allow Class II Gaming and Stay Further Proceedings ("Motion to Vacate"), ECF No. 531. For the reasons set forth herein, the Motion to Vacate is **DENIED**.

Furthermore, and fundamental to the ongoing administration of this case, the Court sua sponte reconsiders the current arrangement, which the Court articulated in its August 4, 2009, Order requiring "Defendants to petition the Court directly to make an exception to the overall prohibition of gaming contained in the [Original Injunction] in this case." *See* Order Regarding Defs.' Third Mot. for Clarification ("Order Regarding Third Clarification Motion") 7, ECF No. 282. The Court sets out a new procedure, herein, for enforcing the Order Granting Summary Judgment and Injunction ("Original Injunction"), ECF No. 115, the Order Modifying September

27, 2001, Injunction ("2002 Order"), ECF No. 165, and the Memorandum Opinion and Order Granting Motion for Contempt ("2009 Order"), ECF No. 281 (collectively, the "Injunction").

As explained in detail below, the Court eliminates the requirement that the Pueblo Defendants submit proposals to the Court seeking prior authorization for the Ysleta del Sur Pueblo of the Tigua Indian tribe (the "Tribe") to engage in any gaming activity, whether the gaming activity be permitted under the Restoration Act, 25 U.S.C. § 1300g, or not.  Requiring the Pueblo Defendants to seek this pre-approval from the Court to engage in any gaming activities violates the spirit, if not the letter, of the Restoration Act, and has improperly contorted this Court's role of arbiter into that of a regulatory body overseeing a segment of the affairs of a sovereign tribal nation.  The Court should not, and will not, undertake this role any longer. Instead, the Restoration Act provides a mechanism for addressing violations of its provisions. That mechanism requires Texas to bring suit in this Court to challenge alleged violations of the Act, and allows this Court to enter an injunction, if warranted.  Additionally, the Court eliminates the requirement that the Pueblo Defendants "allow the designated representatives of the State of Texas access on a monthly basis to . . . any . . . location at which gaming activities are conducted by the Defendants, and access to the records maintained by the Defendants." *See* Order Regarding Defs.' Mot. to Modify Previous Order ("2010 Order") 3, ECF No. 324.

Finally, because the Court no longer requires the Pueblo Defendants to seek prior authorization, the Court refrains from reviewing the Pueblo Defendants' Proposed Use of Sweepstakes to Promote Economic Activity on the Ysleta del Sur Pueblo ("Proposal"), ECF No. 513.  Instead, the Court proceeds to resolve Plaintiff State of Texas's ("Texas") Fifth Amended Motion for Contempt ("Motion for Contempt"), ECF No. 423, based on the facts and evidence before the Court at the time it issued its Order on March 6, 2015, ("March 6, 2015, Order"), ECF

No. 510.  In resolving the Motion for Contempt, the Court determines whether the Pueblo Defendants' activities were in violation of Texas gaming law, and therefore in violation of the Injunction.  As explained in detail below, the Court finds that such activities were in violation.

## I.    BACKGROUND

The present Motion to Vacate "is only the most recent tangle in a protracted saga" between Texas and the Tribe.  March 6, 2015, Order 1.  The Court previously set out the factual and procedural background of this lengthy and contentious case in great detail in its March 6, 2015, Order.  Thus, the Court does not reiterate the extensive factual and procedural background.  Instead, the Court recites only the most significant factual and procedural background, and outlines the pertinent developments since the March 6, 2015, Order.

As the Court previously explained, for more than fifteen years the Tribe has sought to institute various forms of gaming on its reservation, while Texas has sought to enjoin those operations as violations of Texas gaming laws.  *See id.* at 1-2.  To provide context regarding the restrictions the Tribe is subject to with respect to their gaming activities, and to set out the development of the case as it relates to the current state of affairs, the Court begins by recounting the evolution of the Injunction.

### A.    Evolution of the Injunction

#### 1.    Original Injunction

The Court issued the Original Injunction in this case on September 27, 2001.  *See* Original Inj.  The Original Injunction stated:

> The persons and parties enjoined and listed as being subject of injunction are hereby ORDERED to CEASE, DESIST, TERMINATE AND REFRAIN FROM engaging in, permitting, promoting, and conducting activities at the Speaking Rock Casino in violation of Chapter 47 of the Texas Penal Code, and 25 U.S.C. § 1300-6 of [the] Restoration Act, including but not limited to the following activities:

A.   Gambling activities played with cards, dice, balls, or any other gambling device where some, any or all of the persons and parties enjoined receive an economic benefit.  Specifically prohibited are all card games; all dice games; all games using one or more balls and or a spinning wheel and gaming involving a vertical spinning wheel, which require players to pay a monetary fee, whether such fee is designated as "Ante," "Rake," Service Charge or otherwise.

B.   Gambling activities played with cards, dice[,] balls, or any other gambling device where some, any or all of the persons and parties enjoined, charge or collect or attempt to collect any monetary fee as a requirement for any person to bet on or play any game played with cards, dice, balls or any other gambling device, whether such fee is designated by "Ante," "Rake," Service Charge or otherwise.

C.   Gambling activities played with cards, dice, balls, Keno tickets, bingo cards, slot machines, or any other gambling device where some, any or all of the persons and parties enjoined act directly or indirectly as the "house" or "banker" in the same fashion as the operator of the gambling casino.

D.   Providing to any person for his/her use a slot machine, the operation of which results in or is calculated to result in an economic benefit to the owner or lessor of the slot machine.

E.   Conducting any gambling game from which any person or party enjoined herein is likely to receive any economic benefit other than personal winnings, including, but not limited to:

1.   Bingo or any variation thereof;

2.   Scratch tickets, peel tickets, or pull tabs;

3.   Keno or any variation thereof;

4.   Tigua Dice, Craps, or any variations thereof;

5.   Slot Machines;

6.   Poker card games;

7.   Betting on horse races or dog races;

8.   Tigua 21, Blackjack, or any variations thereof;

4

      9.    Wheel of Fortune, Big Six Wheel, or any variations of wheel games;

    F.    Allowing other persons or entities to engage in any of the above activities on the premises of Speaking Rock Casino or anywhere upon the reservation lands of the Ysleta del Sur Pueblo or upon any other lands of said Tribe.

*Id*. at 3-5.

### 2.    2002 Order

In the 2002 Order, the Court observed that the Original Injunction "enjoined the [Pueblo] Defendants from operating the Casino, having the practical and legal effect of prohibiting illegal as well as legal gaming activities by the [Pueblo] Defendants." 2002 Order 3; *see id*. at 6-7 ("As noted, the legal and practical effect of the Court's [Original Injunction] was to cease all gaming activities by the Defendants."). On its face, however, the Original Injunction does not enjoin all gaming activity, regardless of legality. *See* Original Inj. Instead, as detailed above, it enjoins "activities at the Speaking Rock Casino in violation of Chapter 47 of the Texas Penal Code, and 25 U.S.C. § 1300-6 of [the] Restoration Act, including but not limited to [a list of specific activities]." *Id*. at 3-5.

Nonetheless, in the 2002 Order, the Court interpreted the Original Injunction to mean that "the Tribe would ultimately be permitted to participate in legal gaming activities under Texas law, if it so qualified," but that in the interim the Original Injunction enjoined all gaming activities on the reservation as a means of ensuring the illegal gaming activities would cease. *See* 2002 Order 7. Further, the Court stated that "[o]nce in compliance, the [Original Injunction] provided that the Defendants could petition the Court for a modification . . . that would permit the Tribe to conduct legal gaming operations if it otherwise qualified under Texas law." *Id*.

The Court then proceeded "to consider the Defendants' request for declarations that various proposed activities do not violate the injunction, or, if any activity does violate the

injunction and is a legal activity the Tribe is otherwise qualified to participate in under Texas law, that the injunction be modified to permit said activity." *Id.* The Court reviewed details of seven proposed activities, and modified the Original Injunction to permit three activities: (1) "[s]tate lottery activities as an agent of the State of Texas"; (2) "[a]musement devices, but only to the extent the Tribe adheres to all the provisions of Tex. Penal Code Ann. § 47.01(4) and other relevant Texas law"; and (3) "[t]hird-party giveaway contests conducted by national vendors." *Id.* at 7-20.

### 3.     2009 Order

On August 3, 2009, the Court modified the Original Injunction again, upon finding Defendants in civil contempt for violating Texas law in a manner prohibited by the Original Injunction. *See* 2009 Order 8. The Court ordered the Defendants to:

> CEASE and DESIST in the operation of gaming devices in a manner that rewards the player with cash or the equivalent of cash, including but not limited to gift cards, credit cards, or debit cards, in violation of the Texas Penal Code and the injunction and modified injunction in this case.

*Id.* at 8-9.

### B.     March 6, 2015, Order

Texas initiated the most recent contempt proceedings in September 2013, because it discovered the Tribe was conducting sweepstakes operations at Speaking Rock Casino and Entertainment Center ("Speaking Rock") and at the Socorro Entertainment Center ("Socorro") (collectively "Entertainment Centers") on its reservation in El Paso, Texas. *See* March 6, 2015, Order 2, 8. Both Entertainment Centers offer sweepstakes to solicit donations for the Tribe.[1]

---

[1] A more comprehensive and detailed description of the Tribe's sweepstakes operations can be found in the March 6, 2015, Order. *See* March 6, 2015, Order 20-25.

*See id*. at 20.  The sweepstakes are run by four third-party vendors, which "do not sell a product in connection with the sweepstakes."  *See id*.

"[P]articipants play the sweepstakes through hundreds of electronic gaming systems offered at Speaking Rock and Socorro."  *Id*.  Each electronic gaming system "consists of three components: (1) video sweepstakes terminals ('Kiosks'), (2) a central server ('Server'), and (3) a point of sale system ('POS')."  *Id*.

The Kiosks are "upright cabinets with two video displays, a bill acceptor and a printer," and "provid[e] an entertaining display for the redemption of sweepstakes tickets."  *Id*. at 21 (citations omitted).  To initiate an interaction with a Kiosk, sweepstakes participants insert "either cash or pre-obtained free entry vouchers into the Kiosk's bill reader."  *Id*.  After a participant inserts cash into a Kiosk's reader, "a message appears on the Kiosk's screen stating that all 'donations' go toward helping fund the Tribe's services in health care, education, public safety, elder care, veterans' services, and after school and day care programs."  *Id*.  Next, "a screen prompts the participant to either agree or disagree to make a donation."  *Id*.  "If a participant does not agree to donate, the Kiosk prints a 'cash-out ticket' in the amount inserted into the Kiosk."  *Id*.  However, if a participant does agree to donate, "the Kiosk displays a series of touch screen buttons that allow the participant to either 'max,' 'donate,' or 'play.'"  *Id*.

After a participant touches one of these buttons, "the Kiosk uses '[v]isual entertainment' to indicate whether the sweepstakes entries represent a winning or losing result."  *Id*. at 21-22 (alteration in original).  The visual entertainment is "designed to create the look and the feel of casino-like games."  *Id*. at 22 (citation omitted).  The Kiosks are not capable of creating a random result, and the visual entertainment displays do not "alter or determine the sweepstakes result."  *Id*.  Instead, "[s]oftware hosted on the Server creates sweepstakes by generating

7

randomized pools of sweepstakes entry results." *Id*.  The Server delivers an outcome to the Kiosk, and "[t]he Kiosks can only read the value of a result sent by the Server." *Id*.  Thus, the entertaining display is determined by the outcome the Server delivers to the Kiosk. *Id*.

In its Motion for Contempt, Texas asserted that the Pueblo Defendants were violating the Injunction "in three respects: (1) for operating an unauthorized Tribal Sweepstakes; (2) for operating illegal lotteries under Texas law; and (3) for operating illegal gambling devices under Texas law." *Id*. at 8 (citing Mot. for Contempt 9, 11-13).  On October 6 and 7, 2014, the Court held a Show Cause Hearing (the "Hearing").  After the Hearing, the Court found the Pueblo Defendants in contempt for operating a Tribal Sweepstakes without prior approval, but did not ultimately determine whether the Tribe's current sweepstakes were prohibited lotteries as defined by Texas Penal Code § 47.01(7), or whether the Tribe's Kiosks were illegal "gambling devices" as defined by Texas Penal Code § 47.01(4).  *See id*. at 35, 63.

The Court directed the Pueblo Defendants to cease, within sixty days, "all gaming operations at Speaking Rock and Socorro Entertainment Centers, as well as anywhere else on their lands, with the exception of Third Party-Vendor Sweepstakes as defined by [the March 6, 2015, Order and the 2002 Order]." *Id*. at 75.  The Court warned Defendants that "[f]ailure to cease gaming operations shall result in a civil penalty of $100,000.00 per day . . . for each day the gaming operations continue in violation of [the March 6, 2015, Order]." *Id*.

However, the Court provided the Pueblo Defendants an opportunity to effect a stay of the March 6, 2015, Order if the Pueblo Defendants submitted, for the Court's consideration, "a firm and detailed proposal setting out a sweepstakes promotion that operates in accordance with federal and Texas law." *Id*. at 76.  The Court further provided a briefing schedule allowing Texas to respond to the Pueblo Defendants' sweepstakes proposal.  *See id*.

On May 5, 2015, pursuant to the March 6, 2015, Order, the Pueblo Defendants submitted

their Proposal.  Texas filed its Response in Opposition to the Proposal, ECF No. 514, on June 4,

2015, and the Pueblo Defendants filed their Reply in Support of the Proposal, ECF No. 520, on

June 29, 2015.

## C.    NIGC and DOI Letters

On October 6, 2015, the Pueblo Defendants filed a document which is comprised of two

letters ("Agency Letters"), ECF No. 524.  The first letter is addressed to Tribal Governor Carlos

Hisa and is signed by Jonodev O. Chaudhuri, Chairman of the National Indian Gaming

Commission ("NIGC").  *See* Agency Letters 1, 4.[2]  The National Indian Gaming Commission

Letter ("NIGC Letter") is four pages long and is written on NIGC letterhead and dated October

5, 2015. *See id*. at 1-4.  The subject line of the NIGC Letter reads: "Ysleta del Sur Pueblo Class

II Tribal Gaming Ordinance and Resolution No. TC-021-14."  *Id*. at 1.  The NIGC Letter states:

> This letter responds to the [Tribe]'s August 17, 2015, request through its attorneys, Johnson, Barnhouse & Keegan, to the [NIGC] to review and approve the [Tribe]'s amendments to its Class II gaming ordinance.  The amendments to the gaming ordinance were adopted by Resolution No. TC-021-14 by the Ysleta del Sur Pueblo Tribal Council.
>
> Resolution No. TC-021-14 revises the [Tribe]'s current gaming ordinance to reflect the changes in the NIGC regulations in the last twenty years and to seek NIGC regulation of its bingo operations in light of federal case law.  Because the Pueblo's ordinance permits it to conduct gaming on its *Indian lands*, an analysis of whether its lands are eligible for gaming was necessary.

*Id*. (footnotes omitted).

The NIGC Letter approved the Tribe's ordinance, finding it is "consistent with the

requirements of" the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721 and

NIGC regulations.  *Id*. at 4.  The NIGC Letter states that (1) "because the [Tribe] possesses

---

[2] For clarity in citing to the Agency Letters, the Court cites to the page numbers provided by the Court's electronic docketing system.

sufficient legal jurisdiction over its Restoration Act lands, [IGRA] applies," and (2) "because the lands qualify as *Indian lands* under IGRA, the lands are eligible for gaming under IGRA." *Id*. In reaching its conclusions, the NIGC briefly addresses IGRA and the Restoration Act, but cites to and incorporates the second letter, discussed further below, for the finding that IGRA governs gaming on the Tribe's reservation and "impliedly repeal[ed] the portions of the Restoration Act repugnant to IGRA." *See id*. at 1-3, 3 n.18, 4.

Attached to and incorporated in the NIGC Letter is the second letter ("DOI Letter"), which is addressed to Michael Hoenig, General Counsel of the NIGC, and signed by Venus McGhee Prince, Deputy Solicitor for Indian Affairs. *See id*. at 5, 25. The DOI Letter is twenty-one pages long, is written on United States Department of the Interior ("DOI"), Office of the Solicitor, letterhead, and is stamped with the date of September 10, 2015. *See id*. at 5. The subject line of the DOI Letter reads: "Ysleta del Sur Pueblo Restoration Act." *Id*.

The stated purpose of the DOI Letter is to:

respond[] to the [NIGC] Office of General Counsel's letter dated May 29, 2015, requesting our opinion regarding whether, in light of the . . . Restoration Act . . . , and the [IGRA], the [Tribe] can game pursuant to the IGRA on the Tribe's reservation and tribal lands.

*Id*. (footnotes omitted).

The DOI Letter goes on to state:

Applying the [DOI]'s expertise in the field of Indian affairs, this Office concludes that the Restoration Act did not divest the Tribe of jurisdiction over its reservation and tribal lands and, therefore, that IGRA applies to such lands. In addition, we conclude that the IGRA impliedly repealed Section 107 of the Restoration Act[3], which concerns gaming.

*Id*. (footnote omitted).

---

[3] Section 107 of the Restoration Act is codified at 25 U.S.C. § 1300g-6.

Thus, the DOI Letter concludes, "in answer to [the NIGC Office of General Counsel's] question, . . . the Restoration Act does not prohibit the [Tribe] from gaming on its Indian lands under IGRA." *Id*. at 25.

In support of its conclusions, the DOI Letter cites a wealth of sources, including IGRA and its legislative history, the Restoration Act and its legislative history, case law, and Texas gaming law. *See id*. at 5-13. The DOI Letter also recounts the history of the litigation between Texas and the Tribe over the application of IGRA and the Restoration Act. *See id*. Further, the DOI Letter devotes a portion of its analysis to explaining the author's view that the Fifth Circuit opinion in *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325 (5th Cir. 1994), was wrongly decided, and why, contrary to the Fifth Circuit's holding in that case, IGRA applies to the Tribe's gaming activities. *See* Agency Letters 9, 9 n.79, 10-25.

On October 9, 2015, the Court ordered Texas and the Pueblo Defendants to provide additional briefing "regarding what impact, if any, the [Agency Letters] ha[ve] on the case," and to address the Agency Letters' impact on the Court's continuing jurisdiction. Order 1-2 ("Order to Submit Amicus Briefs"), ECF No. 525. The Court also invited the NIGC and the DOI to submit amicus curiae briefs regarding the legal effect of the Agency Letters. *See id*. at 2. The United States respectfully declined the Court's invitation on behalf of the NIGC and the DOI. *See* Advisory to the Court Regarding United States' Amicus Participation ("Advisory to the Court"), ECF No. 537.

On November 9, 2015, the Pueblo Defendants filed the present Motion to Vacate. *See* Mot. to Vacate.

## II.    DISCUSSION

The Pueblo Defendants argue that the Court should vacate the Injunction because the Court should afford *Chevron* deference to the NIGC Letter and the DOI Letter, and conclude that the Court lacks subject matter jurisdiction.  Additionally, the Pueblo Defendants argue that the case should be dismissed for failure to name two indispensable parties, the United States and the Alabama Coushatta Tribe of Texas ("Alabama-Coushatta").  Finally, the Pueblo Defendants urge the Court to either vacate the Injunction, or to modify it to allow the NIGC to regulate Class II gaming.  The Court addresses each of these arguments but first sets out the statutory framework of the two statutes that impact the outcome of the Motion to Vacate.

### A.    Relevant Statutory Framework

Two statutes integral to the Court's decision today, and to the long-running conflict over gaming between Texas and the Tribe, are the Restoration Act and IGRA.[4]  Congress passed the Restoration Act in 1987, *Ysleta*, 36 F.3d at 1329, thereby restoring the federal trust relationship between the United States and the Tribe.  *See* 25 U.S.C. § 1300g-2(a).  One provision of the Restoration Act states that:

> [A]ll laws and rules of law of the United States of general application to Indians, to nations, tribes, or bands of Indians, or to Indian reservations which are not inconsistent with any specific provision contained in this subchapter shall apply to the members of the tribe, the tribe, and the reservation.

*Id*. § 1300g-2(a).

The Restoration Act specifically addresses "[g]aming activities" in § 1300g-6.  *See id.* § 1300g-6.  That section provides:

---

[4] A more in-depth discussion of the history of these statutes can be found in *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325 (5th Cir. 1994).  *See also* William C. Canby, Jr., American Indian Law in a Nutshell 347-86 (6th ed. 2014) (providing overview of IGRA); Cohen's Handbook of Federal Indian Law Ch. 12 (Nell Jessup Newton ed., 2012) [hereinafter Cohen's Handbook] (covering IGRA "and the relationship among the states, tribes, and federal government in gaming matters").

> All gaming activities which are prohibited by the laws of the State of Texas are hereby
> prohibited on the reservation  and on lands of the tribe.  Any violation of the prohibition
> provided in this subsection shall be subject to the same civil and criminal penalties that
> are provided by the laws of the State of Texas.  The provisions of this subsection are
> enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-02-86 which
> was approved and certified on March 12, 1986.

*Id*. § 1300g-6(a).

Section 1300g-6(b) states, however, that "[n]othing in this section shall be construed as a grant

of civil or criminal regulatory jurisdiction to the State of Texas."  *Id*. § 1300g-6(b).

If the Tribe or any of its members engage in "gaming activities which are prohibited by

the laws of the State of Texas" while "on the reservation or on lands of the tribe," the Restoration

Act provides that the "courts of the United States shall have exclusive jurisdiction" over the

offense.  *Id*. § 1300g-6(c).  Further, the Act directs that "nothing in this section shall be

construed as precluding the State of Texas from bringing an action in the courts of the United

States to enjoin violations of the provisions of this section."  *Id*.  Finally, the Restoration Act

charges the "Secretary of the Interior or his designated representative" with "promulgat[ing] such

regulations as may be necessary to carry out the provisions of [the] Act."  Ysleta del Sur Pueblo

and the Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, § 2,

101 Stat. 666 (1987).

Approximately one year after passing the Restoration Act, Congress passed IGRA in

1988, thereby creating an intricate, "three-tiered regulatory paradigm" regarding gaming on

Indian lands.  *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 787-88 (1st Cir. 1996); *see* 25

U.S.C. § 2703(6)-(8) (defining "class I," "class II," and "class III" gaming); *Ysleta*, 36 F.3d at

1330-31 (describing the three classes of gaming under IGRA and their attendant "degree[s] of

regulation").  In § 2701, Congress set out its findings:

(1) [N]umerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

*Id*. § 2701.

Furthermore, § 2702 lists IGRA's purposes:

(1) [T]o provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

*Id*. § 2702.

Additionally, IGRA created the NIGC and charged it with "promulgat[ing] such regulations and guidelines as it deems appropriate to implement the provisions of this chapter." *Id*.

§ 2706(b)(10).

**B.      Motion to Dismiss for Lack of Subject Matter Jurisdiction**

The Pueblo Defendants urge the Court to dismiss the case pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure because the Court lacks subject matter jurisdiction.  *See* Mot. to Vacate 4-5.  The Pueblo Defendants argue that the Court lacks subject matter jurisdiction over the case because under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Court must defer "to the decisions of the [NIGC] on the IGRA issues addressed in the [NIGC Letter], and must defer to the decision of the [DOI] on the Restoration Act and IGRA issues addressed in [the DOI Letter]."  Mot. to Vacate 2.  The Pueblo Defendants argue that the upshot of the Court's affording *Chevron* deference to the agencies' decisions is that IGRA controls the Tribe's gaming activities, and repealed the Tribe's waiver of sovereign immunity in the Restoration Act.  *See id*. at 1-2, 4-5.  The Pueblo Defendants reason that because Texas's "amended complaint does not identify a statutory waiver of the Pueblo's sovereign immunity," as it refers only to the waiver of immunity in the Restoration Act, the Court must dismiss the case for lack of subject matter jurisdiction.  *See id*. at 5.  The Court begins its analysis with the determinative issue—whether the Court should afford *Chevron* deference "to the decisions of the [NIGC] on the IGRA issues addressed in the [NIGC Letter], and . . . to the decision of the [DOI] on the Restoration Act and IGRA issues addressed in [the DOI Letter]."  *Id*. at 2.

**1.      The NIGC and DOI decisions are not entitled to *Chevron* deference**

Under the *Chevron* doctrine, "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions."  *City of Arlington v. FCC*, ---U.S. ----, 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron*, 467 U.S. at 842).  "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly

spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *Id.* (quoting *Chevron*, 467 U.S. at 842-43).  "But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"  *Id.* (quoting *Chevron*, 467 U.S. at 843); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).  Additionally, an agency's interpretation of a statute it does not administer is ordinarily not entitled to deference.  *See Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 833 (D.C. Cir. 2000); *Passamaquoddy*, 75 F.3d at 793-94 (declining to afford *Chevron* deference to NIGC interpretation of the Maine Indian Claims Settlement Act of 1980, in part because "[d]eference is appropriate under *Chevron* only when an agency interprets a statute that it administers" (quoting *CFTC v. Schor*, 478 U.S. 833, 845 (1986))).

The types of interpretations that may qualify for *Chevron* deference include "an agency's interpretation of a statutory ambiguity that concerns the scope of its regulatory authority (that is, its jurisdiction)."  *City of Arlington*, 133 S. Ct. at 1866.  The Supreme Court explained that "the distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage.  No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its authority*."  *Id.* at 1868.

Before considering whether the agency interpretation is made within the bounds of its authority, a court must first determine whether *Chevron* is the appropriate framework at all.  *See, e.g., United States v. Mead Corp.*, 533 U.S. 218, 226-30 (2001).  At a fundamental level, the Supreme Court has "indicated that whether a court should give [*Chevron*] deference depends in

significant part upon the interpretive method and the nature of the question at issue." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (citing *Mead*, 533 U.S. at 218).  For example, "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the legal question over a long period of time" are factors "indicat[ing] that *Chevron* provides the appropriate legal lens through which to view the legality of [a particular] Agency interpretation."  *Id*.

*Chevron* deference is inappropriate where the issue "is a pure question of statutory construction for the courts to decide."  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446-48 (1987). Indeed, the United States Court of Appeals for the Third Circuit has indicated "that *Chevron* deference is not appropriate where the interpretation of a particular statute does not 'implicate [] agency expertise in a meaningful way' but presents instead 'a pure question of statutory construction for the courts to decide.'"  *Drakes v. Zimski*, 240 F.3d 246, 250 (3d Cir. 2001) (quoting *Sandoval v. Reno*, 166 F.3d 225, 239-40 (3d Cir. 1999)); *see Negusie v. Holder*, 555 U.S. 511, 531 (2009) (Stevens, J., concurring in part and dissenting in part) (opining that in determining whether the *Chevron* framework applies, the Court "might distinguish between pure questions of statutory interpretation and policymaking, or between central legal issues and interstitial questions," because "[c]ertain aspects of statutory interpretation remain within the purview of the courts, even when the statute is not entirely clear, while others are properly understood as delegated by Congress to an expert and accountable administrative body"); Samuel L. Feder, Matthew E. Price, & Andrew C. Noll, *City of Arlington v. FCC: The Death of Chevron Step Zero?*, 66 Fed. Comm. L.J. 47, 62 (2013) ("In asking whether Congress intended to delegate interpretative authority to the agency, the Court has invoked two sets of distinctions.

17

The first . . . concerns the *nature* of the question at issue: whether it presents a pure question of statutory construction, or instead involves an aspect of policymaking or mixed question of fact and law.").

      Moreover, to decide whether *Chevron* is the appropriate framework for a particular case, courts address preliminary issues, such as the administrative decision-making process, to determine whether to afford *Chevron* deference to the agency action.  *See Mead*, 533 U.S. at 226-31.  Within the Fifth Circuit, courts are "guided by the two-step analysis" introduced in *United States v. Mead Corp.*, 533 U.S. 218 (2001).  *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 454 (5th Cir. 2015).  "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears [(1)] that Congress delegated authority to the agency generally to make rules carrying the force of law, and [(2)] that the agency interpretation claiming deference was promulgated in the exercise of that authority."  *Id.* (alterations in original) (quoting *Mead*, 533 U.S. at 226-27); *see City of Arlington*, 133 S. Ct. at 1874 ("[F]or *Chevron* deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted."); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990) ("Where Congress prescribes the form in which an agency may exercise its authority . . . [courts] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form.").

      At the outset, the Court notes that the Pueblo Defendants have failed to identify "the precise question at issue," *Chevron*, 467 U.S. at 842-43, that is purportedly subject to *Chevron* deference.  Instead, the Pueblo Defendants state, in conclusory and vague terms, that the Court must defer "to the decisions of the [NIGC] on the IGRA issues addressed in the [NIGC Letter],

and must defer to the decision of the [DOI] on the Restoration Act and IGRA issues addressed in [the DOI Letter]."  Mot. to Vacate 2.  Without identifying for the Court the "precise question at issue," it is difficult, if not impossible, for the Court to discern "whether Congress has directly spoken to the precise question at issue" under the first step in *Chevron.  See Chevron*, 467 U.S. at 842-43.  Nonetheless, the Court does not even advance to the first step of *Chevron*, as the *Chevron* framework is inappropriate in the present context.

While the Pueblo Defendants urge the Court to defer to the NIGC and DOI Letters, the Court does not afford the Letters *Chevron* deference because there is no indication that Congress intended for courts to defer to NIGC and DOI interpretations of anything beyond the respective statutes each agency administers.  IGRA established the NIGC as an entity within the DOI, and charged it with administering IGRA.  *See* 25 U.S.C. §§ 2704(a), 2706(b)(10) (charging NIGC with, among other things, "promulgat[ing] such regulations and guidelines as it deems appropriate to implement the provisions of this chapter").  Likewise, DOI is charged with, among other responsibilities, administering the Restoration Act.  *See* Restoration Act, Pub. L. No. 100-89, § 2, 101 Stat. 666 ("The Secretary of the Interior or his designated representative may promulgate such regulations as may be necessary to carry out the provisions of this Act.").  Thus, NIGC's interpretations of the provisions of IGRA, and DOI's interpretations of the provisions of the Restoration Act, are interpretations potentially within the scope of agency pronouncements accorded *Chevron* deference.  *See City of Arlington*, 135 S. Ct. at 1866.  Yet, the NIGC and DOI Letters interpret not only the agencies' respective organic statutes, but also the interplay of their organic statutes with other statutes and case law.  *See generally* Agency Letters.  Therefore, the Court does not defer to the contents of the NIGC and DOI Letters

19

because an agency's interpretation of a statute it does not administer is ordinarily not entitled to deference. *See Am.'s Cmty. Bankers*, 200 F.3d at 833; *Passamaquoddy*, 75 F.3d at 793-94.

In *Passamaquoddy Tribe v. Maine*, 75 F.3d 784 (1st Cir. 1996), the United States Court of Appeals for the First Circuit declined to afford *Chevron* deference to an NIGC interpretation because it found Congress had spoken directly to the question before the court. *See id.* at 793-94. The court noted an additional reason for declining *Chevron* deference to the NIGC, stating that "[d]eference is appropriate under *Chevron* only when an agency interprets a statute that it administers." *Id.* at 794. The NIGC, however, had not rested its conclusions solely on interpretations of its own statute:

> Here, the question of the Gaming Act's applicability cannot be addressed in a vacuum, and the [NIGC], whatever else might be its prerogatives, does not administer the Settlement Act. That role belongs to the Secretary of the Interior, . . . and has not been delegated by the Secretary to the [NIGC]. Though the [NIGC] may have expertise in the conduct of gaming activities on tribal lands, . . . we cannot take it upon ourselves to assume, without any evidence, that Congress intended to entrust the [NIGC] with reconciling the [IGRA] and other statutes in the legislative firmament.

*Id.* at 794 (citations omitted).

Similarly, in *Commonwealth v. Wampanoag Tribe of Gay Head (AQUINNAH)*, Civil Action No. 13-13286-FDS, 2015 WL 7185436 (D. Mass. Nov. 13, 2015), the court pointed out that the DOI and NIGC letters in that case "focus[ed] predominantly on interpreting [a judicial opinion] and applying its two-step test to the Massachusetts Settlement Act." *Id.* at *16 n.23. Yet, the First Circuit had previously indicated that "'deference is inappropriate when an agency's conclusion rests predominantly upon its reading of judicial decisions' because 'courts, not agencies, have special expertise in interpreting case law.'" *Id.* (quoting *Passamaquoddy*, 75 F.3d at 794). The court declined to afford *Chevron* deference to the agency letters partially on this basis.

This Court faces a similar situation here, where both the NIGC and the DOI, in the NIGC Letter and DOI Letter respectively, have grounded the contents of their Letters in analyses of the statutes each agency is responsible for administering, along with other statutes and judicial decisions. *See* Agency Letters 1-4, 6-26. The Court "cannot take it upon [itself] to assume, without any evidence, that Congress intended to entrust the [NIGC and DOI] with reconciling [IGRA and the Restoration Act, respectively] and other statutes in the legislative firmament." *See Passamaquoddy*, 75 F.3d at 794; *see also City of Arlington v. FCC*, 668 F.3d 229, 247-48 (5th Cir. 2012) ("[W]e do not use *Chevron* when reviewing an agency's interpretation of a statute it is not charged with administering."). Thus, the Court concludes that the Agency Letters do not merit *Chevron* deference on this basis.

Furthermore, to the extent the Pueblo Defendants ask the Court to defer to the NIGC's and DOI's conclusion that IGRA impliedly repealed the Restoration Act, the *Chevron* framework remains untenable. Whether IGRA impliedly repealed the Restoration Act is "a pure question of statutory construction for the courts to decide," and not an issue that appears to "implicate [] agency expertise in a meaningful way." *See Drakes*, 240 F.3d at 250 (alteration in original); *Negusie*, 555 U.S. at 531 (Stevens, J., concurring in part and dissenting in part); *Cardoza-Fonseca*, 480 U.S. at 446-48. The Court should not defer to the NIGC's and DOI's respective interpretations of the interplay among several statutes and case law. *See Wampanoag*, 2015 WL 7185436, at *16 n.23

Finally, even if deference might be appropriate, at least the DOI Letter does not qualify for *Chevron* deference under the Fifth Circuit's two-step analysis guided by *Mead*. Under the first step, the Court asks whether Congress "delegated authority to the agenc[ies] to make rules carrying the force of law." *Knapp*, 796 F.3d at 454. Here, Congress has delegated to the

Secretary of the DOI the authority to make rules carrying the force of law because under the Restoration Act, the Secretary "or his designated representative" is charged with "promulgat[ing] such regulations as may be necessary to carry out the provisions of [the] Act." *See* Restoration Act, Pub. L. No. 100-89, § 2, 101 Stat. 666.

However, the DOI Letter fails under step two, which asks whether "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Knapp*, 796 F.3d at 454. *Cf. Texas v. United States*, 497 F.3d 491, 494, 514 (5th Cir. 2007) (conducting *Chevron* analysis of regulations pertaining to Secretarial Gaming Procedures that Secretary of the Interior promulgated through notice-and-comment, "because Congress explicitly authorized the Secretary to promulgate regulations to carry into effect any statute relating to Indian affairs or arising out of Indian relations"). The DOI Letter does not appear to constitute and does not purport to be a regulation, and the Pueblo Defendants do not attempt to show this Court otherwise. Therefore, the Deputy Solicitor for Indian Affairs did not issue the DOI Letter in exercise of the "Secretary of the Interior or his designated representative['s]" authority to "promulgate such regulations as may be necessary to carry out the provisions" of the Restoration Act. Instead, the Deputy Solicitor addressed the DOI Letter to the General Counsel of the NIGC and stated that the Letter "responds to the [NIGC Letter] requesting our opinion regarding whether, in light of the . . . Restoration Act" and IGRA, the Tribe can game pursuant to the IGRA on the Tribe's reservation and tribal lands. Agency Letters 5.

Thus, while Congress "delegated authority to [the Secretary of DOI] to make rules carrying the force of law," DOI did not issue its interpretations "in the exercise of that authority." *See* Restoration Act, Pub. L. No. 100-89, § 2, 101 Stat. 666. The interpretations were expounded in what appears to be an opinion letter lacking the "force of law," and the DOI Letter does not

purport to constitute a regulation "necessary to carry out the provisions" of the Restoration Act. *See id.*; *Baylor Cty. Hosp. Dist. v. Burwell*, Civil Action No. 7:15-cv-00053-O, 2016 WL 687161, at *4 (N.D. Tex. Feb. 19, 2016) (declining *Chevron* deference to interpretation in agency manual where interpretation was not promulgated in the exercise of agency's general rulemaking authority with respect to Medicare and therefore lacked force of law); *Wampanoag*, 2015 WL 7185436, at *16 n.23 (concluding that letters from NIGC and DOI were not entitled to deference because "the letters [were] only advisory opinions on legal issues, not final agency action[s] that carry the 'force of law'" (citations omitted)). *Cf. Knapp*, 796 F.3d at 454 (finding agency interpretation was promulgated in exercise of authority delegated by Congress to agency to revoke licenses, assess civil penalties, and issue cease and desist orders after notice and opportunity for a hearing, where agency promulgated interpretation in decision pursuant to formal procedures including a hearing before an administrative law judge). The decisions contained in the DOI Letter are therefore not entitled to *Chevron* deference. *See Knapp* 796 F.3d at 454; *Skinner*, 894 F.2d at 1364.

The Court concludes that it may not afford *Chevron* deference "to the decisions of the [NIGC] on the IGRA issues addressed in the [NIGC Letter], and . . . to the decision of the [DOI] on the Restoration Act and IGRA issues addressed in [the DOI Letter]." Mot. to Vacate 2.

## 2. The NIGC and DOI decisions are not entitled to *Skidmore* deference

The Court likewise finds it inappropriate to afford deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "to the decisions of the [NIGC] on the IGRA issues addressed in the [NIGC Letter], and . . . to the decision of the [DOI] on the Restoration Act and IGRA issues addressed in [the DOI Letter]." *Id.* Under *Skidmore*, "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations

23

and information' available to the agency . . . and given the value of uniformity in its

administrative and judicial understandings of what a national law requires." *Mead*, 533 U.S. at

234 (citations omitted).  "The weight [accorded to an administrative] judgment in a particular

case will depend upon the thoroughness evident in its consideration, the validity of its reasoning,

its consistency with earlier and later pronouncements, and all those factors which give it power

to persuade, if lacking power to control." *Id*. at 228 (alteration in original) (quoting *Skidmore*,

323 U.S. at 140).

      The Supreme Court, in *Young v. United Parcel Service, Inc.*, --- U.S. ----, 135 S. Ct. 1338

(2015), recently examined what degree of deference it owed under *Skidmore* to an agency

interpretation contained in an EEOC guideline.  *Id*. at 1352.  The Court concluded that the

relevant factors "severely limit[ed] the EEOC's . . . guidance's special power to persuade,"

explaining that:

> We come to this conclusion not because of any agency lack of "experience" or "informed
> judgment."    Rather,  the  difficulties  are  those  of  timing,  "consistency,"  and
> "thoroughness" of "consideration."  The EEOC promulgated its 2014 guidelines only
> recently, after this Court had granted certiorari in this case.  In these circumstances, it is
> fair to say the EEOC's current guidelines take a position about which the EEOC's
> previous guidelines were silent.  And that position is inconsistent with positions for
> which the Government has long advocated . . . . Nor does the EEOC explain the basis of
> its latest guidance . . . . Why has it now taken a position contrary to the litigation position
> the  Government  previously  took?    Without  further  explanation,  we  cannot  rely
> significantly on the EEOC's determination.

*Id*. at 1352 (citations omitted).

Additionally, in *Christopher v. SmithKline Beecham Corp.*, --- U.S. ----, 132 S. Ct. 2156 (2012),

the Court found an agency interpretation was unpersuasive because it "lack[ed] the hallmarks of

thorough consideration," as the agency "first announced its view . . . in a series of *amicus* briefs,

there was no opportunity for public comment," the agency advanced a different interpretation in

the Supreme Court than it had in two Courts of Appeals, and the agency's "new interpretation

[was] flatly inconsistent with the [statute]." *Id*. at 2169; *see BMC Software, Inc. v. Comm'r of Internal Revenue*, 780 F.3d 669, 675-76 (5th Cir. 2015) (concluding that agency interpretation was unpersuasive under *Skidmore* because notice in which interpretation was found "contain[ed] no analysis or explanation," interpretation ran counter to plain statutory language, and agency had since changed interpretation).

Just as the NIGC Letter and the DOI Letter do not merit *Chevron* deference, the defects discussed with respect to *Chevron* deference also undermine any persuasiveness under *Skidmore*. Moreover, even if these fundamental defects did not exist, the Court would be particularly hesitant to be unduly persuaded by the NIGC Letter, as the NIGC's interpretation is inexplicably inconsistent with a prior agency position.  As recently as 2010, the NIGC endorsed the position that it did not have jurisdiction over the Tribe because IGRA did not govern the Tribe.  *See Ysleta del Sur Pueblo v. Nat'l Indian Gaming Comm'n*, 731 F. Supp. 2d 36, 38 (D.D.C. 2010). In 2010, the United States District Court for the District of Columbia considered the Tribe's suit against the NIGC, which challenged the NIGC's determination that the Tribe was "not under NIGC jurisdiction for funding and other purposes." *Id*.  The Tribe's counsel had written to the NIGC on October 14, 2009, "requesting that NIGC reconsider its decision not to provide the [Tribe] with training." *Id*.  The NIGC "responded with a letter denying plaintiff's request on February 23, 2010, from NIGC headquarters in Washington, D.C." *Id*.  In the letter, the NIGC relied on *Ysleta*, 36 F.3d 1325, *cert. denied*, 514 U.S. 1016 (1996), the Fifth Circuit opinion holding that the Tribe's gaming activities were governed by the Restoration Act, and not by IGRA. *See id*.  "Because IGRA does not govern [the Tribe], NIGC explained that the [Tribe] was not under NIGC jurisdiction." *Id*.  The court ultimately transferred the case to the Western District of Texas.  *See id*.

25

The Court recognizes that the NIGC is not a party to this case,[5] and therefore cannot explain for itself any inconsistencies with prior interpretations of IGRA's applicability to the Tribe; however, the Pueblo Defendants do not address or attempt to explain the reason for the NIGC's about-face on its position that IGRA does not apply to the Tribe and that NIGC lacks jurisdiction over the Tribe's gaming.  *See generally* Mot. to Vacate.  Nor did the NIGC offer a reason in the NIGC Letter.  *See generally* Agency Letters.  Thus, while the Court does not doubt the NIGC's expertise in the application of its statute and regulations, *see Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1085-86 (7th Cir. 2015), the Court would nonetheless be hesitant to attribute undue persuasiveness to the NIGC Letter under *Skidmore* without any explanation for the NIGC's apparent change in position.  *See Young*, 135 S. Ct. at 1352 (declining to rely significantly on agency interpretation under *Skidmore*, in part because agency "position [was] contrary to the litigation position the Government previously took"); *SmithKline*, 132 S. Ct. at 2169  (finding agency interpretation unpersuasive because, among other factors, agency advanced a different interpretation in the Supreme Court than it had in two Courts of Appeals); *BMC Software*, 780 F.3d at 675-76 (concluding that agency interpretation was unpersuasive under *Skidmore* in part because agency had since changed interpretation).

The Court is unpersuaded that it must defer "to the decisions of the [NIGC] on the IGRA issues addressed in the [NIGC Letter], and . . . to the decision of the [DOI] on the Restoration Act and IGRA issues addressed in [the DOI Letter]."  Mot. to Vacate 2.

---

[5] The Court notes, however, that it invited the NIGC to submit an amicus brief; the United States declined the Court's invitation.  *See* Order to Submit Amicus Brief 2; Advisory to the Court.

### 3.   This Court is bound by the Fifth Circuit's decision in *Ysleta*

To the extent the Pueblo Defendants argue that the relevant issues include whether IGRA repealed any part of the Restoration Act and that therefore IGRA, and not the Restoration Act, applies to the Tribe's gaming activities, the Fifth Circuit has already spoken to the issue, and this Court is bound by that decision.  *See, e.g.*, *Ta v. Neimes*, 927 F. Supp. 977, 985 (W.D. Tex. 1996); *Kerr v. Smith Petroleum Co.*, 909 F. Supp. 421, 426 (E.D. La. 1995).

In *Ysleta*, the Fifth Circuit analyzed the interplay between the Restoration Act and IGRA, as applied to the Tribe.  The court examined the text and legislative histories of both acts, and concluded that the Restoration Act, and not IGRA, "would govern the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law" under the Restoration Act.  *Id*. at 1335.  In reaching this conclusion, the Fifth Circuit determined that "the Restoration Act and IGRA establish . . . fundamentally different regimes."  *Id*. at 1334.  Drawing on legislative history, the court also found that Congress had spoken to the issue of whether the Restoration Act or IGRA governs gaming on the Tribe's reservation because IGRA did not impliedly repeal the Restoration Act. *See id*. at 1334-35.  The Fifth Circuit explained:

> With regard to gaming, the Restoration Act clearly is a specific statute, whereas IGRA is a general one.  The former applies to two specifically named Indian tribes located in one particular state, and the latter applies to all tribes nationwide.  Congress, when enacting IGRA less than one year after the Restoration Act, explicitly stated in two separate provisions of IGRA that IGRA should be considered in light of other federal law. Congress never indicated in IGRA that it was expressly repealing the Restoration Act. Congress also did not include in IGRA a blanket repealer clause as to other laws in conflict with IGRA.  Finally, we note that in 1993, Congress expressly stated that IGRA is *not* applicable to one Indian tribe in South Carolina, evidencing in our view a clear intention on Congress' part that IGRA is not to be the one and only statute addressing the subject of gaming on Indian lands.

*Id*. at 1335 (footnotes omitted).

Thus, the Fifth Circuit identified a congressional intent that IGRA did not repeal the Restoration Act and that therefore the Restoration Act—and not IGRA—applies to the Tribe's gaming activity.  *See id*. at 1334-35.  This Court is bound by Fifth Circuit precedent on this issue; therefore, this Court cannot hold otherwise.  *See Neimes*, 927 F. Supp. at 985; *Kerr*, 909 F. Supp. at 426.  Thus, as the Fifth Circuit has stated, IGRA did not repeal the Restoration Act, and the Restoration Act—and not IGRA—governs "the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law."  *Ysleta*, 36 F.3d at 1335.  Accordingly, the Restoration Act, and not IGRA, applies in this case.  *See id*.  The Court must therefore reject the Pueblo Defendants' argument that IGRA repealed the waiver of sovereign immunity contained in the Restoration Act and that the case must therefore be dismissed.  The Pueblo Defendants' Motion to Dismiss for lack of subject matter jurisdiction must be denied.

### C.    Motion to Dismiss for Failure to Name Indispensable Parties

The Pueblo Defendants also argue that the Court should dismiss the case under Rule 12(b)(7) of the Federal Rules of Civil Procedure for failure to name two indispensable parties, the United States and the Alabama-Coushatta.  *See* Mot. to Vacate 5-15.  According to the Pueblo Defendants, the United States and the Alabama-Coushatta are required parties under Rule 19(a), and they cannot be joined because they are immune from suit and because equity and good conscience require dismissal in their absence under Rule 19(b).  *See id*. at 8-14

Texas asserts that neither the United States nor the Alabama-Coushatta are necessary parties under Rule 19, stating that:

> Since this litigation was filed to enjoin and hold accountable the Pueblo Defendants for their continued violation of federal law embodied in the Restoration Act, there is no need to join as parties to this litigation any third-party federal agencies that lack authority to

administer the gambling provisions of the Restoration Act, nor add any third-party tribes
which, unlike the Pueblo Defendants here, are not currently violating federal law.

Texas's Resp. to Pueblo Defs.' Mot. to Dismiss or to Modify Injunction 20, ECF No. 538.

### 1.    Standard

Rule 12(b)(7) allows for dismissal for "failure to join a party under Rule 19." Fed. R.

Civ. P. 12(b)(7). Rule 19, in turn, "provides for the joinder of all parties whose presence in a

lawsuit is required for the fair and complete resolution of the dispute at issue." *HS Res., Inc. v.*

*Wingate*, 327 F.3d 432, 438 (5th Cir. 2003). "It further provides for the dismissal of litigation

that should not proceed in the absence of parties that cannot be joined." *Id.* "Determining

whether an entity is an indispensable party is a highly-practical, fact-based endeavor . . . ." *Hood*

*ex rel. Miss. v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009).

"Determining whether to dismiss a case for failure to join an indispensable party requires

a two-step inquiry." *Id.* "First, the district court must determine whether the party should be

added under the requirements of Rule 19(a)." *Id.* Under Rule 19(a)(1) "[a] person who is

subject to service of process and whose joinder will not deprive the court of subject-matter

jurisdiction" must be joined if:

> (A) in that person's absence, the court cannot accord complete relief among existing
> parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated
> that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the
>> interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double,
>> multiple, or otherwise inconsistent obligations because of the interest.

Fed R. Civ. P. 19(a)(1)(A)-(B).

"While the party advocating joinder has the initial burden of demonstrating that a missing party is necessary, after 'an initial appraisal of the facts indicates that a possibly necessary party is absent, the burden of disputing this initial appraisal falls on the party who opposes joinder.'" *Hood*, 570 F.3d at 628 (quoting *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986)).

"If the necessary party cannot be joined without destroying subject-matter jurisdiction, the court must then determine whether that person is 'indispensable,' that is, whether litigation can be properly pursued without the absent party." *Id*. at 629. Thus, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In conducting this inquiry, the court considers: (1) "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties"; (2) "the extent to which any prejudice could be lessened or avoided"; (3) "whether a judgment rendered in the person's absence would be adequate"; and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(1)-(4).

## 2. Analysis

According to the Pueblo Defendants, the United States is a required party under Rule 19(a) because the NIGC has determined that the Tribe can engage in Class II gaming under IGRA, and "[w]here, as here, administrative decisions are at issue, the administrative agency issuing the decision has an interest relating to the subject of the action that always is sufficient to make it a required party." Mot. to Vacate 8. Second, the Pueblo Defendants assert that the Alabama-Coushatta claims an interest relating to the subject of the present case because "[w]ithin weeks of affirming its regulatory authority over the [Tribe], NIGC issued a similar

decision as to its regulatory authority over the [Alabama-Coushatta]."  *See id*. at 11.  Further, the

Pueblo Defendants argue that "any ruling by this Court will be looked to as controlling precedent

to determine the gaming rights of the [Alabama-Coushatta]" because both they and the Tribe are

covered by the Restoration Act.  *Id*. at 11-12.

Rule 19(a)(1)(B)(i) requires joinder of an absent party if "that person claims an interest

relating to the subject of the action and is so situated that disposing of the action in the person's

absence may . . . as a practical matter impair or impede the person's ability to protect the

interest[.]"  Fed. R. Civ. P. 19(a)(1)(B)(i).  However, "Rule 19 does not contemplate joinder of

any party who might possibly be affected by a judgment in any way."  *Shelton v. Exxon Corp.*,

843 F.2d 212, 218 (5th Cir. 1988).

If the court determines a legally protected interest exists, the court must further determine

whether the person's ability to protect the interest, as a practical matter, will be impaired or

impeded by the suit.  *See* Fed. R. Civ. P. 19(a)(1)(B)(i); *Alto v. Black*, 738 F.3d 1111, 1127-29

(9th Cir. 2013); *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 2:12-cv-02182-KJM-KJN,

2015 WL 6123730, at *8-9 (E.D. Cal. Oct. 16, 2015) (quoting *Makah Indian Tribe v. Verity*, 910

F.2d 555, 558 (9th Cir. 1990)).  As the text of the Rule indicates, courts should be guided by

pragmatic considerations when conducting this inquiry.  *See* Fed. R. Civ. P. 19(a)(1)(B)(i); *Am.*

*Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 360 (2d Cir. 2015) (citing 7

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1601 (3d ed. 2015)).

In making its determination, courts may consider "whether a present party adequately represents

the interests of an absent party," by consulting three factors:

> (1) whether the interests of a present party to the suit are such that it will undoubtedly
> make all of the absent party's arguments; (2) whether the party is capable of and willing

to make such arguments; and (3) whether the absent party would offer any necessary element to the proceedings that the present parties would neglect.

*Lennar Mare Island*, 2015 WL 6123730, at *8-9 (internal quotation marks omitted) (quoting *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1180 (9th Cir. 2012)).

> **a.    The United States is not a required party because proceeding in its absence will not, as a practical matter, impair or impede its ability to protect its interests**

The Court recognizes that the present proceedings implicate the validity of the NIGC's exercise of authority with respect to the Tribe.  The Court has concluded—as it must, pursuant to Fifth Circuit precedent—that the Restoration Act, and not IGRA, applies to the Tribe's gaming activity, while the NIGC has determined that IGRA applies and that the NIGC therefore has authority over the Tribe.  *See* Agency Letters 1-4.  Nonetheless, the Court concludes that as a practical matter, the NIGC's, and, therefore, the United States', interests will not be impaired or impeded because the Pueblo Defendants adequately represent the interests of the United States. The Pueblo Defendants and the NIGC maintain the same position—that IGRA, and not the Restoration Act, applies to the Tribe's gaming activities, rendering the Tribe subject to the NIGC's jurisdiction.  *See id*; Mot. to Vacate 1-5.  The Court finds no reason to doubt that the Pueblo Defendants will "make all of the [United States'] arguments," and discerns no indication that the Pueblo Defendants are incapable of making, or unwilling to make, such arguments.  *See Lennar Mare Island*, 2015 WL 6123730, at *8-9.  Likewise, the Court discerns no suggestion that the United States would "offer any necessary element to the proceedings that the present parties would neglect."  *See id.*  Accordingly the Court finds that the Pueblo Defendants will adequately represent the United States' interests, and that the suit will not impair or impede the United States' ability to protect any of its interests.  *See Salt River*, 672 F.3d at 1180 (concluding that existing defendants would adequately represent interests of absent tribe because defendants'

interests were "aligned with the tribe's interests," there was "no reason to believe the . . . defendants [could not] or [would] not make any reasonable argument that the tribe would [have] ma[d]e if it were a party," and there was "no indication that the tribe would offer any necessary element to the action that the . . . defendants would neglect").

Moreover, although the Pueblo Defendants argue that "[w]here . . . administrative decisions are at issue, the administrative agency issuing the decision has an interest relating to the subject of the action that always is sufficient to make it a required party," the cases they cite do not stand for such a broad proposition. *See* Mot. to Vacate 8. Nor do those cases require the conclusion that the United States is a required party that should be added under Rule 19(a) in this case.

For example, in *Simons v. Vinson*, 394 F.2d 732 (5th Cir. 1968), Plaintiffs, Texas riparian landowners, had sued the Bureau of Land Management, the Bureau of Indian Affairs, DOI (collectively the "federal defendants"), and various other defendants, asserting ownership to certain alleged accreted land. *See id*. at 734. However, the court determined that Plaintiffs were seeking "to obtain quitclaim deeds to the disputed land from [the federal defendants], and an injunction against [the federal defendants] from interfering with plaintiffs' title and possession in the future." *Id*. at 736 (internal quotation marks omitted). Thus, the court recognized that "the District Court was asked both to compel and to restrain actions of the government. The effect of any judgment granting such relief would of necessity operate against the government. Hence, the suit [wa]s unquestionably against the United States." *Id*. As a result, the court explained, "[t]he corollary is clear—the United States is an indispensable party to such an action." *Id*.

Although the present case touches upon the United States'—specifically, the NIGC's—authority over the Tribe, *Simons* is inapposite to the situation in the instant case. Here, Texas is

not effectively seeking relief from the United States, and the suit is not "unquestionably against the United States."  Instead, Texas sought and obtained an injunction against the Pueblo Defendants, *see* Original Inj., and has moved for contempt seeking a determination that the Pueblo Defendants are in violation of the Injunction, *see* Mot. for Contempt.  Accordingly, *Simons* does not support the conclusion that the United States is a necessary party under Rule 19(a).

The Pueblo Defendants' reliance on *Boles v. Greeneville Housing Authority*, 468 F.2d 476 (6th Cir. 1972), is similarly unavailing.  In *Boles*, the appellants' argument indirectly attacked a Department of Housing and Urban Development ("HUD") decision.  *See id.* at 479. The court observed that "[i]n order to grant the relief sought by the appellants[,] this court would be compelled to hold in effect that not only did HUD misinterpret its own guidelines, but that it also misconceived its function and prerogatives under the [relevant act]."  *Id.*  Making such a determination without joining HUD, according to the court, amounted "to depriv[ing] it of the right to defend the integrity of its administrative decisions in these areas which so intimately affect its policies and procedures."  *Id.*  The court ultimately dismissed the case for failure to join HUD because the court was "hesitant to set the precedent of allowing the policies and practices of HUD or any other federal agency to be overhauled by the judiciary without at least affording the agency the opportunity to be heard in support of its present operation," particularly because acting on the appeal "would effectively set aside a HUD project without hearing a single word from HUD."  *Id.*

The Court appreciates that the legitimacy of an NIGC decision is implicated by the Court's determination that the Restoration Act controls in this case.  *See* Agency Letters 1-4 (approving ordinance proposed by the Tribe pursuant to IGRA).  Nonetheless, *Boles* does not

34

require dismissal of this case.  The court in *Boles* was primarily concerned that it had not heard "a single word from HUD," and was "hesitant" to "overhaul" the policies and practices of a federal agency "without at least affording the agency the opportunity to be heard."  *Boles*, 468 F.2d at 479.  In contrast, here, the Court afforded the United States an opportunity to be heard when it invited the DOI and NIGC to submit amicus briefs regarding the impact of the NIGC and DOI Letters.  *See* Order to Submit Amicus Briefs.  Moreover, while the court in *Boles* had not heard "a single word from HUD," here, the Court has letters from the NIGC and the DOI, albeit filed by the Pueblo Defendants, setting out each agency's views on the issue of whether IGRA or the Restoration Act applies to the Tribe's gaming activities.  *See generally* Agency Letters.  Finally, as the Court has explained, there is no indication that the Pueblo Defendants will not adequately represent the United States' interests in this case.  Accordingly, *Boles* does not establish that the United States is a required party under Rule 19(a).

Finally, the Tribe's reliance on *George v. Bay Area Rapid Transit District*, 175 F. App'x 809 (9th Cir. 2006), an unpublished decision consisting of two paragraphs, is likewise misplaced. The issue before the court was "whether certain Department of Transportation (DOT) regulations are arbitrary and capricious."  *Id*. at 809.  The court concluded that "[b]ecause the DOT has a strong interest in the continuing validity of its regulations, the interests of the United States should be represented as a party in the case."  *Id*. at 809-10.  On appeal, however, the United States had appeared as amicus curiae, and indicated at oral argument that it had not been notified that the regulations were being challenged.  *Id*. at 810.  The United States also indicated that "it want[ed] an opportunity to defend the DOT regulations."  *Id*.  Accordingly, the court vacated the district court's grant of summary judgment in favor of the plaintiffs, and remanded the case for the United States to be joined as a party.  *See id*.

Unlike in *George*, where the court relied, at least in part, on the fact that the United States had not been notified that its regulations were being challenged and desired to defend them in the litigation, here, the United States is aware of the present litigation because the Court invited the United States to participate as amicus curiae, and the United States declined the Court's invitation.  *See* Advisory to the Court.  Moreover, as detailed in the Court's analysis under Rule 19(a), there is no indication that the Pueblo Defendants will not adequately represent the United States' interests.  Therefore, *George* does not persuade the Court that the United States is a required party under Rule 19(a).  Accordingly, the Court concludes that the United States is not a required party under Rule 19(a).

> **b.     The Alabama-Coushatta is not a required party because proceeding in its absence will not, as a practical matter, impair or impede its ability to protect any interests**

The Court also concludes that as a practical matter, any interests the Alabama-Coushatta claims in this case will not be impaired or impeded because there is no indication that the Pueblo Defendants will inadequately represent the Alabama-Coushatta's interests, which are aligned with the Pueblo Defendants' interests.  *See generally* Amicus Curiae Brief of the Alabama-Coushatta Tribe of Texas in Support of Defs.' Mot. to Dismiss & for Alternative Relief, ECF No. 592.  The Court likewise finds no reason to doubt that the Pueblo Defendants will "make all of the [Alabama-Coushatta's] arguments," and discerns no indication that the Pueblo Defendants are incapable of making or are unwilling to make such arguments, or that the Alabama-Coushatta would "offer any necessary element to the proceedings that the present parties would neglect." *See Lennar Mare Island*, 2015 WL 6123730, at *8-9; *Salt River*, 672 F.3d at 1180.  Thus, the Alabama-Coushatta is not a required party under Rule 19(a), and the case will not be dismissed on that basis.  Because neither the United States nor the Alabama-Coushatta are required parties,

the Court rejects the Pueblo Defendants' argument that the case must be dismissed under Rule 12(b)(7) for failure to join a party under Rule 19.

### D.       Amending the Injunction to Allow NIGC Regulation of Class II Gaming

Finally, the Pueblo Defendants argue that the Court should amend the Injunction to allow the NIGC to regulate Class II gaming on the Pueblo.  *See* Mot. to Vacate 14-15.  The Pueblo Defendants' argument essentially rests on their proposition that IGRA, and not the Restoration Act, governs the Tribe's gaming activities.  *See id*. at 16-19.  The Pueblo Defendants argue that (1) the Court must defer to the interpretations in the DOI and NIGC Letters, which assert that IGRA applies to the Tribe, and (2) "[g]iven federal regulatory jurisdiction over gaming activities on the Pueblo, maintaining the injunction is no longer prudent and unnecessarily exposes the Pueblo to continued uncertainty regarding its ongoing and future operations."  *Id*.  The Court sympathizes with the Pueblo Defendants' position, and recognizes that a regulatory body such as the NIGC may lend more certainty to the Tribe in its pursuit of gaming activities.  The Court likewise recognizes that a regulatory body such as the NIGC may be a more efficient vehicle for issuing determinations and guidance for the Tribe in its pursuit of gaming activities. Nonetheless, the Court must deny the Pueblo Defendants' request to vacate or amend the Injunction because as explained above, the Court is bound by the Fifth Circuit's conclusion that the Restoration Act, and not IGRA, "govern[s] the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law."  *Ysleta*, 36 F.3d at 1335.  Having determined that the Pueblo Defendants' Motion to Vacate must be denied, the Court turns to its decision to eliminate the proposal requirement, and discusses the manner in which any future administration of this case shall proceed.

### III.    Proposal Requirement

The course of this litigation has transformed the Court into a quasi-regulatory body overseeing and monitoring the minutiae of the Pueblo Defendants' gaming-related conduct.  This is a role which the Restoration Act never contemplated for the Court and it is a role that the Court will no longer carry out.  Because the Original Injunction has morphed into a mechanism by which the Court regulates the Tribe's gaming activities, the Court explains how disputes between Texas and the Pueblo Defendants regarding gaming activities shall proceed from this point forward.

### A.    The Restoration Act Does Not Grant the Court Regulatory Authority

The Restoration Act declares that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe."  25 U.S.C. § 1300g-(6)(a).  However, the Act specifically provides that nothing in the section addressing gaming activity "shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas."  *Id.* § 1300g-6(b).[6]  In the same vein, nothing in the plain language of the Restoration Act operates "as a grant of civil or criminal regulatory jurisdiction" to the federal courts.[7]  Instead, the role of the federal courts in the Restoration Act's statutory scheme is to have "exclusive jurisdiction" over actions brought by Texas to enjoin the Tribe's gaming activities in violation of Texas law.  *See* 25 U.S.C. § 1300g-6(c) (granting to the federal courts "exclusive jurisdiction over any offense in violation [of the gaming provision] . . .

---

[6] The Fifth Circuit has indicated that this provision "is a restatement of Public Law 280."  *Ysleta*, 36 F.3d at 1334.  The "grant of jurisdiction to states under Public Law 280 excludes significant subject areas, particularly in the regulatory and tax fields."  Cohen's Handbook § 6.04(3)(b)(ii).

[7] The Court notes that the "Secretary of the Interior or his [designee]" may be the appropriate authorities to oversee and regulate the Tribe's gaming activities.  *See* Restoration Act, Pub. L. No. 100-89, § 2, 101 Stat. 666 (charging the "Secretary of the Interior or his designated representative" with "promulgat[ing] such regulations as may be necessary to carry out the provisions of [the] [Restoration] Act").

committed by the tribe, or any member of the tribe, on the reservation or on lands of the tribe," and allowing Texas to bring an action in federal court "to enjoin violations"). Yet, as the Court recounted in its March 6, 2015, Order, the lengthy procedural history in this case has consisted of the Pueblo Defendants submitting proposals over the course of a decade, seeking the Court's approval to conduct various gaming activities and declarations that such activities comply with Texas law. *See* March 6, 2015, Order 4-8 (outlining various proposals submitted to the Court since 2002).

The Court required the Pueblo Defendants to submit proposals at least as far back as August 4, 2009, when a previous judge who presided over this case stated:

> The new procedure will be for the Defendants to petition the Court directly to make an exception to the overall prohibition of gaming contained in the [Original Injunction] in this case. Any petition must identify specifically the non-profit organization proposing to conduct charitable bingo games, and furnish detailed information regarding the other requirements for eligibility to conduct charitable bingo games under Texas law . . . . Texas will then be given the opportunity to respond to the Defendants' petition. The Court will then decide once again whether the injunction in this case should be modified.

Order Regarding Third Clarification Mot. 7.

In accordance with that "new procedure," this Court, in its March 6, 2015, Order, indicated "that the Pueblo Defendants may submit a firm and detailed proposal setting out a sweepstakes promotion that operates in accordance with federal and Texas law." March 6, 2015, Order 76.

However, it has been the Court's experience throughout the course of this litigation that by reviewing the minutiae of the Tribe's proposed gaming activities, the Court has come to assume the role of a quasi-regulatory body. Indeed, Black's Law Dictionary defines "regulate" as "control[ling] (an activity or process) esp[ecially] through the implementation of rules." *See* *Regulate*, Black's Law Dictionary (10th ed. 2014) [hereinafter Black's]. By reviewing the details and intricacies of the Tribe's proposed conduct and determining their legality, the Court is

controlling the Tribe's gaming activity by prospectively ruling on the permissibility of the activity.  In essence, the Court is regulating the Tribe's gaming activities.

Indeed, reviewing tribal gaming proposals is a task seemingly identical to the NIGC's responsibilities under IGRA.  The NIGC—a regulatory body Congress created to oversee Indian gaming activities for qualifying tribes—often reviews details of proposed gaming activities and determines whether tribes may engage in such activities.  *See, e.g.*, 25 U.S.C. §§ 2705, 2710-2712 (setting out procedures for Chairman and Commission to review tribal ordinances or resolutions regulating gaming and management contracts).  "The NIGC's broad powers include inspecting tribes' books and records, approving tribal-state pacts, levying and collecting civil fines, monitoring and shutting down unauthorized tribal games, and promulgating regulations and guidelines to implement IGRA."  *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1023 (10th Cir. 2003).

Not only is this supervisory and regulatory role of the Court not one contemplated by the Restoration Act, but the Court has grave doubts as to whether it is a permissible function for the Court at a more fundamental level, as "the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions."  *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (citation omitted).  The Court's repeated opining on the Tribe's gaming proposals in this case leans in that direction.

### B.      The Court Will No Longer Require the Pueblo Defendants to Submit Proposals Before Engaging in Gaming Activities

In light of the Court's decision to cease acting as a quasi-regulatory body, the Court concludes that it can no longer require and review "proposals" from the Pueblo Defendants.  The Court chooses to alter the procedures for enforcing the Injunction, while refraining from

40

modifying the Injunction's terms.  Thus, the Court hereby eliminates the requirement that

"Defendants . . . petition the Court directly to make an exception to the overall prohibition of

gaming contained in the [Original Injunction] in this case," *see* Order Regarding Third

Clarification Mot. 7, which encompasses the requirement that the Pueblo Defendants submit

proposals to the Court before the Tribe engages in any "illegal as well as legal gaming

activities," 2002 Order.  Instead, Texas and the Pueblo Defendants are to comply with the

process set out in the Restoration Act: Texas will possess no civil or criminal regulatory

jurisdiction, but will not be precluded "from bringing an action in the courts of the United States

to enjoin" the Tribe if it engages in "gaming activities which are prohibited by the laws of the

State of Texas."  25 U.S.C. § 1300g-6(a)-(c).

      The Court is mindful that its authority to modify an injunction is limited by, for example,

Rule 60 of the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 60, however a court's

authority to adjust the procedure for enforcing an injunction is more flexible.  A court modifies

an injunction by "chang[ing] the obligations imposed by the injunction."  *In re Deepwater

Horizon*, 793 F.3d 479, 491 (5th Cir. 2015) (quoting 16A Wright & Miller § 3924.2).  On the

other hand, simply "implement[ing] an injunction according to its terms" or "designat[ing]

procedures for enforcement without changing the command of the injunction" is a way of

interpreting, rather than modifying, the injunction.  *Id.* (quoting 16A Wright & Miller § 3924.2)

(citing *In re Seabulk Offshore Ltd.*, 158 F.3d 897, 899 (5th Cir. 1998)).  Thus, because the Court

is not altering "the obligations imposed by the [I]njunction," but is "designat[ing] procedures for

enforcement" by eliminating the requirement that the Tribe submit proposals, the Court is

interpreting, rather than modifying, the Injunction.   Indeed, the Original Injunction nowhere

states that it is prohibiting legal gaming activity, nor does it require the Pueblo Defendants to

repeatedly seek pre-approval from the Court before engaging in legal activity or any activity for that matter.

Further, the Court notes that the Pueblo Defendants make much of the notion that they are permitted to conduct various bingo activities.  *See* Reply in Support of Pueblo Defs.' Mot. to Vacate ("Reply") 7, 12-14, ECF No. 591.  Several amici, including the American Legion Post 312, submitted an amicus brief in which they characterized the present Motion to Vacate as an attempt by the Pueblo Defendants "to conduct Class II electronic bingo on its reservation."  Brief of Amici Curiae American Legion Post 312, et al. Supporting Texas's Opp'n to Pueblo Defs.' Mot. to Vacate 8, ECF No. 599.  However, the legality of the Tribe's purported bingo operations is not before this Court.  And, because the Court will no longer require the Pueblo Defendants to submit proposals regarding their gaming activities, the Court does not opine on whether any proposed bingo activities are permissible under the Restoration Act.

Finally, the Court notes that in the 2010 Order, the Pueblo Defendants were ordered to:

> allow the designated representatives of the State of Texas access on a monthly basis to the Casino and any other location at which gaming activities are conducted by the Defendants, and access to the records maintained by the Defendants with respect to the operation of the devices known as "eight-liners," for the purpose of verifying that such devices are not being operated in a manner contrary to the laws of the State of Texas or the terms of the injunction and contempt order in this case.

2010 Order 3.

Though the Fifth Circuit has upheld this requirement, the Court no longer finds it appropriate, and hereby eliminates the requirement that the Pueblo Defendants "allow the designated representatives of the State of Texas access on a monthly basis to . . . any . . . location at which gaming activities are conducted by the Defendants," including Speaking Rock and Socorro, and to allow access to the Pueblo Defendants' records.  *See Texas v. Ysleta Del Sur Pueblo*, 431 F.

App'x 326, 331 (5th Cir. 2011) ("[D]istrict courts have broad discretion when it comes to matters relating to discovery . . . .").

Because the Court concludes that reviewing proposals for prospective gaming activities is inappropriate, the Court proceeds to address the remaining allegations in Texas' Motion for Contempt.

## IV.    Motion for Contempt

In its March 6, 2015, Order, the Court found the Pueblo Defendants in contempt for operating a Tribal Sweepstakes without approval, but did not ultimately determine whether the Tribe's current sweepstakes were prohibited lotteries as defined by Texas Penal Code Section 47.01(7), or whether the Tribe's Kiosks were illegal "gambling devices" as defined by Texas Penal Code Section 47.01(4). *See* March 6, 2015, Order 35, 63.  Instead, the Court afforded the Pueblo Defendants an opportunity to effect a stay of the March 6, 2015, Order if the Pueblo Defendants submitted, for the Court's consideration, a "firm and detailed proposal setting out a sweepstakes promotion that operates in accordance with federal and Texas law." *Id.* at 76. As the Court no longer requires proposals from the Tribe, the issue of whether the Tribe is in contempt for violating the Injunction because (1) the current sweepstakes are prohibited lotteries as defined by Texas Penal Code Section 47.01(7); and (2) the Tribe's Kiosks are illegal "gambling devices" as defined by Texas Penal Code Section 47.01(4), are fit for resolution.  The Court, therefore, proceeds to this determination.

### A.    Standard

"A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."

*Seven Arts Pictures, Inc. v. Jonesfilm*, 512 F. App'x 419, 422 (5th Cir. 2013) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)).  "[E]vidence is clear and convincing only if it 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established' [which] 'enable[s] the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.'"  *Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013) (quoting *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995)).

## B.      The Pueblo Defendants are in Contempt for Operating Lotteries

The Court previously enjoined the Tribe from "engaging in, permitting, promoting, and conducting activities at the Speaking Rock Casino in violation of Chapter 47 of the Texas Penal Code."  Original Inj. 3-5.  As the Court set out the relevant case law and analysis in its March 6, 2015, Order, *see* March 6, 2015, Order 35-63, the Court only recites the most pertinent information in the present Order.

Texas Penal Code Section 47.03 makes it an offense to set up or promote any "lottery." *See* Tex. Penal Code Ann. § 47.03(a)(5).  A "lottery" under Texas law is "any scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win anything of value, whether such scheme or procedure is called a pool, lottery, raffle, gift, gift enterprise, sale, policy game, or some other name."  *Id*. § 47.01(7).  Thus, to fall under the prohibition of the Texas Penal Code, a lottery must contain the elements of chance, prize, and consideration.  *See id*.; *Jester v. State*, 64 S.W.3d 553, 557 (Tex. App. 2001).

The parties do not dispute that the prize and chance elements are present in the Tribe's sweepstakes.  *See* Pueblo Defs.' Mot. for Summ. J. 15, ECF No. 468 ("[T]here is no dispute that

44

the sweepstakes offer prizes and employ games of chance."); Oct. 6, 2014, Tr. of Oral Arg.

("Oct. 6, 2014, Transcript") 23-24, 83-84, ECF No. 507.  The parties dispute, however, whether

the Tribe's sweepstakes contain the element of consideration.  *See* Oct. 7, 2014, Tr. of Oral Arg.

("Oct. 7, 2014, Transcript") 230, 239, ECF No. 508.

      As the Court previously explained, judicial precedent "establishes two principles

regarding the element of consideration in relation to sweepstakes."  March 6, 2015, Order 39.

"First, consideration is absent from a sweepstakes where no participant provides any form of

payment to enter the sweepstakes."  *Id.* (citing *Griffith Amusement Co. v. Morgan*, 98 S.W.2d

844, 844-45, 847 (Tex. Civ. App. 1936); *Brice v. State*, 242 S.W.2d 433, 435 (Tex. Crim. App.

1951)).  "Second, 'consideration [is present] if sweepstakes participants *must* pay money for the

privilege of playing or if participants who pay have better chances of winning than non-paying

participants.'"  *Id.* (alterations in original) (quoting *United States v. Davis*, 690 F.3d 330, 337

(5th Cir. 2012)).

      This case, however, falls "somewhere between this guidance" because "participants in

the Tribe's sweepstakes are not *required* to make a donation in order to play," yet it is "beyond

dispute that at least some of the Tribe's participants *do* make a payment in the form of a donation

to the Tribe in connection with the sweepstakes."  *Id.* at 39-40.

      Sweepstakes do not necessarily constitute illegal lotteries "when a means of entry is

connected to the purchase of a legitimate product."  *Id.* at 52 (citing *Jester*, 64 S.W.3d at 558-59;

*Davis*, 690 F.3d at 338-40; *State v. Socony Mobil Oil Co., Inc.*, 389 S.W.2d 169, 173-74 (Tex.

App. 1964)).  However, as the Court previously explained, "a promotional sweepstakes must

also offer an alternative means of free entry and the primary subject of the transaction must be

the promoted product and not the sweepstakes game itself."  *Id.* (citing *Jester*, 64 S.W.3d at 558-

59; *Davis*, 690 F.3d at 338-40; *Socony Mobil*, 389 S.W.2d at 173-74).  Whether consideration is present in the Tribal sweepstakes turns on (1) "whether the sweepstakes is intended to promote a Tribal product, or whether the product is mere subterfuge to legitimize consideration paid to participate in the Tribe's sweepstakes"; (2) whether the product being promoted by the sweepstakes is the "primary subject of the transaction"; and (3) whether the Tribe provides an "'alternative' means of entering the contest that does *not* require the payment of consideration" and treats "customers" and "non-customers" alike.  *Id*. at 52-53 (citations omitted).  "[T]he mere pretense of free prizes, designed to evade the law, [will] not negate the element of consideration."  *Id*. at 53 (alterations in original) (quoting *Jester*, 64 S.W.3d at 558).

In this case, while the sweepstakes may provide sufficient "'alternative' means" of entry and treat "customers" and "non-customers" alike, Texas has nonetheless established by clear and convincing evidence that the sweepstakes is not intended to promote a product.  And, even if there was a Tribal product connected to the sweepstakes, the evidence shows any such product is not the "primary subject of the transaction."

First, Texas has presented evidence at the October 6, 2014, Contempt Hearing showing that there is no Tribal product associated with the sweepstakes offered at the Entertainment Centers.  As witness testimony demonstrated, sweepstakes participants can "insert money into the gaming kiosks and win cash prizes."  March 6, 2015, Order 11 (citing Oct. 6, 2014, Tr. 82-83).  Specifically, the evidence shows that sweepstakes participants initiate an interaction with a Kiosk when they insert "either cash or pre-obtained free entry vouchers into the Kiosk's bill reader."  *Id*. at 21.  After a participant inserts cash into a Kiosk's reader, "a message appears on the Kiosk's screen stating that all 'donations' go toward helping fund the Tribe's services in health care, education, public safety, elder care, veterans' services, and after school and day care

46

programs." *Id*.  "If a participant does not agree to donate, the Kiosk prints a 'cash-out ticket' in the amount inserted into the Kiosk." *Id*.  However, the evidence established that if a participant does agree to donate, "the Kiosk displays a series of touch screen buttons that allow the participant to either 'max,' 'donate,' or 'play.'" *Id*.  Thus, the evidence shows that when a participant interacts with a Kiosk, no product is being promoted in connection with the sweepstakes; rather, participants can insert money for the chance to win a cash prize. *See id*. at 11.

Further, Texas's first witness, Lieutenant James Ferguson ("Lt. Ferguson") of the Texas Attorney General's office, testified regarding visits to Speaking Rock and Socorro. *See id*. at 9. During his visit, Lt. Ferguson never saw "a vendor selling a product in connection with the four vendors operating the sweepstakes." Oct. 6, 2014, Tr. 25.  In playing the sweepstakes, Lt. Ferguson also stated that he "was playing for chance" and that he "was not buying a product." *Id*. at 64.

One of the Pueblo Defendants' witnesses, Randee Ralph Kerns ("Mr. Kerns"), Director of Business Development and Compliance at Diamond Game Enterprises ("Diamond Game"), testified regarding the sweepstakes operated at the Entertainment Centers. *See* March 6, 2015, Order 16.  Mr. Kerns stated that the sweepstakes "are run to solicit donations" for the Tribe, and confirmed that the company was not selling a product.  Oct. 7, 2014, Tr. 44.  In fact, as the Court previously observed, the evidence established that "none of the Tribe's current sweepstakes sell or promote a third-party product of any sort in connection with the sweepstakes." *See* March 6, 2015, Order 16.

Moreover, as the Court previously stated, the Pueblo Defendants failed to articulate what product the sweepstakes promote.  *Id*. at 53.  Additionally, the Pueblo Defendants argued, and

the Court rejected, the notion that the donation itself constitutes the "product" the sweepstakes is promoting. *See id.* at 54-55 (citing Pueblo Defs.' Mot. for Summ. J. 11; Oct. 1, 2014, Tr. 44, 236). This is because "[t]he 'primary subject of the transaction' . . . cannot be the payment made to enter the sweepstakes, whether charitable or not." *Id.* at 55 (citing *Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 339-40). Furthermore, while the Pueblo Defendants "presented evidence regarding the services supported by the donations made to the Tribe," the Court did not understand the Pueblo Defendants to "contend that these services are a legitimate product promoted by the sweepstakes."[8] *See id.* at 55. Finally, the Court previously rejected the argument that "entertainment" constitutes the product promoted by the sweepstakes. *See id.* at 55 n.17. Thus, Texas's evidence indicates that there is no Tribal product the sweepstakes are intended to promote, which tends to establish the presence of consideration.

Next, even if there was a product, Texas also established by clear and convincing evidence that the product being promoted by the sweepstakes is not the "primary subject of the transaction" but instead, "is mere subterfuge to legitimize consideration paid to participate in the Tribe's sweepstakes." *See id.* at 52 (citing *Jester*, 64 S.W.3d at 558-59; *Davis*, 690 F.3d at 338-40; *Socony Mobil*, 389 S.W.2d at 173-74). The Court previously stated that the Tribe had a "clear intent to create a casino-like business model." March 6, 2015, Order 58. Texas's evidence established that Speaking Rock and Socorro have a casino-like environment, which the Fifth Circuit has indicated can represent "[f]urther evidence that [a] defendant['s] true purpose"

---

[8] The Pueblo Defendants have proposed "to modify [their] existing business model to focus on a mixed use, localized destination business concept," by using "sweepstakes promotions and other marketing to attract business to existing and planned retail, service and e-commerce shopping locations." Proposal 50. The Pueblo Defendants "intend[] to use sweepstakes to promote the sale of these goods and services." *Id.* As the Court has found it inappropriate to engage in further review of proposals, the Court addresses only the facts that were before the Court at the time it issued the March 6, 2015, Order and therefore does not pass upon the legality of the Pueblo Defendants' above-mentioned proposals.

is to promote the playing of a sweepstakes and not the sale of a product.  *See Davis*, 690 F.3d at

339.  For example, "[t]he undisputed evidence at the Hearing established that the Entertainment

Centers are lined with 'rows and rows' of sweepstakes Kiosks that look similar to slot

machines."  March 6, 2015, Order 58 (citing Oct. 6, 2014, Tr. 21-22, 84; May 6, 2014, Incident

Supplemental Page ("May 6, 2014, Report"), Pl.'s Ex. 1, at 9, 37, 45).  Specifically, Texas's

witness Tom Loper, a lieutenant with the Criminal Investigation Division of the Texas Attorney

General's Office ("Lt. Loper"), testified that he observed over one thousand gaming Kiosks at

Speaking Rock, and "close to 400" at Socorro.  Oct. 6, 2014, Tr. 85.  Additionally, Lt. Loper

testified that the Entertainment Centers promoted an "environment" similar "to legal casinos,

including low lighting, participants rubbing the gaming kiosks in superstitious ways, and the

distinctive sounds of bells, whistles, and coins falling into trays."  March 6, 2015, Order 11

(citing Oct. 6, 2014, Tr. 83-84, 102).

> Further, as the Court previously explained:
>
> It is additionally indisputable that the Kiosks are designed to look and function similar to slot machines.  The Kiosks are "upright cabinets with two video displays, a bill acceptor and a printer" . . . .  When a participant makes a donation, the Kiosk allows the participant to choose a game theme resembling roulette, black jack, poker, or other common casino games . . . .  The Kiosks further make distinctive sounds, mimicking bells, whistles, and coins falling into a tray whenever a participant pushes the Kiosks' buttons . . . .  Indeed, the Kiosks' simulated gaming displays are "designed to create the look and feel of casino-like games" . . . .  Accordingly, it is beyond dispute that the Entertainment Centers are designed to look and feel like casinos.

*Id*. at 58 (citing Oct. 6, 2014, Tr. 59-60, 84, 238; Oct. 7, 2014, Tr. 115, 133).

Moreover, even the Pueblo Defendants' evidence "appears to support the finding that the

patrons' main purpose is to have fun playing the Kiosks, and not to purchase or support any

tribal product."  *Id*. at 67.

Accordingly, the Court is satisfied that Texas established by clear and convincing evidence "that the casino-like business model indicates . . . the 'true purpose' of the Entertainment Centers is to 'create a place where people [are] comfortable staying . . . and playing the sweepstakes,' and not to promote a tribal product." *Id.* at 58-59 (alterations in original) (quoting *Davis*, 690 F.3d at 339). Because the clear and convincing evidence demonstrates that the sweepstakes does not promote a legitimate product, and the true purpose of the sweepstakes is to play the sweepstakes game itself and not to promote a product, the element of consideration is present. *See Davis*, 690 F.3d at 339.

During the Hearing, the Pueblo Defendants "presented substantial evidence that a free entry alternative" is available to sweepstakes participants. March 6, 2015, Order 61 (citing BMM Certification Test Report ("BMM Report"), Defs.' Ex. A., at 15, 33, 48, 59; Oct. 6, 2014, Tr. 43). Specifically, the Pueblo Defendants "submitted evidence indicating that the Tribe has received over a million and a half free entry applications since 2012." *Id.* at 61 (citing Defs.' Free Entry Appls., Defs.' Ex. H; No Donation Necessary Forms from Entertainment Centers from March 13 through 19, 2012, Defs.' Ex. D; No Donation Necessary Forms from Entertainment Centers from May 7 through 9, 2012, Defs.' Ex. E; No Donation Necessary Forms from Entertainment Centers from July 9, 2013, Defs.' Ex. F; No Donation Necessary Forms from Entertainment Centers from May 16, 2014, Defs.' Ex. G; Oct. 6, 2014, Tr. 146). Moreover, the Pueblo Defendants showed "that donation-based entrants receive no advantage over participants who enter for free." *Id.* at 62 (citing Oct. 7, 2014, Tr. 122, 127; BMM Report 15, 35, 50, 61). Nonetheless, evidence establishing an alternative means of free entry is insufficient to show an absence of consideration; "the mere pretense of free prizes, designed to evade the law, [will] not negate the element of consideration." *Jester*, 64 S.W.3d at 558 (citing *Brice*, 242 S.W.2d at

434).  It remains that the primary subject of the Tribal sweepstakes transaction is not to promote

a product but instead, to promote the sweepstakes game itself.  *See id*. at 558-89; *Davis*, 690 F.3d

at 338-40.

      Thus, the Pueblo Defendants are in contempt for operating a lottery in violation of the

Texas Penal Code Section 47.03(a)(5), as defined by Texas Penal Code Section 47.01(7).

      **C.**      **The Pueblo Defendants are in Contempt for Operating Gambling Devices**

      Next, Texas alleges that the Tribe's Kiosks are illegal "gambling devices" as defined

under the Texas Penal Code.  Mot. for Contempt 11-12; Oct. 7, 2014, Tr. 250.  The Pueblo

Defendants respond that the Kiosks are not prohibited gambling devices because the elements of

chance, prize, and consideration are absent.  *See* Oct. 6, 2014, Tr. 260; Oct. 7, 2014, Tr. 235;

Defs.' Mot. for Summ. J. 21.

      Under Texas law, it is illegal to possess "any gambling device," "subassembly," or

"essential part of a gambling device."  Tex. Penal Code Ann. § 47.06(a).  A "gambling device" is

"any electronic, electromechanical, or mechanical contrivance . . . that for a consideration affords

the player an opportunity to obtain anything of value, the award of which is determined solely or

partially by chance, even though accompanied by some skill, whether or not the prize is

automatically paid by the contrivance."  *Id*. § 47.01(4).

      The Court previously determined, however, that the elements of chance and prize were

present.  *See* March 6, 2015, Order 64-65.  For example, the Court outlined the evidence

establishing that while "the Kiosks contain no random number generator, . . . a random number

generator is employed by the Server at various points in the pool creation process."  *Id*. at 64

(citing Oct. 7, 2014, Tr. 20; BMM Report 13, 32, 48, 59).  Moreover, at least in connection with

some of the sweepstakes, "the Server employs a random number generator to choose and issue a

participant's result." *Id.* (citing BMM Report 48).  Thus, the clear and convincing evidence

establishes "that a random number generator is employed at least at the Server level."  *Id.*

"Although the Kiosk itself does not apply the random number generator," as Karl Maahs

("Mr. Maahs"), the General Manager at the Ysleta del Sur Pueblo, testified, all of the Kiosks are

connected to "at least one" Server, which does apply the random number generator.  *Id.* at 65

(citing Oct. 7, 2014, Tr. 124).  "Indeed, the Pueblo Defendants' own witness, Mr. Kerns, admits

that both the Kiosk and the Server are 'essential parts' of the same overall gaming device."  *Id.*

(citing Oct. 7, 2014, Tr. 42).  Thus, the clear and convincing evidence establishes that the

element of chance is present in the Kiosks.  *See id.*; Tex. Penal Code Ann. § 47.06(a).

Next, the evidence also establishes that the Kiosks encompass the element of prize.  "It is

indisputable that the sweepstakes system, as a whole, offers participants the possibility of

winning cash prizes."  March 6, 2015, Order 65 (citing Official Rules for the Blue Stone

Electronic Sweepstakes Rules, Defs.' Ex. N., at 4, 6; AMS Official Sweepstakes Rules, Defs.'

Ex. M, at 4-11; Oct. 6, 2014, Tr. 25; May 6, 2014, Report 15, 19, 21).  "It is further indisputable

that the Kiosks print the prize vouchers awarded to participants."  *Id.* (citing BMM Report 27,

57, 71, 91).  Finally, although the Server "creates, defines, and chooses the winning sweepstakes

entries that result in cash prizes, . . . the Server nonetheless ultimately sends these results to a

Kiosk to display the result in an entertaining fashion."  *Id.* at 66 (citing BMM Report 32-34, 48,

60, 74, 94, 114-16).  As the Court previously observed, "because the Kiosks are an 'essential

part' of the sweepstakes system, . . . the Kiosks would be no less prohibited if the sweepstakes

system as a whole contains the element of prize."  *Id.* (citing Oct. 7, 2014, Tr.; Tex. Penal Code

Ann. § 47.06(a)).

Moreover, consideration is present because, as discussed above with respect to lotteries, there is clear and convincing evidence that the sweepstakes lacks a legitimate product that is the primary subject of the transaction; instead, the uncontroverted evidence demonstrates that "the cash inserted into the Kiosk is consideration paid for the sweepstakes." *Id*.; *see id*. at 67 (noting that Pueblo Defendants' evidence "appears to support the finding that the patrons' main purpose is to have fun playing the Kiosks, and not to purchase or support any tribal product"). Because the Kiosks are an "essential part" of the sweepstakes, which is intended to promote the playing of the sweepstakes game rather than the sale of a product, *see Davis*, 690 F.3d at 339, the Kiosks, like the sweepstakes, possess the element of consideration. Therefore, because the Kiosks involve the elements of chance, prize, and consideration, they are "gambling devices" under Texas Penal Code Section 47.01(4). *See* Tex. Penal Code Ann. § 47.01(4). Accordingly, the Pueblo Defendants are also in contempt of the Injunction for possessing a "gambling device" in violation of Texas Penal Code Section 47.06(a).

## V.       CONCLUSION

For the foregoing reasons, the Pueblo Defendants' Motions to Vacate Injunction and Dismiss Case for Failure to Name Indispensable Parties and Lack of Subject Matter Jurisdiction, or in the Alternative, to Modify Injunction to Allow Class II Gaming and Stay Further Proceedings, ECF No. 531, are **DENIED**.

**IT IS FURTHER ORDERED** that the Pueblo Defendants **SHALL** no longer be required to submit proposals in order to obtain pre-approval from the Court to engage in gaming activities.

**IT IS FURTHER ORDERED** that the Pueblo Defendants **SHALL** no longer be required to allow designated representatives of the State of Texas access on a monthly basis to

any locations at which the Pueblo Defendants are conducting gaming activities, or to their records.

**IT IS FURTHER ORDERED** that, within sixty (60) days of entry of this Order, the Pueblo Defendants shall cease the gaming activities described above and in the March 6, 2015, Order as violating Texas Penal Code Sections 47.03(a)(5), 47.01(7), and 47.06(a), to the extent the Pueblo Defendants are still offering such activities.  Failure to cease these gaming activities shall result in a civil penalty of $100,000 per day, jointly and severally among each of the Pueblo Defendants, for each day the gaming operations continue in violation of this Order.

The Clerk shall close the case.

**SO ORDERED.**

SIGNED this 27th day of May, 2016.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE